# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD J. TORNETTA, Individually and on Behalf of All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant TESLA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ELON MUSK, ROBYN M. DENHOLM, ANTONIO J. GRACIAS, JAMES MURDOCH, LINDA JOHNSON RICE, BRAD W. BUSS, and IRA EHRENPREIS,<br><br>Defendants, and<br><br>TESLA, INC., a Delaware Corporation,<br><br>Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 2018-0408-KSJM |

## POST-TRIAL OPINION

Date Submitted: April 25, 2023
Date Decided: January 30, 2024

Gregory V. Varallo, Glenn R. McGillivray, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Margaret Sanborn-Lowing, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Peter B. Andrews, Craig J. Springer, David M. Sborz, Andrew J. Peach, Jackson E. Warren, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeremy S. Friedman, Spencer M. Oster, David F.E. Tejtel, FRIEDMAN OSTER & TEJTEL PLLC; Bedford Hills, New York; *Counsel for Plaintiff Richard J. Tornetta.*

David E. Ross, Garrett B. Moritz, Thomas C. Mandracchia, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Evan R. Chesler, Daniel Slifkin, Vanessa A. Lavely, CRAVATH, SWAINE & MOORE LLP, New York, New York; *Counsel for Defendants Elon Musk, Robyn M. Denholm, Antonio J. Gracias, James Murdoch, Linda Johnson Rice, Brad W. Buss, and Ira Ehrenpreis.*

Catherine A. Gaul, Randall J. Teti, ASHBY & GEDDES, P.A., Wilmington, Delaware; *Counsel for Nominal Defendant Tesla, Inc.*

**McCORMICK, C.**

Was the richest person in the world overpaid? The stockholder plaintiff in this derivative lawsuit says so. He claims that Tesla, Inc.'s directors breached their fiduciary duties by awarding Elon Musk a performance-based equity-compensation plan. The plan offers Musk the opportunity to secure 12 total tranches of options, each representing 1% of Tesla's total outstanding shares as of January 21, 2018. For a tranche to vest, Tesla's market capitalization must increase by $50 billion and Tesla must achieve either an adjusted EBITDA target or a revenue target in four consecutive fiscal quarters. With a $55.8 billion maximum value and $2.6 billion grant date fair value, the plan is the largest potential compensation opportunity ever observed in public markets by multiple orders of magnitude—250 times larger than the contemporaneous median peer compensation plan and over 33 times larger than the plan's closest comparison, which was Musk's prior compensation plan. This post-trial decision enters judgment for the plaintiff, finding that the compensation plan is subject to review under the entire fairness standard, the defendants bore the burden of proving that the compensation plan was fair, and they failed to meet their burden.

A board of director's decision on how much to pay a company's chief executive officer is the quintessential business determination subject to great judicial deference. But Delaware law recognizes unique risks inherent in a corporation's transactions with its controlling stockholder. Given those risks, under Delaware law, the presumptive standard of review for conflicted-controller transactions is entire fairness. To invoke the entire fairness standard, the plaintiff argues that Musk's

compensation plan was a conflicted-controller transaction.  The plaintiff thus forces

the question:  Does Musk control Tesla?

Delaware courts have been presented with this question thrice before, when

more adroit judges found ways to avoid definitively resolving it.[1]  This decision dares

to "boldly go where no man has gone before,"[2] or at least where no Delaware court

has tread.  The collection of features characterizing Musk's relationship with Tesla

and its directors gave him enormous influence over Tesla.  In addition to his 21.9%

equity stake, Musk was the paradigmatic "Superstar CEO,"[3] who held some of the

most influential corporate positions (CEO, Chair, and founder), enjoyed thick ties

with the directors tasked with negotiating on behalf of Tesla, and dominated the

process that led to board approval of his compensation plan.  At least as to this

transaction, Musk controlled Tesla.

The primary consequence of this finding is that the defendants bore the burden

of proving at trial that the compensation plan was entirely fair.  Delaware law allows

defendants to shift the burden of proof under the entire fairness standard where the

transaction was approved by a fully informed vote of the majority of the minority

stockholders.  And here, Tesla conditioned the compensation plan on a majority-of-

---

[1] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293 (Del. Ch. Mar. 28, 2018) [hereinafter "*SolarCity I*"]; *In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185 (Del. Ch. Apr. 27, 2022) [hereinafter "*SolarCity II*"], *aff'd*, 298 A.3d 667 (Del. 2023) [hereinafter "*SolarCity III*"].

[2] *Star Trek: The Original Series* (Paramount Pictures 1968).

[3] Assaf Hamdani & Kobi Kastiel, *Superstar CEOs and Corporate Law*, 100 Wash. U. L. Rev. 1353 (2023) [hereinafter "*Superstar CEOs*"].

the-minority vote. But the defendants were unable to prove that the stockholder vote was fully informed because the proxy statement inaccurately described key directors as independent and misleadingly omitted details about the process.

The defendants were thus left with the unenviable task of proving the fairness of the largest potential compensation plan in the history of public markets. If any set of attorneys could have achieved victory in these unlikely circumstances, it was the talented defense attorneys here. But the task proved too tall an order.

The concept of fairness calls for a holistic analysis that takes into consideration two basic issues: process and price. The process leading to the approval of Musk's compensation plan was deeply flawed. Musk had extensive ties with the persons tasked with negotiating on Tesla's behalf. He had a 15-year relationship with the compensation committee chair, Ira Ehrenpreis. The other compensation committee member placed on the working group, Antonio Gracias, had business relationships with Musk dating back over 20 years, as well as the sort of personal relationship that had him vacationing with Musk's family on a regular basis. The working group included management members who were beholden to Musk, such as General Counsel Todd Maron who was Musk's former divorce attorney and whose admiration for Musk moved him to tears during his deposition. In fact, Maron was a primary go-between Musk and the committee, and it is unclear on whose side Maron viewed himself. Yet many of the documents cited by the defendants as proof of a fair process were drafted by Maron.

Given the collection of people tasked with negotiating on Tesla's behalf, it is unsurprising that there was no meaningful negotiation over any of the terms of the plan. Ehrenpreis testified that he did not view the negotiation as an adversarial process. He said: "We were not on different sides of things." Maron explained that he viewed the process as "cooperative" with Musk. Gracias admitted that there was no "positional negotiation." This testimony came as close to admitting a controlled mindset as it gets. And consistent with this specific-to-Musk approach, the committee avoided using objective benchmarking data that would have revealed the unprecedented nature of the compensation plan.

In credit to these witnesses, their testimony was truthful. They did not take a position "on the other side" of Musk. It was a cooperative venture. There were no positional negotiations. Musk proposed a grant size and structure, and that proposal supplied the terms considered by the compensation committee and the board until Musk unilaterally lowered his ask six months later. Musk did not seem to care much about the other details. They got ironed out.

In this litigation, the defendants touted as concessions certain features of the compensation plan—a five-year holding period, an M&A adjustment, and a 12-tranche structure that required Tesla to increase market capitalization by $100 billion more than Musk had initially proposed to maximize compensation under the plan. But the holding period was adopted in part to increase the discount on the publicly disclosed grant price, the M&A adjustment was industry standard, and the 12-tranche structure was reached in an effort to translate Musk's fully-diluted-share

4

proposal to the board's preferred total-outstanding-shares metric. It is not accurate to refer to these terms as concessions.

The defendants also point to the duration of the process (nine months) and the number of board and committee meetings (ten) as evidence that the process was thorough and extensive. The defendants' statistics, however, elide the lack of substantive work. Time spent only matters when well spent. Plus, most of the work on the compensation plan occurred during small segments of those nine months and under significant time pressure imposed by Musk. Musk dictated the timing of the process, making last-minute changes to the timeline or altering substantive terms immediately prior to six out of the ten board or compensation committee meetings during which the plan was discussed.

And that is just the process. The price was no better. In defense of the historically unprecedented compensation plan, the defendants urged the court to compare what Tesla "gave" against what Tesla "got." This structure set up the defendants' argument that the compensation plan was "all upside" for the stockholders. The defendants asserted that the board's primary objective with the compensation plan was to position Tesla to achieve transformative growth, and that Tesla accomplished this by securing Musk's continued leadership. The defendants offered Musk an opportunity to increase his Tesla ownership by about 6% (from about 21.9% to at most 28.3%) if, and only if, he increased Tesla's market capitalization from approximately $50 billion to $650 billion, while also hitting the operational milestones tied to Tesla's top-line (revenue) or bottom-line (adjusted EBITDA)

5

growth. According to the defendants, the deal was "6% for $600 billion of growth in stockholder value."

At a high level, the "6% for $600 billion" argument has a lot of appeal. But that appeal quickly fades when one remembers that Musk owned 21.9% of Tesla when the board approved his compensation plan. This ownership stake gave him every incentive to push Tesla to levels of transformative growth—Musk stood to gain over $10 billion for every $50 billion in market capitalization increase. Musk had no intention of leaving Tesla, and he made that clear at the outset of the process and throughout this litigation. Moreover, the compensation plan was not conditioned on Musk devoting any set amount of time to Tesla because the board never proposed such a term. Swept up by the rhetoric of "all upside," or perhaps starry eyed by Musk's superstar appeal, the board never asked the $55.8 billion question: Was the plan even necessary for Tesla to retain Musk and achieve its goals?

This question looms large in the price analysis, making each of the defendants' efforts to prove fair price seem trivial. The defendants proved that Musk was uniquely motivated by ambitious goals and that Tesla desperately needed Musk to succeed in its next stage of development, but these facts do not justify the largest compensation plan in the history of public markets. The defendants argued the milestones that Musk had to meet to receive equity under the package were ambitious and difficult to achieve, but they failed to prove this point. The defendants maintained that the plan is an exceptional deal when compared to private equity compensation plans, but they did not explain why anyone would compare a public

6

company's compensation plan with a private-equity compensation plan. The defendants insisted that the plan worked in that it delivered to stockholders all that was promised, but they made no effort to prove causation. They also made no effort to explain the rationale behind giving Musk 1% per tranche, as opposed to some lesser portion of the increased value. None of these arguments add up to a fair price.

In the final analysis, Musk launched a self-driving process, recalibrating the speed and direction along the way as he saw fit. The process arrived at an unfair price. And through this litigation, the plaintiff requests a recall.

The plaintiff asks the court to rescind Musk's compensation plan. The plaintiff's lead argument is that the court must rescind the compensation plan due to disclosure deficiencies because the plan was conditioned on stockholder approval. This argument, although elegant in its simplicity, is overly rigid and wrong. The plaintiff offers no legal authority for why rescission must automatically follow from an uninformed vote. Generally, a court of equity enjoys broad discretion in fashioning remedies for fiduciary breach, and that general principle applies here.

Although rescission does not automatically result from the disclosure deficiencies, it is nevertheless an available remedy. The Delaware Supreme Court has referred to recission as the "preferrable" (but not the exclusive)[4] remedy for breaches of fiduciary duty when rescission can restore the parties to the position they

---

[4] *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981) (describing rescission as the "preferrable" remedy), *overruled in part by Weinberger v. UOP, Inc.*, 457 A.2d 701, 703–04 (Del. 1983) ("We therefore overrule [*Vickers*] to the extent that it purports to limit a stockholder's monetary relief to a specific damage formula.").

7

occupied before the challenged transaction. Rescission can achieve that result in this case, where no third-party interests are implicated, and the entire compensation plan sits unexercised and undisturbed. In these circumstances, the preferred remedy is the best one. The plaintiff is entitled to rescission.

## I. FACTUAL BACKGROUND

Trial took place over five days. The record comprises 1,704 trial exhibits, live testimony from nine fact and four expert witnesses, video testimony from three fact witnesses, deposition testimony from 23 fact and five expert witnesses, and 255 stipulations of fact. These are the facts as the court finds them after trial.[5]

### A. Tesla And Its Visionary Leader

Tesla is a vertically integrated clean-energy company.[6] Tesla and its employees "design, develop, manufacture, sell and lease high-performance fully electric vehicles and energy generation and storage systems."[7] As of December 31,

---

[5] This decision cites to: C.A. No. 2018-0408-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); trial demonstratives (by "PDX" and "DDX" number); the trial transcript, Dkts. 245–49 ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 243 ("PTO"). The witnesses in order of appearance were: Ira Ehrenpreis, Todd Maron, Robyn M. Denholm (remotely), Deepak Ahuja, Phoung Phillips (through deposition clips), Elon Musk, Antonio J. Gracias, James Murdoch, Andrew Restaino, Brian Dunn, Jon Burg (through deposition clips), Kimbal Musk (through deposition clips), Jonathan Chang (through deposition clips), Paul Gompers, Kevin Murphy, Brad W. Buss, and Thomas Brown. The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr."

[6] PTO ¶ 26.

[7] JX-1440 at 5; PTO ¶ 29.

2021, Tesla and its subsidiaries had nearly 100,000 full-time employees worldwide,[8] and its market capitalization was over $1 trillion.[9]

Tesla's success came relatively recently and, by all accounts, was made possible by Musk. In 2004, Musk led Tesla's Series A financing round, investing $6.5 million.[10] He would invest considerably more before the company went public, take on the role of chairman of Tesla's Board of Directors (the "Board") (from April 2004 to November 2018), and, ultimately, become Tesla's CEO (since October 2008).[11] Musk possesses the ability to "dr[aw] others into his vision of the possible" and "inspir[e] . . . his workers to achieve the improbable."[12] And although Musk was not at the helm of Tesla at its inception, he became the driving visionary responsible for Tesla's growth. He earned the title "founder."[13]

### 1. The Master Plan

At the time of Musk's initial investment, Tesla was a small-scale startup producing small quantities of a single vehicle: the Tesla "Roadster," a high-end,

---

[8] JX-1440 at 14.

[9] JX-1510 at 5. As of the start of trial in November 2022, it was $618 billion. JX-1510 at 1. After trial, Tesla's market capitalization dropped to approximately $380 billion. *See* Dkt. 263 ("Defs.' Post-Trial Opening Br.") at 9–10.

[10] JX-1386 ("Murphy Opening Expert Rep.") at 11 (giving background on Tesla's early years).

[11] *Id.* at 11–12; PTO ¶¶ 44–45.

[12] Richard Waters, *Elon Musk, billionaire tech idealist and space entrepreneur*, Fin. Times (Sept. 30, 2016), https://www.ft.com/content/8ca82034-86d0-11e6-bcfc-debbef66f80e.

[13] *See, e.g.*, Trial Tr. at 729:19–730:3 (Gracias) (describing Musk as a "founder CEO" and the "strategic visionary" of Tesla).

battery-powered sports car.[14]  By 2006, however, Tesla had broadened its goals.  That year, then-chairman Musk published on Tesla's blog "The Secret Tesla Motors Master Plan"[15] (a.k.a., the "Master Plan"), which provided a roadmap for Tesla's future. Distilled, Musk's vision was to start by building the Roadster sports car, to use "that money to build an affordable car," to use "that money to build an even more affordable car," and to "provide zero emission electric power generation options" while accomplishing these production milestones.[16]  The plan advanced what Musk described as Tesla's "overarching purpose"—to move toward a sustainable energy economy, or, as he wrote at the time, to "expedite the move from a mine-and-burn hydrocarbon economy towards a solar electric economy."[17]

The Master Plan was bold.  Although it might seem difficult to believe now, back then, the market for electric vehicles was unproven.  Electric-vehicle technology was "described as impossible."[18]  Even traditional automotive startups faced an "incredibly challenging" environment in which many failed.[19]  In fact, no new domestic car company since Chrysler in the 1920s had achieved financial success.[20]

---

[14] Murphy Opening Expert Rep. at 11–12.

[15] JX-48.  Musk wrote this document.  PTO ¶ 47.

[16] JX-48 at 4 (emphasis omitted).

[17] *Id.* at 1.

[18] Trial Tr. at 15:21–16:18 (Ehrenpreis).

[19] *Id.*

[20] *Id.*

Given the risks, Musk himself viewed the probability of Tesla completing the Master Plan as "extremely unlikely."[21]

To even Musk's surprise, the Master Plan came to fruition. In abbreviated form, the events played out like this: In 2006, Tesla announced that it would begin to sell the Signature 100 Roadster for approximately $100,000.[22] By August 2007, Tesla had pre-sold 570 Roadsters,[23] which became available in 2008,[24] the same year that Musk became Tesla's CEO.[25] Tesla went public in January 2010, raising $226.1 million.[26] In June 2012, Tesla launched the Model S, delivering 2,650 vehicles by year's end.[27] Model S sales increased to approximately 22,000 in 2013, 32,000 in 2014, and 50,000 in 2015.[28] Over this period, Tesla developed stationary energy storage products for commercial and residential use, which it began selling in 2013.[29] In 2014, Tesla announced its intent to build its first battery "Gigafactory" and work

---

[21] *Id.* at 567:20–23 (Musk).

[22] *See* Murphy Opening Expert Rep. at 12 (citing *Google, Paypal founders fund battery-electric sports car*, The Globe and Mail (July 21, 2006), https://www.theglobeandmail.com/report-on-business/google-paypal-founders-fund-battery-electric-sports-car/article18168182/).

[23] *Id.* (citing *Tesla all-electric Roadster to hit road by year end*, Reuters News (August 7, 2007)).

[24] PTO ¶ 31; Murphy Opening Expert Rep. at 12.

[25] PTO ¶ 45.

[26] Murphy Opening Expert Rep. at 13.

[27] *Id.* at 14.

[28] *Id.*

[29] JX-178 at 8 (2/26/14 Form 10-K).

with suppliers to integrate battery precursor material.[30] The factory went live in 2015.[31] In September 2015, Tesla launched the Model X, a midsize SUV crossover.[32]

## 2. The Master Plan, Part Deux

By 2016, Tesla had reached the final phase of the Master Plan,[33] and Musk began contemplating the next chapter of Tesla's development. In July 2016, he published a new strategic document: "Master Plan, Part Deux" (a.k.a., "Part Deux").[34]

That year, Tesla unveiled a long-range, compact sedan called the "Model 3."[35] Tesla projected that it would begin mass production of the Model 3 in 2017. That endeavor proved the crucible for Tesla. As the company disclosed on March 1, 2017: "Future business depends in large part on our ability to execute on our plans to develop, manufacture, market and sell the Model 3 vehicle . . . ."[36] Tesla announced another ambitious deadline, stating that its goal was "to achieve volume production and deliveries of this vehicle in the second half of 2017."[37]

---

[30] *Id.* at 13–14.

[31] JX-248 at 5 (2/24/16 Form 10-K).

[32] PTO ¶ 35; *see also* JX-248 at 4.

[33] *See* JX-335 at 4–5 (3/1/17 Form 10-K).

[34] JX-274.

[35] JX-335 at 4.

[36] *Id.* at 17.

[37] *Id.*

No one thought Tesla could mass produce the Model 3.[38] Musk stated in Part Deux that, "[a]s of 2016, the number of American car companies that haven't gone bankrupt is a grand total of two: Ford and Tesla."[39] Tesla had come close to bankruptcy in its early years.[40] And as of March 2017, approximately 20% of Tesla's total outstanding shares were sold short, making it the most shorted company in U.S. capital markets at that time.[41] Everyone was betting against Tesla and the man at its helm.

### 3. Musk's Backstory And Motivations

Musk is no stranger to a challenge, having led the life of a serial entrepreneur.[42] He and his brother, Kimbal Musk,[43] launched Musk's first start-up in 1995.[44] Musk later co-founded an electronic payment system called X.com, which would be acquired and renamed PayPal.[45] He also founded: in 2002, a rocket development and launch company, Space Exploration Technologies Corporation

---

[38] Trial Tr. at 450:17–21 (Ahuja); *see, e.g.*, JX-329 at 1 (2/23/17 Morgan Stanley report dated February 23, 2017, expecting "no more than a small/modest amount of customer deliveries" in 2018).

[39] JX-274 at 1.

[40] Trial Tr. at 17:2–6 (Ehrenpreis).

[41] *See* JX-995.

[42] *See* Murphy Opening Expert Rep. at 10–11, 112; *see also* Trial Tr. at 495:23–496:11 (Ahuja) ("Elon is a unique individual who is extremely motivated by super-difficult challenges. . . . [V]ery few people in this world can accept . . . the risk level[] that Elon can.").

[43] This decision refers to Kimbal Musk as "Kimbal" solely to distinguish him from his brother. No disrespect is intended.

[44] PTO ¶ 49.

[45] *Id.* ¶¶ 50–52.

13

("SpaceX");[46] in 2015, an artificial intelligence research organization, OpenAI Inc.;[47] in 2016, a neurotechnology company, Neuralink Corp.;[48] and, in 2017, a private tunnel-boring company, The Boring Company.[49]

In 2017 through 2018, in addition to his positions at Tesla, Musk was the CEO, CTO, and board chairman of SpaceX and the board co-chair of OpenAI.[50] Musk divided most of his time between SpaceX and Tesla as of June 2017,[51] but he increased the amount of time he spent at Tesla by the end of 2017.[52]

Musk is motivated by ambitious goals, the loftiest of which is to save humanity. Musk fears that artificial intelligence could either reduce humanity to "the equivalent of a house cat"[53] or wipe out the human race entirely.[54] Musk views space

---

[46] *Id.* ¶¶ 53–55, 62.

[47] *Id.* ¶ 61; Trial Tr. at 21:2–5 (Ehrenpreis).

[48] PTO ¶ 59; JX-350; Trial Tr. at 21:6–7 (Ehrenpreis).

[49] PTO ¶ 57; Trial Tr. at 21:8–10 (Ehrenpreis).

[50] PTO ¶ 62.

[51] Trial Tr. at 568:16–569:9, 661:7–15 (Musk); JX-408 at 13. In 2017, Musk typically spent Monday and Thursday at SpaceX, and Tuesday, Wednesday, and Friday at Tesla, with additional work for Tesla interspersed throughout the week. Trial Tr. at 661:7–15 (Musk); JX-1256 at 34 ("Mr. Musk estimates he split the bulk (at least 90%) of his work hours, approximately 80 to 90 hours per week, between Tesla and SpaceX, with an allocation of 60% to Tesla and 40% to SpaceX. He allocated his remaining work hours (8–9 hours per week) between Neuralink, The Boring Company and Open AI.").

[52] Trial Tr. at 569:10–18 (Musk) (testifying that "later in 2017, when things got very difficult for Tesla, [his] time was almost 100 percent Tesla").

[53] Musk Dep. Tr. at 110:5–111:3.

[54] *Id.* at 108:20–110:4.

colonization as a means to save humanity from this existential threat.[55] Musk seeks

to make life "multiplanetary" by colonizing Mars.[56] Reasonable minds can debate the

virtues and consequences of longtermist beliefs like those held by Musk, but they are

not on trial.[57] What is relevant here is that Musk genuinely holds those beliefs.

Colonizing Mars is an expensive endeavor.[58] Musk believes he has a moral

obligation to direct his wealth toward that goal,[59] and Musk views his compensation

from Tesla as a means of bankrolling that mission.[60] Musk sees working at Tesla as

---

[55] *See id.* at 117:10–16 (stating the mission of SpaceX is "[t]o extend the light of consciousness beyond Earth in a sustained, permanent manner" by "becoming multiplanetary"); Trial Tr. at 647:10–20 (Musk) (confirming SpaceX's mission).

[56] Trial Tr. at 647:10–20 (Musk).

[57] *Compare* William MacAskill, *What We Owe The Future* (2022), *with The Good It Promises, the Harm It Does: Critical Essays on Effective Altruism* (Carol J. Adams, Alice Crary, and Lori Gruen eds., 2023).

[58] The court takes judicial notice of this fact.

[59] Musk does not dally in the conventional amenities of ordinary billionaires. For example, he owns only one home. Musk Dep. Tr. at 118:14–21 ("I tried to put it on Airbnb, but they banned Airbnb in Hillsborough. They're so uptight.").

[60] Trial Tr. at 77:9–15 (Ehrenpreis) ("Q. Fair for me to understand that your takeaway from speaking with Mr. Musk about this compensation plan was that he never wavered on his love for Tesla, that he was trying to determine whether he could achieve his big aspirations to colonize Mars through Tesla; right? A. Correct."); *id.* at 367:9–18 (Denholm) ("Q. And I think you testified, and I just want to make sure it's clear, that one of the things that Mr. Musk told you was that he had a quest to put a mission on Mars and where he spent his time and energy needed to help him generate capital to fulfill that quest to put a mission on Mars; right? A. Yes. I mean, something like that is what I said before. I was talking about -- I mentioned interplanetary travel, but in the conversation he did mention Mars."); *id.* at 420:8–12 (Maron) (affirming that "Elon wanted this new stock grant to make humans an interplanetary species and to colonize Mars"); *id.* at 666:22–667:10 (Musk) ("Q. What you did was you told Robyn and Ira that the benefit you saw in working hard at Tesla to achieve the plan was that you would have money to go to Mars. Fair to say? A. Well, not me. To get humanity to Mars. Q. That there would be funds available to

worthy of his time only if that work generates "additional economic resources . . . that could . . . be applied to making life multi-planetary."[61]

## B.  Musk's Prior Compensation Plans

Prior to the challenged transaction, Musk received two compensation plans from Tesla—one in 2009 and one in 2012.  Both were equity linked.  The first included a performance-based component.  The second was entirely performance based.

### 1.  The 2009 Grant

On December 4, 2009, the Board approved Musk's first compensation plan (the "2009 Grant").[62]  The 2009 Grant comprised two parts, each of which offered Musk stock options to purchase 4% of Tesla's fully diluted shares as measured at the grant date.[63]

The first part of the 2009 Grant vested automatically in tranches, with 1/4th vesting immediately and 1/48th vesting each month over the following three years, assuming that Musk continued to work at Tesla.[64]

The second part of the 2009 Grant was performance based, offering Musk an additional 4% of Tesla's fully diluted shares prior to the grant date for achieving each of the following: "successful completion of the Model S Engineering Prototype";

---

pursue your long-term goal of making life interplanetary?  A.  Yes.  Q. Saving the world?  A. Well, saving civili -- consciousness, yes.").

[61] *Id.* at 665:2–667:10 (Musk); *see also* Musk Dep. Tr. at 115:24–117:16, 163:14–165:5 (discussing space colonization plans and tradeoffs of spending time on Tesla).

[62] JX-68 at 2–3 (1/29/10 Form S-1 (Excerpt)).

[63] *Id.*

[64] *Id.* (stating "1/48th of the shares [are] scheduled to vest each month over the subsequent three years").

16

"successful completion of the Model S Vehicle Prototype"; "completion of the first Model S Production Vehicle"; and "completion of the 10,000th Model S Production Vehicle."[65] The 2009 Grant required that Musk meet these milestones within four years; otherwise, he forfeited his right to the unvested portions.[66]

Tesla began delivering its next electric car model, the Model S, in June 2012 and Musk achieved all the 2009 Grant's performance milestones by December 31, 2013.[67]

### 2. The 2012 Grant

Before the 2009 Grant milestones had been achieved, on August 1, 2012, the Board approved a second compensation plan for Musk (the "2012 Grant").[68] The 2012 Grant involved ten tranches, each offering options representing 0.5% of Tesla's outstanding common stock as of August 2012.[69]

For a tranche to vest, Tesla would have to achieve both a market capitalization milestone and an operational milestone.[70] Each tranche required Musk to increase Tesla's market capitalization by $4 billion—an increment greater than Tesla's $3.2 billion market capitalization 18 trading days before the Board approved the 2012 Grant.[71] The operational milestones required Tesla to accomplish specified product-

[65] *Id.* at 3.

[66] *Id.*

[67] PTO ¶¶ 32, 191; JX-178 at 114.

[68] PTO ¶ 192; JX-135 at 77 (8/2/12 Form 10-Q for Q2).

[69] JX-135 at 77.

[70] *Id.*

[71] *Id.*; JX-154 at 26 (4/17/13 Tesla Schedule 14A Proxy).

17

related goals, such as developing and launching the Model X and the Model 3, and reaching aggregate production of 300,000 vehicles.[72] The milestones worked in tandem. For example, one tranche would vest if Tesla achieved one of the operational milestones and a market capitalization increase of $4 billion, while two tranches would vest if Tesla achieved two of its operational milestones and a market capitalization increase of $8 billion.[73] The 2012 Grant had a ten-year term.[74]

By the end of 2016, Tesla had achieved seven of the market capitalization milestones and five of the operational milestones of the 2012 Grant, with another four operational milestones "considered probable of achievement."[75] By March 2017, seven of the 2012 Grant's ten tranches had vested.[76]

From the Board's perspective, the 2012 Grant was successful. In only five years, Tesla's market capitalization grew by over 15x from $3.2 billion to $53 billion.[77] Tesla saw significant operational growth as well, designing and launching the Model S, Model X, and Model 3, and increasing its total annual vehicle production from

---

[72] JX-135 at 77; JX-154 at 26.

[73] JX-135 at 77; JX-154 at 26.

[74] JX-137 at 1 (stating the 2012 Grant expired on August 13, 2022); JX-68 at 3.

[75] JX-335 at 45.

[76] PTO ¶ 206.

[77] Tesla's market capitalization was approximately $59 billion as of the proxy statement's publication (February 2018) and $53 billion as of the stockholder approval (March 2018). JX-154 at 26; JX-878 at 24 (2/8/18 Schedule 14A Proxy Statement); JX-1510 at 26.

approximately 3,000 total vehicles in 2012[78] to more than 250,000 vehicles in 2017.[79]

Musk worked hard toward these goals. And he was paid extremely well. In the end, the value of Musk's holdings increased from approximately $981 million to $13 billion, meaning that Musk ultimately received approximately 52x the 2012 Grant's grant date fair value.[80]

### C.    The Compensation Process Takes Off.

In 2017, Tesla was already nearing completion of the 2012 Grant milestones, even though the 2012 Grant had a ten-year term. This prompted a discussion that led to the compensation plan at issue in this litigation (the "2018 Grant" or the "Grant"). By this time, Musk had accumulated beneficial ownership of 21.9% of the outstanding shares of Tesla common stock through his early investments and the two prior grants.[81]

---

[78] JX-147 at 4 (3/7/13 Form 10-K).

[79] JX-1105 at 45 (2/19/19 Form 10-K).

[80] JX-1384 ("Dunn Opening Expert Rep.") at 103. This is the measure of the compensation expense for all stock-based compensation awards under the Financial Accounting Standards Board (FASB) Accounting Standards Codification Topic (ASC) 718. Murphy Opening Expert Rep. at 94–96 "ASC 718 allows companies to use a variety of methodologies to measure the company's cost of granting employee stock options, including Black-Scholes, binomial and lattice models, and Monte Carlo simulations. . . [T]he value of options can be estimated by computing the expected value of the option upon exercise assuming that the expected return on the stock is equal to the risk-free rate, and then discounting the expected value to the grant using the risk-free grant." *Id.*

[81] PTO ¶ 64.

1.      **Meet The Decision Makers.**

At all relevant times, Tesla had a nine-person Board comprising Musk, Kimbal, Brad W. Buss, Robyn M. Denholm, Ira Ehrenpreis, Antonio J. Gracias, Steve Jurvetson, James Murdoch, and Linda Johnson Rice.[82]  The Board had a standing compensation committee (the "Compensation Committee"), which was responsible for negotiating Musk's compensation plan.[83]  Ehrenpreis, Buss, Denholm, and Gracias served on the Compensation Committee, with Ehrenpreis as chair.[84]  Musk and Kimbal recused themselves from most of the meetings and all of the votes on the 2018 Grant, and Jurvetson had prolonged leaves of absence during the relevant period.[85] The fiduciaries responsible for Tesla in connection with the 2018 Grant, therefore, were the Compensation Committee members plus Murdoch and Johnson Rice.

a.      **The Compensation Committee Members**

i.      **Ehrenpreis**

Ehrenpreis is a founder and managing partner of DBL Partners, an impact-investing venture-capital firm that focuses on driving environmental change through

---

[82] *Id.* ¶¶ 44, 73, 82, 87, 98, 122, 127, 132, 143.

[83] *Id.* ¶¶ 155, 214, 218, 220, 222, 224, 226, 228, 229.

[84] *Id.* ¶¶ 74, 84, 88, 106.

[85] *Id.* ¶¶ 133, 232; JX-631 at 1; JX-791 at 1; Trial Tr. at 48:5–10 (Ehrenpreis); *id.* at 837:1–5 (Murdoch); *id.* at 1438:3–8, 1463:19–22 (Brown).

investments.[86]  Ehrenpreis and DBL have invested tens of millions of dollars in Musk-controlled companies.[87]

Ehrenpreis had been a member of the Board since 2007 and chair of both the Compensation Committee and the Nominating and Corporate Governance Committee since 2009.[88]  Between 2011 and 2015, Ehrenpreis was granted 865,790 Tesla options.[89]  He exercised less than a quarter of those options in 2021, netting over $200 million.[90]  Being a Tesla director had "been a real benefit in fundraising" for Ehrenpreis's funds.[91]

Ehrenpreis and the Musk brothers have known each other for over 15 years.[92] As Ehrenpreis acknowledged, his personal and professional relationship with the Musk brothers has had a "significant influence on his professional career[.]"[93]

To argue that Ehrenpreis's relationship with Musk was weighty in other ways, the plaintiff points to a July 2017 tweet in which Ehrenpreis professed his love for

---

[86] PTO ¶ 91; Trial Tr. at 11:8–15 (Ehrenpreis).

[87] PTO ¶¶ 92–95.  These investments included roughly $40 million in SpaceX, $10 million in The Boring Company, and approximately $1 million in Neuralink.  *Id*; Ehrenpreis Dep. Tr. at 392:24–393:16.

[88] PTO ¶¶ 87–89.

[89] JX-1701 at 1; Trial Tr. at 202:23–204:1 (Ehrenpreis).  He sold only enough of these shares to cover the exercise price and taxes.  Trial Tr. at 207:8–17 (Ehrenpreis).

[90] JX-1701 at 1; Trial Tr. at 204:2–207:19 (Ehrenpreis).

[91] Trial Tr. at 192:15–18 (Ehrenpreis).

[92] Kimbal Dep. Tr. at 59:17–66:4.

[93] Trial Tr. at 192:6–10 (Ehrenpreis).

Musk.[94]  But the exchange does not reveal the deep relationship that the plaintiff described.  It was an irrelevant joke.[95]

Ehrenpreis is a close friend to Kimbal.  They had known each other since at least 1999, and Ehrenpreis attended Kimbal's wedding in Spain.[96]  Ehrenpreis also invested in Kimbal's company, The Kitchen Group—a family of restaurants based in Colorado and Chicago.[97]

### ii.    Buss

Buss joined the Board and the Compensation Committee in 2009.[98]  He worked as an accountant and in the semiconductor field until his retirement in 2014, and

---

[94] JX-518 at 1.

[95] To dive into the minutia of the tweet, Ehrenpreis had the right to purchase the first Model 3, but he gifted that right to Musk, tweeting, "[Musk] you deserve it!!! Much love and respect for everything you do for [Tesla]."  JX-518 at 1 (7/8/17 Musk tweet, https://www.twitter.com/elonmusk/status/883848060119527424);  JX-1586 at 1 (7/8/17 Ira Ehrenpreis tweet).  Also in that tweet thread, Ehrenpreis jokingly proposed a "romantic dinner" with Musk on the tenth anniversary of the start of Tesla Roadster production.  JX-967 at 1 (3/17/18 Ehrenpreis tweet).  Ehrenpreis testified at trial that he was not "being literal" and that he "did not have a romantic dinner with [Musk] or anybody."  Trial Tr. at 199:7–13 (Ehrenpreis).  He remarked that "clearly humor doesn't translate" and that he and Musk had a "collaborative working relationship" instead.  Id. at 66:11–17, 199:7–13 (Ehrenpreis).  In the end, the tweet was just a bad joke; it does not inform the control analysis.  See generally Kimbal Dep Tr. at 59:9–66:4; Trial Tr. at 193:19–21 (Ehrenpreis).

[96] Kimbal Dep. Tr. at 59:9–10; Trial Tr. at 193:19–21 (Ehrenpreis).

[97] Trial Tr. at 193:13–15 (Ehrenpreis); Kimbal Dep. Tr at 48:11–18.

[98] PTO ¶¶ 73–75.  Buss also served on the Nominating and Corporate Governance Committee and the Audit Committee.  Id.

then served as CFO of SolarCity Corp.[99] until February 2016.[100]  Buss had no personal relationship with Musk or other members of the Board and has never invested in any of Musk's other businesses.[101]

From 2014 through 2016, Buss's held assets valued at between $30 and $60 million, not including his Tesla and SolarCity holdings.[102]  He earned about $2 million in total compensation from his work with SolarCity.[103]  Between 2011 and 2018, Buss reported that compensation as a Tesla director was approximately $17 million.[104]  He realized about $24 million for sales of Tesla shares that he received as compensation prior to January 21, 2018.[105]

---

[99] SolarCity is a solar technology company that Tesla acquired in November 2016. PTO ¶ 56.  Musk served as SolarCity's board chair from July 2006 until November 2016.  *Id.*

[100] Trial Tr. at 1375:7–22, 1377:7–10, 1377:17–1378:15 (Buss); PTO ¶¶ 77–78.

[101] Trial Tr. at 1381:6–17 (Buss).

[102] *Compare* JX-1167 ¶ 26 (9/24/19 Declaration of Brad W. Buss in Connection with the Director Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, filed in *In re Tesla Motors, Inc. S'holder Litig.*, Consol. C.A. No. 12711-VCS) ("during 2014-2016, I had net assets, exclusive of all Tesla and SolarCity holdings, conservatively estimated at in excess of $30 million"), *with*, Trial Tr. at 1426:15–1427:13 (Buss) ("my number was bigger than [$30 million]. . . . It wasn't double or triple that, but it was substantially higher and has done very well by itself.").

[103] Trial Tr. at 1384:6–9 (Buss).  Buss stepped down from his committee assignments while working for SolarCity but returned to these positions in mid-2017, in time to participate in the development of the 2018 Grant.  PTO ¶¶ 74–76; Trial Tr. at 1386:12–18 (Buss).  Although the exact date on which Buss rejoined the Compensation Committee is unclear, he attended the first meeting at which the 2018 Grant was discussed.  JX-439 (6/23/17 Compensation Committee meeting minutes listing Buss as "present").

[104] Trial Tr. at 1409:13–21 (Buss).

[105] JX-1587 (Brad Buss Form 4s from June 25, 2010 to May 20, 2019); Trial Tr. at 1410:13–1411:12 (Buss).  Buss left the Board in June 2019.  PTO ¶ 81.

Buss owed roughly 44% of his net worth to Musk entities.[106] Buss lacked any other personal or business connections to Tesla and left the Board soon after the Board approved the 2018 Grant.[107]

### iii. Denholm

Denholm joined the Board and the Compensation Committee in 2014.[108] Her background is in accounting and telecommunications.[109] She was recruited to the Board by Buss, who she knew professionally.[110] Musk asked Denholm to be Board chair in 2018 following a settlement with the SEC (the "SEC Settlement") that required Musk to relinquish his chairmanship.[111]

Denholm does not appear to have had any personal relationship with Musk outside of her service on the Board. Denholm derived the vast majority of her wealth from her compensation as a Tesla director. Denholm's compensation from Tesla between 2014 and 2017 was valued at about $17 million when it was issued, an amount she acknowledged was material to her at the time.[112] Denholm ultimately received $280 million through sales in 2021 and 2022 of just some of the Tesla options

---

[106] JX-1167 ¶ 26; Trial Tr. at 1409:13–14:11:12, 1413:15–1416:8, 1426:15–1427:13 (Buss); *see also SolarCity II*, 2022 WL 1237185, at *4 & n.26. Buss was somewhat evasive when estimating this number at trial, testifying that his net assets exclusive of all Tesla and SolarCity holdings were higher than a certain amount but not "double or triple that." Trial Tr. at 1426:15–1427:13 (Buss).

[107] PTO ¶ 81.

[108] *Id.* ¶¶ 82, 84. She is also chair of the Audit Committee. *See id.* ¶ 85.

[109] Trial Tr. at 313:14–314:14 (Denholm).

[110] *Id.* at 312:3–15 (Denholm).

[111] Denholm Dep. Tr. at 93:8–95:18; PTO ¶ 83.

[112] Trial Tr. at 395:8–23 (Denholm).

she received as part of her director compensation.[113]  She described this transaction as "life-changing."[114]  Denholm testified that between 2017 and 2019, she received approximately $3 million per year in her non-Tesla position.[115]  Even assuming Denholm valued her Tesla compensation at a fraction of its Black-Scholes value, her Tesla compensation far exceeded the compensation she received from other sources.

### iv.    Gracias

Gracias joined the Board in 2007 and the Compensation Committee in 2009.[116] He founded and continues to manage Valor Equity Partners ("Valor"), a private-equity firm with approximately $16 billion under management.[117]  For years, Valor has also been "deeply operationally engaged in" Tesla.[118]  Valor actively assisted management in trying to drive sales for and lower the cost of production of Tesla's Roadster model.[119]

Gracias has amassed "dynastic or generational wealth" from investing in Musk's companies.[120]  Gracias invested in PayPal in the 1990s, returning "roughly 3x to 4x."[121]  Valor began investing in Tesla at Musk's invitation in 2005.  By 2007, Valor

---

[113] *Id.* at 396:8–397:12 (Denholm).

[114] *Id.* at 397:6–12 (Denholm).

[115] *Id.* at 397:17–398:11 (Denholm); Denholm Dep. Tr. at 10:4–12.

[116] PTO ¶¶ 98, 106.  He is also on the Nominating and Governance Committee.  *Id.* at ¶ 107.

[117] *Id.* ¶ 100; Trial Tr. at 698:16–699:8 (Gracias).

[118] Trial Tr. at 707:16–24 (Gracias).

[119] *Id.* at 708:1–710:2 (Gracias).

[120] *Id.* at 774:22–24 (Gracias).

[121] *Id.* at 767:14–15 (Gracias).

had invested $15 million.[122]  Valor ultimately distributed some of its Tesla shares to its investors, including Gracias.[123]  As of 2017, Gracias was the third-largest individual investor in Tesla, with virtually all of his Tesla shares held in trust for his children.[124]  As of 2021, that Tesla stock was worth approximately $1 billion.[125]  Valor and Gracias have invested hundreds of millions of dollars in SpaceX, SolarCity, The Boring Company, and Neuralink, all of which significantly increased in value.[126]

All told, Gracias and his fund have netted billions of dollars by investing in Musk's companies, many of which were made only with Musk's personal invitation.[127]  Gracias has touted endorsements from Musk in marketing his own fund.[128]

Musk and Kimbal have invested in Gracias's ventures.  At Gracias's request, Musk invested $2 million in Valor no later than 2003 and an additional $2 million in

---

[122] *Id.* at 705:18–707:24, 767:17–768:21 (Gracias); Gracias Dep. Tr. at 38:4–14.  At one point during his trial testimony, Gracias stated that this investment was $50 million.  Trial Tr. at 707:16–24 (Gracias).  Given the phonological similarity between "15" and "50" and the more detailed testimony supporting a $15 million total investment, it is likely that Gracias's statement that the investment was $50 million was in error.

[123] Trial Tr. at 711:17–712:9 (Gracias).

[124] *Id.* at 712:15–713:7 (Gracias); PTO ¶ 109.

[125] Trial Tr. at 769:6–9 (Gracias); PTO ¶ 110.

[126] Valor invested between $400 million and $500 million in SpaceX, a stake valued between $2 billion and $3 billion as of May 2021.  Trial Tr. at 769:14–770:19, 771:20–772:4 (Gracias); PTO ¶ 115.  Valor invested approximately $24 million in SolarCity in 2012, yielding proceeds of approximately $136 million.  Trial Tr. at 772:6–11 (Gracias); PTO ¶ 111.  Valor invested between approximately $15 million and $20 million in The Boring Company as of May 2021.  Trial Tr. at 772:12–16 (Gracias); PTO ¶ 119.  Valor invested between approximately $15 and $20 million in Neuralink as of May 2021.  Trial Tr. at 773:22–774:7 (Gracias); PTO ¶ 118.

[127] Trial Tr. at 711:17–712:9, 767:17–774:24 (Gracias).

[128] JX-1472 at 2.

26

2007.[129] Musk planned to invest in another Valor fund in 2013, but he ultimately did not because Gracias was concerned about conflicting fiduciary duties.[130] Kimbal also invested $1 million to $2 million in Valor, and Valor invested a total of between $15 million and $20 million in two of Kimbal's ventures.[131] Gracias personally donated up to $500,000 to Kimbal's charity and served on its board.[132]

Gracias and Musk are "close friends."[133] Gracias once personally loaned $1 million to Musk and could not recall if he charged Musk interest.[134] They meet outside of work as frequently as once a month.[135] They have spent the night at each other's homes.[136] They have vacationed together with their respective families, including a trip to illusionist David Copperfield's Bahamian island, a trip to Africa, and a ski trip.[137] They have spent Christmas together.[138] They have a long-standing tradition of spending Presidents' Day weekend together with their families at Gracias's home in Jackson Hole.[139] Gracias attended Musk's second wedding and was

---

[129] Trial Tr. at 713:11–24, 775:7–22 (Gracias).

[130] *Id.* at 714:1–21 (Gracias).

[131] Trial Tr. at 776:5–17 (Gracias); PTO ¶¶ 103–04, 149.

[132] Trial Tr. at 776:18–777:2 (Gracias); PTO ¶¶ 101–02.

[133] Trial Tr. at 715:2–6 (Gracias).

[134] *Id.* at 755:3–756:17 (Gracias).

[135] *Id.* at 715:16–22 (Gracias).

[136] *Id.* at 757:14–16 (Gracias).

[137] *Id.* at 757:20–759:1 (Gracias); *id.* at 1080:13–21 (Kimbal).

[138] *Id.* at 760:17–761:3 (Gracias).

[139] *Id.* at 759:2–17 (Gracias).

a groomsman at Kimbal's wedding in 2018.[140]  Gracias has attended birthday parties for both Musk brothers and their children.[141]  Gracias is friends with two of Musk's cousins and has taken numerous vacations with them.[142]  Gracias is also friendly with Musk's mother and sister.[143]

### b. The Other Directors

### i. Murdoch

Murdoch's professional background is in media and entertainment.[144]  At the time he joined the Tesla Board, he was the CEO of 21st Century Fox.[145]  Murdoch met Musk in the late 1990s, but they lost touch until Murdoch purchased a Tesla Roadster in 2006 or 2007.[146]  The two became friends thereafter, meeting when they happened to be in the same city.[147]  Before he joined the Board, Murdoch, and Musk took family vacations together to Israel, Mexico, and the Bahamas.[148]  During one of these trips, which Gracias and Kimbal also attended,[149] Musk asked Kimbal to help him decide whether to add Murdoch to the Board.[150]  After the trip, Gracias and Musk

---

[140] *Id.* at 757:17–19, 761:10–20 (Gracias).

[141] *Id.* at 759:18–760:10 (Gracias).

[142] *Id.* at 760:11–16 (Gracias).

[143] *Id.* at 762:15–17 (Gracias).  Gracias left the Board in October 2021.  PTO ¶ 98.

[144]  Trial Tr. at 815:1–24 (Murdoch).

[145] *Id.* at 816:4–8 (Murdoch).

[146] *Id.* at 817:21–818:19 (Murdoch).

[147] *Id.* at 819:2–16 (Murdoch).

[148] *Id.* at 820:20–821:2, 847:5–849:15 (Murdoch).

[149] *Id.* at 821:3–13 (Murdoch).

[150] *Id.* at 1080:13–21 (Kimbal).

invited Murdoch to join the Board, and he agreed.[151]  Murdoch and Kimbal are also

friendly, and Murdoch attended Kimbal's wedding in 2018.[152]

As of December 31, 2017, Murdoch owned 10,485 Tesla shares through a family

trust.[153]  He bought these shares on the market before anyone approached him to

become a director.[154]  Murdoch now runs a private-investment company, which

invested approximately $50 million in SpaceX in 2019 and 2020.[155]  Murdoch also

personally invested approximately $20 million in SpaceX in 2019.[156]

---

[151] *Id.* at 821:21–822:21 (Murdoch).  There are some minor conflicting details in the story of Murdoch's addition to the Board.  Gracias testified that he was the first to suggest adding Murdoch to the Board during a dinner with Murdoch in New York. *Id.* at 780:23–781:1 (Gracias); Gracias Dep. Tr. at 109:25–110:11.  Gracias further testified that he did not speak to Musk about Murdoch joining the Board prior to this dinner.  Gracias Dep. Tr. at 109:25–110:11.  It is not clear from Gracias's testimony whether this dinner with Murdoch occurred before or after the Bahamas trip. Murdoch testified that Gracias suggested him joining the Board during a lunch (not a dinner) in New York that occurred after the Bahamas trip.  Trial Tr. at 821:21– 822:17 (Murdoch).  Murdoch's lunch and Gracias's dinner are presumably the same event (they ate), which took place after the Bahamas trip.  But Kimbal testified that Musk asked him to help decide whether Murdoch should join the Board while they were on the Bahamas trip, before the New York meal.  *Id.* at 1080:13–21 (Kimbal). This suggests two possibilities: one of these three witnesses has confused or misunderstood a detail, or Musk and Gracias independently decided to consider adding Murdoch as a Board member (Musk did not testify about this).  In either case, it appears more likely than not that Musk supported Murdoch being added to the Board early in the process.

[152] *Id.* at 850:19–24 (Murdoch).

[153] PTO ¶ 123.

[154] Trial Tr. at 827:12–828:17 (Murdoch).

[155] PTO ¶¶ 124–25.

[156] *Id.* ¶ 126.

Murdoch received total compensation of approximately $35,000 in cash for his service as a Tesla director in 2017 and 2018.[157]

### ii. Johnson Rice

Johnson Rice joined the Board on Gracias's recommendation.[158] She and Gracias were friends and ran in the same social circle in Chicago.[159] Johnson Rice's sole employer before and during her time at Tesla was a family business, Johnson Publishing Company, which published the magazines *Ebony* and *Jet*.[160] She has also served on a number of other boards.[161] Johnson Rice declined to stand for re-election in 2019.[162] Although she received Tesla options as compensation for her work as a director, they expired without being exercised.[163]

### 2. Musk Proposes Terms Of A Compensation Plan.

The first mention in the record of what would become the 2018 Grant is a text from Ehrenpreis to Musk sent on April 8, 2017—one day after Tesla's Compensation Committee certified vesting of the 2012 Grant's sixth tranche.[164] Ehrenpreis asked

---

[157] JX-1210 at 20 (3/2/20 James Murdoch's Responses and Objections to Interrogatory Nos. 2, 3, 4, 8, and 11–39 from Plaintiff's First Set of Interrogatories).

[158] Gracias Dep. Tr. at 123:24–124:3.

[159] *Id.* at 122:23–123:21.

[160] Johnson Rice Dep. Tr. at 10:11–20.

[161] *Id.* at 12:4–18.

[162] *Id.* at 45:1–46:5.

[163] *Id.* at 41:14–24.

[164] JX-362 at 2; Trial Tr. at 99:3–101:7 (Ehrenpreis); JX-361 at 75.

Musk to discuss "a few comp related issues."[165]  They spoke by phone on April 9.[166]

Ehrenpreis testified that he had reached out to Musk to see if he was "ready to recommit"[167] and "to figure out . . . was his head in a place that he wanted to recommit over a longer duration to Tesla[?]"[168]

Musk put forward terms of a new compensation plan during the April 9 call.[169] He envisioned a purely performance-based compensation plan, structured like the 2012 Grant but with more challenging market capitalization milestones[170] and proposed 15 milestones of $50 billion in market capitalization—a total possible award of 15% of Tesla's outstanding shares.[171]

To put Musk's proposal in perspective, each market capitalization milestone increase of $50 billion required Tesla to grow in size roughly equal to the market capitalizations of each of Tesla, Ford, and GM as of early 2018.[172]  So, Tesla would

---

[165] JX-362 at 2.

[166] *See* Trial Tr. at 98:11–105:24 (Ehrenpreis); *see also* JX-362 at 2 (4/8/17 text from Ehrenpreis to Musk asking to "pls chat for a few minutes this weekend re a few comp related issues"); JX-1598 (1/7/18 email from Maron containing draft proxy language describing April 9, 2017 call).

[167] Trial Tr. at 24:5–19 (Ehrenpreis).

[168] *Id.*

[169] *See* JX-1700 at 12 (1/12/18 Draft Schedule 14A Proxy).

[170] *Id.*

[171] *Id.*; *see also* Trial Tr. at 269:17–270:8 (Maron) (testifying that "at the beginning of the process . . . the conception of the plan at a high level was to have $50 billion market cap increments").

[172] JX-1700 at 12; JX-1510 at 27 (cumulative market capitalization of Tesla was approximately $56 billion as of January 10, 2018); JX-757 at 2 (12/31/17 Ford Form 10-K) (aggregate market value of common stock was approximately $42.8 billion as of December 31, 2017); JX-1104 at 1 (2/6/19 GM Form 10-K) (aggregate market value

31

have to grow an amount in market capitalization equal to that of the most significant domestic car manufacturers for Musk to earn a single tranche of compensation.[173] Musk viewed this proposal as "really crazy."[174]

Musk's initial proposal is reflected in a draft of the proxy statement issued in connection with the 2018 Grant. The draft states:

> On April 9, 2017, . . . Ira Ehrenpreis, the Chairman of the Compensation Committee, and Mr. Musk discussed the possibility of a new performance award that would have an incentive structure similar to the 2012 Performance Award but with even more challenging performance hurdles.
>
> Mr. Musk expressed interest in such an arrangement and suggested a compensation structure that would incentivize management to grow Tesla into one of the most valuable companies in the world.
>
> During this meeting, Mr. Musk suggesting performance milestones that would trigger stock option awards of 1 % of the Company's current total outstanding shares based on incremental $50 billion increases in market capitalization, such that if Tesla grew by $750 billion, a maximum

---

of voting stock was approximately $55.5 billion as of June 30, 2018); *see* Trial Tr. at 1268:2–20 (Murphy) ("You know, with the 2012 plan everybody liked basically we started off by saying we got to double the market cap for you to get anything. Well, now the market cap had grown to 50 billion and it was up to 59 billion by the time they actually approved the plan. But this idea, 50 billion, that's a nice round number. I think at the end of 2017, Ford was worth about 49 billion. I think that GM was worth about 58 billion. So this is: Every time we'll get another Ford or a GM. I think that just kind of resonated."); Trial Tr. at 231:11–16 (Ehrenpreis) ("Q. . . . So these options, by the way, are worth roughly the value, the market cap of Ford; right? A. That's true."); *id.* at 1397:1–5 (Buss) ("I mean, again, those market cap goals, you know, were totally insane. I mean, you literally had to create a Ford, GM, or FedEx every ten months. Every ten months. And maintain it, right? So, okay, wow, that's pretty nuts.").

[173] JX-1700 at 12; JX-1510 at 27; JX-757 at 2; JX-1104 at 1; *see* Trial Tr. at 1268:2–20 (Murphy); *id.* at 231:11–16 (Ehrenpreis); *id.* at 1397:1–5 (Buss).

[174] JX-398.

possible award would amount to 15% of the Company's current total outstanding shares.

Mr. Musk indicated that such an award structure would align his incentives with those of stockholders and incentivize him to continue leading the management of the Company over the long-term.

Mr. Ehrenpreis indicated that the Compensation Committee would consider Mr. Musk's perspectives as part of its analysis.[175]

Language like the above appears in other drafts but not in the final proxy statement.[176]

The draft proxy statement is the most reliable (indeed, the only) evidence of the substance of the April 9 discussion. Neither Musk nor Ehrenpreis took contemporaneous notes or otherwise memorialized their April 9 discussion. By the

---

[175] JX-1700 at 12.

[176] *See* JX-1597 at 9 (1/8/17 Draft Schedule 14A Proxy); JX-1598 at 3 (1/7/18 draft language for Schedule 14A Proxy); JX-1599 at 14 (1/10/18 Draft Schedule 14A Proxy); *see also* JX-878 at 9–12 (2/8/18 Schedule 14A Proxy Statement) (background section of the final proxy omitting any mention of the April 9 conversation). There were minor changes in language between the proxy drafts. *Compare, e.g.*, JX-1598 at 3 ("Mr. Musk *indicated an interest* in such a structure, and *mentioned the possibility* of setting 15 milestones in which each would require a market capitalization increase of $50 billion[.]" (emphasis added)), *with*, JX-1700 at 12 ("Mr. Musk *expressed interest* in such an arrangement and *suggested* a compensation structure that would incentivize management to grow Tesla into one of the most valuable companies in the world. During this meeting, Mr. Musk *suggesting* [sic] performance milestones that would trigger stock option awards of 1% of the Company's current total outstanding shares based on incremental $50 billion increases in market capitalization[.]" (emphasis added)).

time of discovery and then trial in this action, Musk had only vague memories of the discussion, and Ehrenpreis had no memory of it at all.[177]

It is unclear who prepared the draft proxy statement, but Maron, Tesla's General Counsel, was responsible for it. Maron testified he spoke to Ehrenpreis within hours of the April 9 call and reviewed the draft.[178]

---

[177] *See* Trial Tr. at 70:6–72:18, 79:13–20, 97:20–102:7 (Ehrenpreis); *id.* at 631:3–632:6, 633:24–635:7, 694:6–695:9 (Musk). Ehrenpreis did not remember the substance of their April 9, 2017 conversation prior to reviewing documents in preparation for his deposition. *Id.* at 70:13–71:13 (Ehrenpreis). Despite his vague recollection, Musk offered an alternative account of the April 9 discussion during his deposition and at trial. When asked about the April 9 call, Musk testified that he might have instead proposed a grant of "10 percent of the company, incrementally taking into account dilution of [his] own shares." Musk Dep. Tr. at 144:13–150:3; *see also* Trial Tr. at 632:18–633:2 (Musk). Ultimately, when pressed, neither Musk nor Ehrenpreis disputed the draft proxy statement's account. Trial Tr. at 633:15–635:7 (Musk) (not disputing the relevant language in JX-1597); *id.* at 91:2–97:24 (Ehrenpreis) (not disputing "Mr. Musk asked for a 15 percent plan" based in part on the proxy statement drafts). Musk stated in an interrogatory answer that he did not "specifically recall the dates or substance" of any discussions of a new stock option award before June 23, 2017. JX-1256 at 9–10 (8/3/2020 Musk's Amended Responses and Objections to Plaintiff's First Set of Interrogatories Directed to All Defendants and Nominal Defendant Tesla, Inc.). Musk reaffirmed his interrogatory answer at trial. Trial Tr. at 631:3–632:6 (Musk). When offering his alternative account, he was equivocal, stating that the proposal "*might* have happened[.]" *Id.* at 632:18–633:2 (Musk) (emphasis added). He also stated, "I *think* I proposed . . . 10 percent[.]" Musk Dep. Tr. at 144:13–146:6 (emphasis added).

[178] *See* Trial Tr. at 100:22–102:7 (Ehrenpreis); *id.* at 239:12–15 (Maron); Maron Dep. Tr. at 127:13–128:12; JX-1700 at 2 ("Todd will review all of our comments on these sections of the proxy and press release and give WSGR the final draft. . . . Todd/Phil[ip Rothenberg] [w]ill work to provide an updated draft Background section"); Trial Tr. at 239:9–15 (Maron) (stating that he heard about the possibility of a new compensation plan for Musk from Ehrenpreis in April 2017); *see also* JX-369 at 2–3 (email thread between Maron and Ahuja dated April 9, 2017 discussing the new compensation plan for Musk); Trial Tr. at 105:18–24 (Ehrenpreis) (stating that Maron was cued into discussions of Musk's new compensation plan on April 9 and 10).

Maron was totally beholden to Musk, lending credibility to the accuracy of the draft proxy statement. But his relationship with Musk raises concerns as to other aspects of the process during which Maron advised the Board and Compensation Committee. Maron joined Tesla as Deputy General Counsel in September 2013, and was promoted to General Counsel in September 2014, reporting directly to Musk.[179] Before joining Tesla, Maron was Musk's divorce attorney.[180] Maron neither socialized with Musk nor considered himself a friend of Musk when he worked at Tesla, but he owed his career to and had genuine affection for Musk.[181] Both in his deposition and at trial, Maron held back tears when asked about his departure from Tesla in January 2019, describing it as "the most difficult decision[]" he had made to date.[182]

---

[179] PTO ¶¶170–71; Maron Dep. Tr. at 23:21–24.

[180] Maron Dep. Tr. at 19:23–20:8.

[181] *Id.* at 20:9–18 (stating that he and Musk did not socialize and that he never met Musk's family); *id.* at 199:7–200:5 (Maron) (stating that, although he and Musk were not "friends," he "cared about [Musk] a tremendous amount . . . [he's] always cared about him and wanted him to have . . . success in life. . . . [he] just want him to be happy as you would with anyone that you care about").

[182] *Id.* at 74:10–17 (becoming "emotional" about the decision to leave Tesla); *id.* at 200:9–15 ("Unfortunately I lost my cool earlier and cried because I love the company so much, and I loved my teammates and my colleagues and the people on the executive team."); Trial Tr. at 275:10–24 (Maron) (confirming he "choked up" at his deposition about his "incredible experience[]" at Tesla and the "very emotional decision" to leave Tesla).

After speaking to Ehrenpreis on April 9, Maron enlisted other Tesla employees to help him model Musk's proposal. All told, 13 in-house Tesla executives worked on the 2018 Grant.[183] The key executive in addition to Maron was Ahuja, Tesla's CFO.[184]

At the outset of his involvement, Ahuja recommended one substantive change to the structure—pairing the market capitalization milestones with operational milestones.[185] He recommended this change for accounting purposes. Maron relayed the change to Ehrenpreis, who questioned whether operational milestones were necessary.[186] Maron explained that "there's an important account[ing] reason" for having operational milestones.[187]

---

[183] Trial Tr. at 110:8–112:14 (Ehrenpreis).

[184] Ahuja was Tesla's CFO from August 2008 to November 2015 and from March 2017 to March 2019. PTO ¶¶ 180–81.

[185] JX-369 at 3 (Ahuja explaining that "[i]f the award only has a market condition, the SBC expense will start on the date of the grant," but "[i]f the award has both a market and performance condition, the expense is first recorded when probability of achievement exceeds 70%[.]").

[186] JX-367 at 1 (Maron explaining to Ehrenpreis the need for operational milestones); Trial Tr. at 105:5–24 (Ehrenpreis) (confirming that Maron contacted him in response to Musk asking for market cap milestones and his request that Maron and Ahuja address the issue); JX-418 at 2 ("[O]ne thing Ira wanted to pressure test is whether we really do need the operational milestones[.]").

[187] JX-367 at 1. Despite this explanation, Ehrenpreis later advocated for removing the operational milestones, directing the Tesla team to "pressure test" the feasibility of that structure in mid-June 2017. Trial Tr. at 112:15 –113:17 (Ehrenpreis); *id.* at 285:18–286:20 (Maron). He was again informed that operational milestones were necessary for accounting purposes. JX-423 at 1 (Maron emailing Ehrenpreis that he "wanted to pressure test . . . whether we really do need operational milestones in addition to the market cap milestones. If we could only do the latter, that's what he would prefer, but I remember you telling me that there were accounting reasons for why we needed both.").

36

Maron's team began analyzing Musk's initial proposal on April 10, roping in Tesla's legal counsel at Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini")[188] and lining up compensation consultants. Maron proposed retaining Compensia, Inc., a compensation consulting firm that Tesla had engaged in connection with the 2009 and 2012 Grants,[189] but he also provided four other options for Ehrenpreis to consider.[190]

### 3.  Musk States That He Is Committed To Tesla For Life.

Little progress was made on Musk's new compensation plan through May 2017. During a May 3 earnings call, an analyst asked about Musk's "view of staying actively in place with Tesla longer into the future[.]"[191] Musk responded that he should not be "CEO forever."[192] He further indicated that he was going to reevaluate his position after Tesla achieved volume production of the Model 3.[193]

The plaintiff argues that Musk's statement about not being "CEO forever" was intended to pressure Tesla in negotiations over Musk's compensation plan, but the

---

[188] JX-371.

[189] JX-368; PTO ¶¶ 153, 155–56.

[190] JX-374 (proposing FW Cook, Pearl Meyer, Semler Brossy, and Radford as alternative compensation consultants).

[191] JX-390 at 20.

[192] *Id.* at 20–21.

[193] JX-185 at 12 ("I think I was -- yes, certainly be CEO for like, say, 4 or 5 years and then it's sort of TBD after that. Yes, but that's the commitment I made to people at Tesla and also to investors is that I'm going to make sure that we execute through the high-volume, affordable car at a minimum and then we'll evaluate it at that point."); Trial Tr. at 574:14–18 (Musk) (testifying that the "high-volume, affordable car" Musk was referring to in JX-185 was the Model 3).

record does not support that conclusion. Musk clarified his statement later in the May 3 earnings call, saying:

> Well, maybe I wasn't clear. I intend to be actively involved with Tesla for the rest of my life. Hopefully, stopping before I get too old—or too crazy, I don't know. But essentially for as long as I can positively contribute to Tesla, I intend to be—to have a significant involvement with Tesla.[194]

In other words, Musk had every intention of remaining "significant[ly] involved" in some leadership role at Tesla, even though he did not envision himself being "CEO forever." Musk repeated this assertion at trial, stating unequivocally that he would have remained at Tesla even if stockholders had rejected a new compensation plan because he was "heavily invested in Tesla, both financially and emotionally, and viewed Tesla as part of his family."[195] Trial witnesses similarly testified that they never heard Musk say he had any plans to quit Tesla.[196] And even though Musk did not intend to stay CEO forever, he had no immediate plans to resign

---

[194] JX-390 at 20.

[195] Trial Tr. at 643:24–644:15 (Musk); *see also* JX-912 at 75 (2/26/18 draft CEO performance award investor presentation) ("Elon is heavily invested in Tesla, both financially and emotionally, and views Tesla as part of his family.").

[196] Trial Tr. at 278:3–9 (Maron) ("Q. Now, during the 2017, 2018 time frame, Elon never really told you that he was planning to leave Tesla, right? A. He never said that to me. Q. Never expressed to you that he was no longer interested in an executive role at Tesla? A. No, never said that."); *id.* at 526:14–19 (Ahuja) ("Q. And thinking about Elon, during your time as CFO, Elon never told you that he was planning to stop his involvement with Tesla? A. He did not, though I would not expect any CEO to tell that to the CFO or the management team."); *id.* at 784:16–18 (Gracias) ("Q. And you never heard Elon Musk say he was going to quit Tesla; correct? A. I did not."); *id.* at 785:8–11 (Gracias) ("Q. And Elon Musk certainly never said he would quit Tesla if he felt he was inadequately compensated; correct? A. Correct.").

from that position. Corroborating that fact is lack of any succession plans during the relevant period. That is, before 2021, neither Musk nor Tesla had identified a potential successor for the role of Tesla CEO.[197]

### 4. The First (And Forgettable) Board Discussion

By June 5, 2017, Tesla had met all ten CEO market capitalization milestones for the 2012 Grant and had only three tranches of operational milestones left to achieve.[198] The Board first discussed the prospect of a new compensation plan for Musk during a June 6, 2017 Board meeting. Musk chaired the meeting.[199]

The Board's conversation during the June 6 meeting concerning Musk's compensation was brief and, apparently, forgettable. During that meeting, Ehrenpreis updated the Board on the near fulfillment of the 2012 Grant milestones and stated that "plans were underway to design the next compensation program" for Musk.[200] The minutes of that meeting are three pages long, and the discussion of a new compensation plan was limited to a sentence.[201] At least one director who served on the Compensation Committee, Denholm, did not recall the June 6 Board

---

[197] *Id.* at 1421:9–13 (Buss) ("Q. Shifting gears, during your board tenure, the Tesla board had no formal documented succession plan to replace Mr. Musk; correct? A. Formally documented, no. We had various discussions. But correct, nothing documented."); *id.* at 857:9–858:10 (Murdoch) (confirming Musk had not identified a successor until the months after his 2021 deposition).

[198] JX-404.

[199] PTO ¶ 211; JX-407 at 1 (6/6/17 Board meeting minutes).

[200] JX-407 at 2.

[201] *Id.*

discussion at all.[202]  She testified at trial that any discussion of a new compensation plan during the June 6 Board meeting must not have been substantive.[203]

### 5. Musk Accelerates The Process.

On June 18, 2017, Maron emailed the Compensation Committee stating: "We would like to . . . discuss Elon's next stock grant."[204]  This sort of outreach from Maron was common during the process.  Although he was counsel to Tesla, he would reach out and prompt action by the Compensation Committee to benefit Musk (the "we" in the prior quote).

A few days prior, on June 15, 2017, Maron's team had prepared an aggressive timeline for approving a compensation plan.  The timeline scheduled the Compensation Committee and Board to approve the plan by July 17 or by July 24 at the latest.[205]  The initial June 15 plan contemplated only two Compensation Committee meetings prior to final approval and allotted the committee just over a month to do its job.[206]  A later June 26 version of the timeline was even more rushed, proposing only one Compensation Committee meeting (with an additional meeting if

---

[202] Denholm Dep. Tr. at 214:14–19 ("Q.  Just so we're clear, focus on June 18th, the Todd Maron email, was that the first time you heard or learned about a potential new compensation plan for Mr. Musk?  A.  Yes.  I believe so, yes.").

[203] Trial Tr. at 357:19–359:14 (Denholm) (stating that the first substantive discussions regarding the 2018 Plan took place on June 23, 2017).

[204] JX-420 at 1.

[205] JX-423 (6/19/17 email from Matt Tolland to Maron re "Re: Privileged - Comp Comm Process").

[206] *Id.*

40

necessary) and giving the committee less than three weeks to complete its task.[207] That timeline envisioned that on July 7, the Compensation Committee would "[g]ain agreement on proposed approach, award size and metrics/goals" and "[g]ain preliminary approval of grant agreement[.]"[208]

The timeline reflected a reckless approach to a fiduciary process, given that the Compensation Committee had not yet discussed any substantive terms nor met concerning the Grant. Despite the break-neck speed contemplated by the timeline, Maron reported to counsel on June 18 that Ehrenpreis was "aligned on the plan and timing."[209]

After Musk asked to discuss his compensation plan, the Maron-led team was supercharged. They conducted initial calls with five potential compensation consultants and selected three for Maron and Ehrenpreis to interview.[210] During the initial calls, the consultants were informed of Musk's initial proposal and the

---

[207] JX-456 at 2 (6/26/17 email from Phoung Phillips to Ira Ehrenpreis and Todd Maron re: "Tesla | Executive Compensation Timeline").

[208] *Id.*

[209] JX-423 at 1.

[210] JX-424 at 1 (6/19/17 email from Phillips to Maron stating, "[w]e are just doing prep calls with these other folks (so they are slightly prepared when speaking to Ira). Also, Yun and I are hoping to take 5 down to 3 teams so we don't waste Ira's time. Do you want to be included in the preliminary meetings - we realized it takes about 30 minutes to explain what we want and we want to see if they even understand what we are asking before we present them in front of you and Ira."); *see also* JX-432 at 1 (noting the three calls with the compensation consultants).

aggressive timeline leading to a late-July approval.[211]  Maron and Ehrenpreis updated Musk about the process on June 20, 2017.[212]

### 6.    The First Compensation Committee Discussion

The Compensation Committee discussed Musk's compensation plan for the first time on June 23, 2017.[213]  The committee formally resolved to retain Wilson Sonsini and Compensia as legal advisor and compensation consultant, respectively.[214]  A few days later, Tesla retained Jon Burg at Aon Hewitt Radford ("Radford") to value the 2018 Grant in light of the market-based milestones and to advise on the accounting treatment of the 2018 Grant in light of the performance-based milestones.[215]

During the meeting, Ehrenpreis stated that the Compensation Committee's aim was to create a new compensation plan similar to the 2012 Grant.  The committee

---

[211] *See, e.g.*, JX-434 at 4 (Brown's handwritten notes of June 19 and 20 calls stating under the heading "Goals . . . Timing . . . 2-3 wks"); Trial Tr. at 1434:7–16 (Brown) (noting what was to be discussed in the calls).

[212] JX-428 (6/20/17 email from Maron to Ahuja stating, "I'm going to be meeting with Elon in part to update him on this plan, and that meeting is currently scheduled for 4pm[.]"); JX-425 at 2 (6/20/17 Ehrenpreis text message asking, "[c]an we chat about board and comp. . . . Calling in 5 to 10."); Maron Dep. Tr. at 183:19–184:20 (confirming he kept Musk "abreast at a high level" of the process); Ehrenpreis Dep. Tr. at 155:3–156:18 (confirming "check-ins" with Musk).

[213] The topic did not come up during their meeting held on June 5, although that was the day before the Board was informed that "plans are underway."  JX-405 (6/5/17 Compensation Committee meeting minutes) (no mention of Musk's package); JX-407 6/6/17 Board meeting minutes) (first mention of plans for the 2018 Grant); *see also* JX-420 (6/18/17 email from Maron to Compensation Committee proposing June 23 meeting to discuss Musk compensation).

[214] *See* JX-439 at 2; PTO ¶ 214.

[215] PTO ¶151; JX-455 (6/26/17 Radford engagement authorization form).

then set out the goals for the compensation plan in broad strokes. The minutes of the

meeting describe that discussion as follows:

> The Committee discussed how Mr. Musk had been and would likely remain a key drive of the Company success and its prospects for growth, and that, accordingly, it would be in Tesla's interest, and in the interest of its stockholders, to structure a compensation package that would keep Mr. Musk as the Company's fully engaged CEO. The Committee also discussed the fact that unlike most other Chief Executive Officers Mr. Musk manages multiple successful large companies. The Committee discussed the importance of keeping Mr. Musk focused and deeply involved in the Company's business, and the corresponding need to formulate a compensation package that would best ensure that Mr. Musk focuses his innovation, strategy and leadership on the Company and its mission.[216]

The minutes do not reflect any discussion by the committee concerning the

effect of Musk's pre-existing 21.9% equity stake on these goals.

The committee was not presented with any proposed terms for a compensation

plan, and it did not consider any. This was the case even though, behind the scenes,

Ehrenpreis and Musk had discussed Musk's initial proposal, which Musk's team had

already modeled.[217]

---

[216] JX-439 at 1.

[217] Specifically, on June 23, Tesla's Deputy General Counsel Phil Rothenberg sent an Excel spreadsheet titled "Elon Grant 2017" to Kenneth Moore, another Tesla employee. JX-445 at 3–4. The spreadsheet models a 15-tranche structure with operational milestones. The model also includes a "Performance Milestone" column with each row marked "tbd." There are some quirks with the terms reflected in the June 23 spreadsheet, which make it clear that the spreadsheet was an early model that needed to be refined, but to mention them briefly: Each tranche triggers as Tesla's stock price rises from $300 to $4,800 at $300 increments per tranche over 15 tranches, each of which gives Musk the right to purchase 1.6 million shares at $300 per share. The grant value of each tranche is calculated by multiplying 1.6 million

Although the committee had no idea what the terms of the plan might be, they were told to be prepared to approve it in July.[218] Brown thought the timeline was unwise.[219] Brown called Ehrenpreis to ask for more time to work on the matter,[220] but Ehrenpreis responded that "this is the timeline we are working with."[221] A member of Maron's team would later repeat that message, telling both Brown and Burg that "we are running up against a short deadline and we have to make sure this keep [sic] moving."[222] The message was clear—move at full tilt. Other than Brown, there is no evidence that anyone questioned the timeline.

---

by the differential between the market price of Tesla stock and the $300 exercise price. The result is $480 million for tranche one (at a market price of $600 per share), $980 million for tranche two (at a market price of $900 per share), and so on. Adding up all 15 tranches this way yields $57.6 billion. The $57.6 billion figure, however, is not the total possible award that Musk could reach under this proposal. Triggering all 15 tranches would result in a total grant value of $108 billion.

[218] JX-1592 at 9 (6/23/17 email from Chang to Ehrenpreis) (listing approval date in July); JX-437 at 7 (same). Trial Tr. at 130:7–13 (Ehrenpreis) ("Q. It's also true, though, isn't it, that at the June 23rd compensation committee meeting, the committee wasn't shown any of the specific metrics that had been working -- that the group had been working on, like 1 percent tranches or $50 billion market caps? A. No, that was -- no."); *see also* JX-439 (7/23/17 Compensation Committee meeting minutes making no mention of these features or the discussion with Musk); Trial Tr. at 557:9–559:13 (Phillips) (affirming that the minutes are a fair summary of the meeting and that they do not reflect discussion of the grant features or the discussion with Musk, but disclaiming any recollection of the substance of the meeting); Trial Tr. at 359:15–360:19 (Denholm) (stating that she had no recollection of whether Ehrenpreis mentioned his conversation with Musk when Ehrenpreis and Denholm first discussed the 2018 Grant).

[219] Trial Tr. at 1487:21–23, 1488:3–21 (Brown).

[220] *Id.*

[221] *Id.* at 1487:21–1488:17 (Brown).

[222] JX-472 at 1–2 (6/30/17 email from Phillips to Burg, Brown, and Chang); *see also* JX-418 at 2 (Matt Tolland, a Tesla Employee, stating in an internal email to Maron

44

### 7. The First Working Group Meeting

After the June 23 Compensation Committee meeting, Ehrenpreis formed a "Working Group." The group consisted of Maron and at least two in-house attorneys who reported to him (Phillip Chang and Phuong Phillips), Ahuja, Brown, Burg, and attorneys from Wilson Sonsini.[223] Ehrenpreis and Gracias were in the Working Group, but the Compensation Committee decided that the two members with less extensive ties to Musk—Denholm and Buss—were "optional" attendees.[224]

The Working Group first met on June 30. Phillips proposed the agenda,[225] and Brown prepared a slide deck with a high-level overview of the suggested terms of Musk's new equity plan.[226] In relevant part, the presentation included: a few slides summarizing the 2012 Grant;[227] a slide titled "Preliminary Concept," reflecting the 15-tranche combined market and operational goals structure;[228] and three slides titled "Key Program Terms: Alternatives and Considerations," which identified terms of the compensation plan under the title "Preliminary Alternatives" and

---

that the proposed timeline "may be a bit accelerated, and may require pushing the Comp Consultant to keep up").

[223] JX-475 (6/30/17 email invite to Working Group members); Trial Tr. at 33:4–13 (Ehrenpreis); Burg Dep. Tr. at 141:3–142:7, 174:14–177:1, 179:17–181:7 (Burg testifying that he attended at the Working Group meetings after he was retained).

[224] JX-474 (6/30/17 email from Chang to Denholm and Buss).

[225] JX-473.

[226] JX-475.

[227] *Id.* at 3, 10.

[228] *Id.* at 4.

considerations relevant to each term under the title "Considerations/Decision Points."[229]

The presentation identified the following question for discussion: "Will both operational and company valuation goals be used?"[230] By framing the structure as a question, the presentation suggests that it was an open issue. Brown's notes on a June 26 draft version of this presentation, however, reflect that the issue had in fact been resolved.[231] He wrote that: "there will be 15 goals of each type[,]" referring to both market capitalization and operational goals, and "the market cap goals are increments of $50B, for a total of $750B of incremental market cap growth for all 15 tranches (yes, there [sic] numbers are what they are thinking!)[.]"[232] In part, therefore, the presentation was a vehicle for getting the Compensation Committee members up to speed on the work done behind the scenes prior to that time.

After the June 30 meeting, the Working Group stood poised to move forward. Chang emailed members of the group about developing operational milestones, including a structure in which each market capitalization milestone would also require an increase of $15 billion in GAAP revenue.[233] Chang stated that Tesla

---

[229] *Id.* at 5–7.

[230] JX-464 at 7. An earlier June 26 draft version of this presentation included a note from Brown: "Their starting place is 15 goals of each type." JX-1703 at 5.

[231] JX-1703.

[232] *Id.* at 6.

[233] JX-480.

should "expect to achieve a milestone roughly once every 12 to 15 months over the next 3 years."[234]

### 8. Musk Decelerates The Process.

The Working Group met again on July 6, the day before the next Compensation Committee meeting. After this meeting, Maron informed Chang, Ahuja, and others that "we're now going on a slower track with the CEO grant. We're now looking to issue it in August or September instead of within the next couple of weeks."[235]

Maron professed ignorance as to why the timeline decelerated.[236] Chang and Phillips too lacked any recollection.[237] Ehrenpreis testified that "it was way too complex to do under what was originally described as a preliminary timeline" but did not recall additional details.[238] Brown testified that he received pushback when he asked to extend the timeline, so he was not the impetus for the delay.[239] Maron would not have made the determination to extend the timeline to August or September unilaterally. The reality is that Maron answered to and spoke for Musk in this

---

[234] *Id.*

[235] JX-503 at 1.

[236] Maron Dep. Tr. at 190:4–192:22.

[237] Chang Dep. Tr. at 373:23–375:13; Phillips Dep. Tr. at 237:23–239:7; *see also* JX-502 at 1 (7/6/17 email from Chang to Tesla employees saying: "I haven't gotten the full details as to why the postponement[.]").

[238] Trial Tr. at 123:21–124:10 (Ehrenpreis).

[239] *Id.* at 1488:3–21 (Brown).

context.  It was Musk who either asked to slow things down or stopped pushing to get them done so quickly.[240]

Phillips circulated "the proposed new timeline for Elon's equity grant" to the Working Group on the evening of July 6.[241]  The initial timeline contemplated preliminary approval by the Compensation Committee on July 7 and final approval by the committee and Board approval by July 24.  The revised timeline pushed final approval by the committee and Board out to September 8 and September 19, respectively.[242]

### 9. The First Compensation Committee Discussion Of The Substantive Terms

The July 7 Compensation Committee went forward as scheduled, but the agenda was revised given the new timeline.  The revised agenda included "a short presentation re the CEO grant" from Brown.[243]  This was the first meeting where the committee would be presented with terms of a compensation plan.

In addition to the $50 billion market capitalization milestones that Musk had proposed, Brown's presentation covered alternatives—a flat $25 billion increase or graduated milestones beginning at $10 billion and increasing to $50 billion.[244]  These

---

[240] Musk denied aspects of this finding.  *See* Musk Dep. Tr. at 172:19–174:1 (denying that he was "pushing for" the grant to "happen quickly" in early July 2017, and stating that he was "generally erring on the side of . . . [going] slowly[,]" and did not "recall the exact reason" why the process slowed down in early July).  But his recollection of relevant events was generally spotty.

[241] JX-495.

[242] JX-423 at 2–3; JX-456 at 2; JX-495 at 6–7.

[243] JX-503 at 1.

[244] JX-510 at 1, 12.

different market capitalization approaches corresponded to different award sizes, ranging from 7.5% of total outstanding shares to Musk's proposed 15%.[245]

Although the presentation identified alternatives to Musk's proposal, the presentation included a valuation only for Musk's proposal.[246] The presentation was therefore biased toward Musk's proposal, although this was the first meeting at which the committee had considered any terms.

In addition to the market capitalization and operational milestones, the presentation identified other potential grant features, including the following:

- A "Clawback Provision."[247] Around April 2015, the Board adopted new Corporate Governance Guidelines (the "Guidelines") providing that Tesla's "executive officers [are] subject to a clawback policy relating to the repayment of certain incentives if there is a restatement of our financial statements.'"[248] The presentation contained the following question: "Is the current clawback provision sufficient protection for the Company?"[249] There is no evidence that the committee discussed this question or ever demanded a more protective Clawback Provision. The final version of the Grant included a Clawback Provision based on the Guidelines.[250]

---

[245] *Id.* at 13.

[246] *Id.* at 24.

[247] JX-475 at 7. The Clawback Provision was also discussed at the June 30 Working Group meeting. JX-464 at 1, 8 (6/27/17 email from Brown to Ehrenpreis attaching draft slides with Clawback Provision questions for Tesla Working Group meeting on June 30, 2017).

[248] PTO ¶ 252.

[249] JX-464 at 8.

[250] JX-878 at 64–65 (appendix to the proxy statement attaching performance stock option agreement) (stating that the Clawback Provision was consistent with Tesla's internal guidelines).

- An "M&A Adjustment," which is a provision that accounts for the impact of financing or acquisitions on the market capitalization milestones ("M&A Adjustment").[251] These provisions are standard.[252]

- A "Hold Period," which was a period post-exercise during which Musk would be prohibited from selling his stock. The presentation noted that "post-exercise hold periods decrease the grant/accounting value" of the stock as follows: "2 year = -15%; 3 years = -18%; and 5 years = -22%."[253]

Benchmarking analyses were on the advisors' minds. Prior to the first Working Group meeting, Phuong suggested an agenda item addressing "[b]enchmark companies – risks associated with such grant."[254] And Brown's presentation for the July 7 Compensation Committee meeting contained an appendix listing the "Largest CEO Pay Packages in 2016"; summaries of other executive compensation plans at SolarCity, Nike, Avago Technologies, and Apple; Radford's $3.1 billion valuation of a grant featuring $50 billion market capitalization milestones and awarding 15% of total outstanding shares; and Radford's additional preliminary models based on different market capitalization approaches.[255] But the appendix data does not constitute a traditional benchmarking study,[256] and it is unclear whether the

---

[251] JX-464 at 7 ("If market cap/enterprise value used, how to account for the impact of financing or acquisition activities, where market cap increases may not translate to stock price increases? Will the use of enterprise value encourage debt financings?").

[252] Trial Tr. at 1010:22–24 (Dunn) (testifying that the M&A adjustment provision was both "smart" and "pretty standard[]" for the Board to include).

[253] JX-510 at 10.

[254] JX-473.

[255] JX-510 at 18, 19–22, 24–29.

[256] Trial Tr. at 1475:20–24 (Brown) (describing traditional benchmarking).

committee discussed this information or the "risks associated with such grant" in any event.

### 10. Stockholder Outreach

During the July 7 meeting, the Compensation Committee tasked Ehrenpreis and Maron with contacting Tesla's largest institutional stockholders to discuss Musk's new compensation plan.[257] Maron's team worked with outside counsel to prepare talking points to use during the calls.[258] They ultimately spoke to 15 stockholders between July 7, 2017, and August 1, 2017.[259] Maron's subordinates joined these calls and took notes.[260]

As scripted, Ehrenpreis was to: introduce himself and Maron and identify his objectives as Compensation Committee chair (to "keep executives engaged and performing their best"); sing Musk's praises ("I think we can all agree that he's an extraordinary leader and continues to accomplish incredible things for Tesla and its stockholders"); remind the stockholders of the "[i]ncredible success of the 2012 Grant"; and explain that they are considering a new compensation structure for Musk

---

[257] *Id.* at 252:23–254:1 (Maron); JX-509 at 2 (7/7/17 Compensation Committee meeting minutes) ("Ehrenpreis and Maron then reviewed upcoming plans to discuss CEO compensation generally with the Company's largest shareholders, and solicit their feedback and input for any new program.").

[258] *See, e.g.*, JX-517 (7/8/17 email with comments from outside counsel re: SH Talking Points).

[259] JX-878 at 11 (2/8/18 Schedule 14A Proxy Statement); Trial Tr. at 252:23–253:10 (Maron) (verifying accuracy of 2019 proxy).

[260] *See, e.g.*, JX-522 (7/11/17 Maron notes from call with Jennison Associates); JX-546 (7/21/17 Maron notes from call with Fidelity); JX-551 at 1(7/24/17 Maron notes from call with Baillie Gifford).

51

and that "[o]bviously, the goals of the new program will be similar to the 2012 grant[.]"[261]

In this litigation, the defendants report that the stockholders to whom Ehrenpreis and Maron spoke "were pleased with the 2012 Plan's results and supported a similar approach for a new compensation plan,"[262] and that stockholders also provided suggestions for the new compensation plan that the Board ultimately adopted.[263] It is difficult to credit the defendants' narrative for two reasons. First, the script reads like a loaded questionnaire intended to solicit positive stockholder feedback and not a method for gaining objective stockholder perspectives on a potential new plan. There is nothing inherently wrong with the script; it simply undermines the evidentiary weight of the resulting communications. Second, what the stockholders said in response to these inquiries is hearsay and untested by the adversarial process, including cross examination.[264]

### 11. The Working Group Develops Operational Milestones.

The Working Group next met on July 17.[265] One of the objectives for the meeting was to establish a metric for operational milestones. Brown prepared a

---

[261] JX-517 at 5.

[262] Defs.' Post-Trial Opening Br. at 29.

[263] *Id.* at 30.

[264] *See* JX-522 at (notes on Jennison call); JX-546 at 1 (notes on Fidelity call); JX-551 at 1 (notes on Baillie Gifford call); JX-552 at 1 (notes on Baron call); JX-531 at 5 (slide featuring comments from T. Rowe, PrimeCap, and Jennison); Trial Tr. at 38:9–39:10 (Ehrenpreis) (the plaintiff's hearsay objection to JX-551 and the court's overruling of that objection for the limited purpose of what Ehrenpreis was told); *id.* at 40:3–10 (Ehrenpreis) (the defendants' acknowledgement of same limited purpose for JX-546).

[265] JX-527 at 3.

presentation for the meeting that listed the following potential operational metrics: "EBITDA; operating income; free cash flow; gross margin; strategic/execution goals" (such as introducing a new model or producing a certain number of units, as in the 2012 Grant); and "Return Metrics (ROA, ROIC, ROE)," with each option paired with a handful of "advantages" and "disadvantages."[266]

Ahuja had developed the strategic milestones for the 2012 Grant, and he took responsibility for developing the operational milestones for the 2018 Grant.[267] On July 19, Burg sent Ahuja and other members of the Working Group an analysis of the historical market capitalization-to-revenue ratio of large U.S. companies.[268] Ahuja used this data to propose starting with a 6.5x revenue-to-market-capitalization-milestone ratio, which could be used to determine the initial revenue milestones— $7.5 billion additional revenue for each $50 billion in market capitalization. The

---

[266] *Id.* at 6; JX-530 at 6. Of these options, Ahuja and Maron preliminarily expressed in advance of the meeting that they favored revenue. JX-526 at 1–3 (7/10/17 emails between Ahuja, Maron, and Chang re: Operational Metrics). Consistent with this preference, the presentation makes a case for revenue, describing it as "the most objective financial metric" and noting that the only listed downsides could be mitigated with other, already-discussed plan features. JX-530 at 5 ("Disadvantages . . . [1.] Requires adjustments for acquisition activities (e.g., goal increases for acquired companies)[;] [2.] Ignores profitability and may incentivize price cutting/lower margins; however, this concern mitigated if paired with long-term market cap goals[.]"). All of the other metrics are accompanied by multiple downsides, and none of the downsides for the non-revenue metrics included explanations of how those downsides could be mitigated or obviated by other plan features. *Id.* at 5–6.

[267] Trial Tr. at 451:3–5 (Ahuja) ("My role was to provide information to the Board and Compensation Committee about potential operations milestones that could be used."); *see generally* JX-622 (collection of Ahuja's emails concerning milestone development).

[268] JX-538.

revenue milestones then declined to 4x for the final tranches at increments of $12.5 billion for each $50 billion market capitalization increment.[269]

On July 23, Ahuja suggested four EBITDA milestones in addition to the 15 revenue-based milestones: $4 billion, $8 billion, $12 billion, and $16 billion.[270] Ahuja projected that Tesla "should be able to get to $12B EBITDA in the next 4–5 years depending on volumes . . . and margin assumptions[.]"[271]

The agenda for the July 17 Working Group Meeting included discussion of an M&A Adjustment and a Hold Period.[272] Brown prepared a detailed slide on the M&A Adjustment, but there are no contemporaneous communications reflecting discussion of the adjustment beyond that slide.[273]

As to the Hold Period, the presentation noted that the Guidelines required a six-month post-vesting Hold Period.[274] The next day, Phillips emailed Burg and Brown a question from Ehrenpreis about "creative options" they could employ to "solve for getting a bigger discount" on the publicly reported grant date fair value,[275]

---

[269] JX-622 at 3 (7/19/17 email from Ahuja to Compensia, Radford, and Tesla in-house attorneys).

[270] JX-549.

[271] *Id.* In this litigation, Ahuja testified that by the end of 2017 it became clear that these assumptions were no longer reasonable. Ahuja Dep. Tr. at 308:8–312:12. As discussed *infra*, however, there is a lot of competing testimony on the reliability of Tesla's projections.

[272] JX-530 at 3 (7/17/17 Working Group discussion document).

[273] *Id.* at 10.

[274] *Id.* at 8.

[275] JX-535 at 1–2 (7/18/17 email from Phillips to Radford and Compensia asking them to compute what the discount would be if "Elon had to hold all exercised shares for 5 years?").

such as extending the Hold Period to five years (the "Five-Year Hold Period").[276] Burg provided holding periods ranging from one to ten years and types of options with corresponding discounts.[277]

After the July 17 meeting, the Working Group began planning for an August 1, 2017 Compensation Committee meeting.[278] The agenda for the meeting included an update for the full Board (excluding Musk and Kimbal) on the structure under discussion for the compensation plan and on stockholder feedback on the structure.[279] Maron sent an email to the full Board on July 27, summarizing the process to date and asking everyone to attend upcoming Compensation Committee meetings.[280]

### 12. Musk Hits The Brakes.

Late July 2017 proved a busy time for Tesla, which delivered the first Model 3 on July 29. This triggered the eighth milestone in Musk's 2012 Grant.[281] It also prompted Musk to, once again, reset the Compensation Committee's timeline. In Maron's view, given the struggles with the Model 3 launch, Musk's desired to extend the timeline either because he was unsure whether to commit to Tesla (which Musk denied) or simply did not want to focus on compensation during a busy time.[282]

---

[276] *Id.*

[277] JX-544 at 1–2 (7/21/17 email from Burg to Compensia, Chang, Ahuja, and other Tesla team members re: "Update to Slide Per Ira's Request").

[278] JX-554 at 1.

[279] *Id.*

[280] JX-559 (7/27/17 email from Maron to Gracias, et al. re "CEO Comp planning").

[281] JX-563 (7/30/17 email from Gracias to Maron re: "Tesla UWC - Milestone Achievement").

[282] Maron Dep. Tr. at 197:1–199:6; Trial Tr. at 249:16–250:12 (Maron).

Whatever the reason, Musk hit the brakes on the process. On June 30, two days before the planned Compensation Committee meeting, Musk sent Maron a brief email asking to put the discussion of his compensation "on hold for a few weeks[.]"[283] Maron replied that he would "rather keep cranking on it . . . because there's a fair amount to it that we've been working on with the board and there's lead time involved."[284] Musk agreed to let Maron proceed, stating that he "[j]ust want[ed] to make sure Tesla interests come first."[285] Musk reminded Maron that "[t]he added comp is just so that I can put as much as possible towards minimizing existential risk by putting the money towards Mars if I am successful in leading Tesla to be one of the world's most valuable companies. This is kinda crazy, but it is true."[286]

## D.   The Process Goes Off Course.

By August 2017, Musk remained hyper-focused on Model 3 production, which was proving slow and painful.[287] As Musk described at trial, "[t]he sheer amount of pain required to achieve that goal, there are no words to express."[288] This aspect of Musk's testimony was totally credible.

---

[283] JX-564 (7/30/17 email from E. Musk to T. Maron re "Re: My comp stuff").

[284] *Id.*

[285] *Id.*

[286] *Id.*

[287] JX-615 at 4 (9/5/17 email from Musk describing "[t]he slow progress" as "extremely alarming," demanding production of 1,000 Model 3 vehicles in the final week of September, stating "[c]ome hell or high water that 1000 unit number is going to f***ing happen if I have to help build them myself. . . . I'm going to be draconian because I have to be[,]" and warning that "Tesla's life is at stake" (asterisks added)).

[288] Trial Tr. at 673:13–17 (Musk).

Although Musk agreed to allow Maron to "keep cranking," progress on Musk's compensation plan had slowed to a halt.[289] From August through September, there was some discussion of Musk's compensation plan but no action, and there were no meaningful discussions of the 2018 Grant in October.[290] The highlights of this interregnum are discussed in brief below.

The Compensation Committee held a telephonic meeting on August 1, and Compensia made a presentation during that meeting that summarized the committee's progress to date.[291] The most notable aspect of this meeting concerned the following "key question" that went undiscussed: "Is additional compensation for the CEO required given his current ownership and its potential appreciation with Company performance?"[292] Musk had made his initial proposal in April 2017, and the original timeline had the process wrapping up by July 2017, but this was the first time that this "key question" had been posed—did Musk require additional

---

[289] *See, e.g.*, JX-596 at 1 (8/12/17 email from Brown telling another Compensia employee that there was "no need to spend time on [a presentation relating to the 2018 Grant] for now" and noting that "Elon and the Board are negotiating a little bit, which may impact where they land on some of the key program points[,]" although the record does not reflect any such negotiations at that time); JX-599 (8/17/17 email from Phillips tacitly noting the pause by stating that "[w]e would like to proceed with Elon's grant. I am hoping we can get on a call tomorrow with this small group to discuss next steps, proposed timeline and slides," although it does not appear that any call took place); JX-604 at 1 (8/27/17 email from Ahuja to Working Group members stating "[i]t was decided to defer [] action by a few months").

[290] Materials for the October 5 Compensation Committee meeting, for instance, make no mention of the 2018 Grant. *See* JX-650.

[291] JX-566 at 10–15 (8/1/17 slide deck for Compensation Committee meeting, with a slide titled: "For Reference: Preliminary Work to Date").

[292] *Id.* at 7–8.

compensation? The most curious thing about this question is that there is no evidence that any director deliberated over it, and it did not appear in any other Board or committee materials.[293]

The next event of interest occurred on September 8, when Ehrenpreis and Denholm spoke to Musk to discuss his compensation plan.[294] Once again, the most notable aspect of this conversation concerns a question that went undiscussed. The agenda for the September 8 call identified the following topic for discussion: "Should some type of commitment be included as part of comp structure?"[295] Trial testimony revealed that no one raised this issue with Musk.[296] Ehrenpreis recalled discussing Musk's dedication to Tesla generally.[297] And Maron's summary of the call reflects that the participants discussed the "opportunity costs" of Musk devoting time to

---

[293] The presentation also: reflected Musk's proposed 15-tranche structure; described the operational milestones as "TBD"; and included questions about a Clawback Provision ("Should there be an expanded clawback provision, or is the current provision from the Corporate Governance Guidelines adequate?"), an M&A Adjustment ("How should corporate transactions and potential changes in control be addressed?"), and a Hold Period ("What limitations should there be on the form of exercise, and should extended post-exercise holding period(s) for earned shares be established?"). *Id.* at 8.

[294] PTO ¶ 223; JX-610. Although Maron was invited to the call, he did not attend and did not have a substantive recollection of what was discussed. Maron Dep. Tr. 221:7–223:18.

[295] JX-612 at 2.

[296] JX-617 at 2 (9/8/17 Compensation Committee meeting minutes indicating that a call occurred but providing no substance); Trial Tr. at 140:4–141:1 (Ehrenpreis) (testifying that he could not recall if Musk or Denholm had discussed with him "anything about . . . Musk[] devoting his time and attention to Tesla" as opposed to his other companies).

[297] Ehrenpreis Dep Tr. at 309:11–311:6.

Tesla.[298] Although Musk didn't "have a good recollection of [the September 8] call,"[299] he was confident that they did not discuss a time or attention commitment "vis-à-vis [Musk's] other interests."[300] Musk said "that would be silly."[301]

The Board met on September 19, but the meeting was not terribly interesting. Ehrenpreis reported on the committee's progress[302] and the September 8 conversation with Musk.[303] Brown gave a presentation covering much of the same ground as the August 1 presentation. Brown valued the 15% market capitalization option at a $2–3 billion grant date fair value.[304] According to the meeting minutes, "[t]he Board expressed its general support for the overall structure of" the Grant,

[298] JX-629 at 2; *see also* Trial Tr. at 665:2–667:10 (Musk) (discussing opportunity costs).

[299] Musk Dep Tr. at 154:12–22.

[300] *Id.* at 160:11–18.

[301] *Id.*

[302] PTO ¶ 225; JX-631 (9/19/17 special Board meeting minutes); JX-629 at 3 (9/18/17 email from Maron to the Board attaching a document stating, "[d]ecisions to be made at this meeting: 1. With Ira's assistance, have compensation committee determine the following: a. Whether to maintain basic 2012 award structure (tranches tied to paired operational and market cap goals) and determine approach to goals b. Appropriate award size (e.g., number and size of tranches)"); JX-632 at 3 (9/19/17 email from Maron to the Board attaching a document stating, "[d]ecisions to be Made -Whether to maintain basic 2012 award structure (tranches tied to paired operational and market cap goals) - Appropriate award size (e.g., number and size of tranches)").

[303] JX-631 at 1 (9/19/17 special Board meeting minutes stating: "Mr. Ehrenpreis provided an update on the activity regarding the CEO Compensation Program. Mr. Ehrenpreis reviewed the continuing work by members of the Compensation Committee, Company management and outside advisors, including Compensia, Radford and Wilson Sonsini Goodrich & Rosati. The Compensation Committee had developed key points and met with Mr. Musk to discuss various aspects of the CEO Compensation Program. . . . Mr. Ehrenpreis and Ms. Denholm updated the Board regarding their last meeting with Mr. Musk.").

[304] JX-632 at 7, 21.

meaning the 15-tranche structure.[305] The Board favored "a long-term stock option grant . . . with performance-based vesting, primarily keyed to the market capitalization of the Company[.]"[306] The Board noted that "Musk was driven by large goals[,]" and "viewed the discussed targets as achievable given the potential of the Company and believed that Mr. Musk would as well."[307]

Before this period of inactivity, the only milestones that had been discussed were the $50 billion market capitalization milestones. Operational milestones remained "TBD,"[308] but Ahuja gave some thought to them in August and September. There was a Working Group meeting on August 3,[309] and after that time, discussions focused on adjusted EBITDA.[310] It is unclear who made the decision to focus on that metric.

On August 17, Ahuja asked one of his employees for "operational metrics [that] will line up with 15 increments of $50B in market cap."[311] Ahuja envisioned 15 adjusted EBITDA milestones "ranging from $2B to $25B" and requested comparisons to historic EBITDA/market capitalization correlations for Apple, Amazon, and

---

[305] JX-631 at 2.

[306] *Id.*

[307] *Id.*

[308] JX-566 at 28.

[309] JX-584 (8/3/17 email from Phillips to Maron with Working Group agenda).

[310] JX-640 at 3–4 (8/17/17 email from Ahuja to a subordinate stating that "the thinking now is to focus more on adjusted EBITDA . . . rather than revenue metrics").

[311] *Id.* at 3.

Google.[312]  After pulling the data, members of Ahuja's team responded that they "didn't see immediate parallels to where we are."[313]  Ahuja requested more information on the data they gathered concerning "% Adjusted EBITDA/Revenue and Market Cap to Adjusted EBITDA multiple."[314]

The day after the September 19 Board meeting, Ahuja reached out to his team for help developing "10 Adjusted EBITDA based metrics that end at a revenue of about $150B and market cap of about $800B using % and multiples which start high and progressively become lower."[315]  He explained that "[t]he thinking is that we will develop EBITDA based operational metrics rather than [r]evenue based."[316]  It is unclear who dictated that "thinking" at the time.  A Tesla employee responded to Ahuja's request on September 21, providing ten potential EBITDA milestones (going from $2 billion to $20 billion in even increments of $2 billion, similar to Ahuja's range).[317]  The data reflected adjusted EBITDA/revenue ratios of Tesla and its peers (*e.g.*, Apple (34%) and Google (42%)).[318]  The employee found that Ahuja's proposed

---

[312] *Id.*

[313] *Id.* at 2.

[314] *Id.*

[315] *Id.* at 1.

[316] *Id.*

[317] JX-641 at 1.

[318] *Id.* at 4; JX-642; JX-643.

EBITDA milestones range would necessitate an EBITDA-to-market-capitalization multiple well above that of Amazon, Apple, or Google.[319]

### E. The Process Restarts.

By the end of October, Tesla's production difficulties seemed to be easing. A "Quarterly Update Letter" signed by Musk and Ahuja for the Board's audit committee (the "Audit Committee") at its October 31, 2017 meeting was generally optimistic. It stated that the "production rate will soon enter the steep portion of the manufacturing S-curve," which would create "non-linear production growth" in the following weeks.[320] With Tesla's production stabilizing, Musk turned his attention back to his compensation plan.

#### 1. Musk Lowers His Ask.

In the early hours of November 9, Musk sent Maron an email stating that he wanted to "move forward with [his compensation plan] now, but in a reduced manner from before."[321] Musk testified that by "reduced," he meant something less than 15% of total outstanding shares.[322] It is unclear why Musk decided to lower his ask. It is possible that he was just trying to single-handedly calibrate the compensation package to terms that were more reasonable. Later that morning, Musk told Maron

---

[319] JX-641 at 1; *see also* JX-642 (9/21/17 Spreadsheet of Milestones, Sheet Two, Columns F, N).

[320] JX-1540 at 84 (10/31/17 Audit Committee meeting materials).

[321] JX-664.

[322] Trial Tr. at 676:18–677:1 (Musk).

that he would "like to take board action as soon as possible if they feel comfortable and then it would go to shareholders."[323] Musk stated:

> I think the amount should be reduced to a 10% increment in my Tesla ownership if I can get us to a $550B valuation, but that should be a fully diluted 10%, factoring in that it dilutes me too. So if it hypothetical [sic] was awarded to me now and I own (probably) ~20% fully diluted, then I would have ~30%. Of course there will be future dilution due to employee grants and equity raises, so probably this is more like 25% or so in 10 years when it has some chance of being fully awarded.[324]

The implication of Musk's proposal to use a 10% fully diluted figure at 1% per tranche is that he now sought a ten-tranche structure.

Moments later, Musk sent Maron another email stating:

> Given that this will all go to causes that at least aspirationally maximize the probability of a good future for humanity, plus all Tesla shareholders will be super happy, I think this will be received well. It should come across as an ultra bullish view of the future, given that this comp package is worth nothing if 'all' I do is almost double Tesla's market cap.[325]

Ehrenpreis relayed Musk's revised proposal to the Board at a special meeting on November 16, 2017.[326] In advance of that meeting, Chang sent Ehrenpreis a list of talking points, stating the "[n]umbers we are talking about are now lower than before . . . 10 tranches to $550 billion; 1% per tranche[.]"[327]

---

[323] JX-664.

[324] *Id.*

[325] *Id.*

[326] JX-669 (11/16/17 special Board meeting minutes).

[327] JX-670 (11/15/17 email from Chang to Ehrenpreis in advance of a Board meeting the following day).

### 2. Some Turbulence

Meanwhile, on November 13, Jurvetson began a leave of absence.[328] At the time, Jurvetson had been a managing director of Draper Fisher Jurvetson ("DFJ"), a venture capital firm with investments in Tesla and other Musk-related businesses.[329] Following a scandal, Jurvetson was removed from DFJ. This became a "PR problem" for Tesla.[330] Jurvetson returned to the Board in April 2019 but left again in September 2020.[331] On November 14, Musk emailed Maron again, asking to "pause for a week or two" on his compensation plan as it would be "terrible timing."[332] At trial, Musk did not recall the nature of the problem. He is a smart person, though, and it is possible that he thought it was better to avoid releasing controversial news on the heels of controversial news.[333]

---

[328] PTO ¶ 133. Jurvetson had joined both the Tesla Board and the SpaceX board in June 2009, and he joined the Audit Committee in January 2010. *Id.* ¶¶ 132, 134, 136.

[329] *Id.* ¶¶ 130, 135 (6,546,420 shares of SpaceX collectively with affiliated funds); *id.* ¶¶ 138–39 (stating that DFJ was also SolarCity's third-largest institutional stockholder, owning 4,827,000 SolarCity shares (worth $98,229,450.00) as of its acquisition by Tesla). Jurvetson has other personal and professional ties with Musk. For instance, he personally beneficially owned 114,576 shares of Tesla common stock as of December 31, 2017. *Id.* ¶ 135. Jurvetson is an investor in Musk's Boring Company and Kimbal's The Kitchen Restaurant Group. *See id.* ¶¶ 140–41.

[330] Gracias Dep. Tr. at 96:12–21, 98:3–16. The details of the incident do not appear in the record.

[331] PTO ¶¶ 132–33.

[332] JX-668.

[333] Trial Tr. at 640:8–641:4 (Musk) ("I'd asked to just pause any discussions of compensation given the crisis level at the company was too high to think about anything else.").

### 3. Musk Further "Negotiates Against Himself."

Musk's November 9 proposal had the unintended consequence of raising Musk's demand. According to Chang, Musk's demand to increase his current percentage of fully diluted shares (approximately 18.9%) by ten percentage points (to approximately 28.9%) would require an award of 28,959,496 shares, which equaled approximately 17.23% of total outstanding shares as of November 2017.[334] Musk's November 9 request, therefore, turned out to be larger than his initial proposal, contrary to Musk's desire for a "reduced" amount.[335]

Maron sent Chang's calculations to Musk on November 29.[336] Maron presented to Musk both (i) the total amount of shares Musk would receive based on his November 9 request for an additional 10% on a fully diluted basis (28,959,456 shares); and (ii) the total amount of shares Musk would receive based on his March 2017 request for an award of 15% of total outstanding, non-diluted shares (25,217,325 shares).[337]

Musk responded on December 1 telling Maron: "That is more than intended. Let's go with 10% of the current FDS number, so 20.915M."[338] Musk arrived at this number by multiplying Tesla's FDS (fully diluted share) total as of November 2017 by 10%, or by factoring in dilution on a pre-grant basis.

---

[334] JX-673.

[335] JX-664.

[336] JX-678.

[337] *Id.* at 1.

[338] JX-682 at 1.

When asked about his December 1 proposal, Musk volunteered an answer that the plaintiff's counsel has gleefully emphasized at every opportunity. He said that the December 1 proposal "was, I guess, me negotiating against myself."[339]

### 4. A Surge Of Activity

The parties crammed a lot of work into a few days in December. During a five-day period that month, the Compensation Committee met twice (on December 8 and 10),[340] and the Board met once (December 12).[341] There was a renewed sense of urgency after the December 8 meeting, as reflected by email chatter on December 10 and 11 among high-ranking Tesla employees enlisted to work on the Grant.[342]

During the December 10 meeting, the Compensation Committee approved a 12-tranche Grant structure and a set of operational milestones. Ehrenpreis reported that Musk "appeared prepared to accept" the structure, which the minutes described at the "lower end of the previously contemplated range of 12% of the total outstanding shares."[343] The December 12 meeting minutes also identify other terms under consideration.

---

[339] Musk Dep Tr. at 263:2–4.

[340] JX-697 (12/8/17 Compensation Committee meeting minutes); PTO ¶ 229 (noting the Compensation Committee met on 12/10/17).

[341] JX-729 (12/12/17 special Board meeting minutes).

[342] JX-717 at 1 (12/10/17 email noting the "importance and the timing on getting" an analysis of the stock-based compensation effects of the grant "out quickly" because of a valuation deadline the next day); *id.* (12/11/17 email marked as "high" importance stating, "[w]e are back on with a vengeance (apologies in advance). . . . I am just now digesting myself"); JX-718 at 1 (12/11/17 email stating that "[o]ur CEO grant[] is back and on a fast track now").

[343] JX-729 at 1.

### a.  The 12%/12-Tranche Structure

All pre-November 9 discussions had assumed 15 tranches, in line with Musk's proposals.[344]  And on November 9, Musk proposed ten tranches measured by fully diluted shares.  On December 10, however, the Compensation Committee approved a 12-tranche structure, which was presented to the Board two days later.  The parties dispute the evolution of the 12-tranche structure.

According to Ehrenpreis, the 12-tranche structure was intended to counter Musk's offer for a fully diluted 10% and its corollary ten-tranche structure.[345]  This may appear counterintuitive, because 12% of total outstanding shares equals approximately 10% fully diluted—thus, making it seem like there was no real upside to using the 12% figure.  The difference, however, is that adding two more tranches on top of Musk's suggested ten tranches required Tesla to hit the $50 billion market

---

[344] *See* JX-1598 at 3 (15 tranches, 1% of total outstanding shares each); JX-434 at 3 (15 tranches, 1% of total outstanding shares each); JX-445 (15 tranches, 1% of total outstanding shares each); JX-464 at 5–7; (15 tranches, 1% of total outstanding shares each); JX-486 at 1 (15 tranches, 1% of total outstanding shares each); JX-510 at 12 (15 tranches, varying total outstanding shares awards each); JX-530 at 9, 13 (15 tranches, varying total outstanding shares awards each); JX-566 at 11, 14 (15 tranches, varying total outstanding shares awards each); JX-640 at 3 (15 tranches); JX-632 at 4 (15 tranches, varying total outstanding shares awards each).  One Compensia presentation from September 19 provides "5 to 10" tranches as a possible range, but this is clearly an error as the rest of the presentation, including the slide where this range appears, assumes an award with 15 tranches.  *See* JX-628 at 6.  Ehrenpreis's testimony that "5 to 10 . . . was the range of the number of tranches that was being considered at that time" is not credible, and he acknowledged on redirect that the rest of the presentation envisioned 15 tranches.  Trial Tr. at 51:18–24, 214:20–215:6 (Ehrenpreis).

[345] Trial Tr. at 58:15–59:11 (Ehrenpreis) ("And essentially -- and getting him to agree to the total outstanding share framework, we added two more vesting tranches, which would have required, for him to achieve the equivalent in number of shares, $100 billion market cap more.").

capitalization target two more times to generate an additional $100 billion in market capitalization.[346] So, the 12-tranche structure made it harder for Musk to achieve the maximum payout of the Grant. Musk testified that the shift from fully diluted to total outstanding shares was one of "two areas . . . where the board pushed significantly, which I conceded[.]"[347]

This testimony, however, finds no support in the contemporaneous record. Although there are benefits of a 12-tranche structure to minority stockholders, the move to 12% and 12 tranches was driven by the Board's preference to base the Grant on total outstanding shares rather than fully diluted shares.

The issue first arose during the November 16 Board meeting. There, the Board discussed a move from Musk's proposed fully diluted shares to the Board's preferred total outstanding shares.[348] The Board viewed total outstanding shares as a simpler metric and had used it when issuing the 2012 Grant.[349]

---

[346] Where each tranche is 1%, and there is a $50 billion market capitalization target per tranche, adding two tranches increases the total market capitalization goal by $50 billion x 2 = $100 billion.

[347] *Id.* at 584:9–19 (Musk). The other area was the Five-Year Hold Period, discussed below.

[348] JX-669 (noting the Board "expressed a general preference" for a non-diluted award and a structure of "1% of current total outstanding shares as the award for each vesting tranche" accompanied by $50 billion market capitalization increases and a "matching operational milestone").

[349] Maron Dep. Tr. at 407:17–25 (stating that the Board used total outstanding shares, instead of fully diluted shares, because "it was a simpler approach"); JX-135 at 77 (showing 2012 Grant using total outstanding shares as well). The 2009 Grant used a diluted approach. JX-68 at 2–3.

On December 10, the Compensation Committee held a special meeting to discuss the Grant.[350] There are no minutes for the December 10 meeting. Chang attended and took notes, which he circulated by email later that evening.[351] His notes state:

> Todd Introduction/led discussion re review of terms
> o We seem to be at the right place as far as size: 10% of
> FDS (~12% of TOS)
> o #of tranches?
> Simplicity of 10
> 10 means that the end goal is smaller
> Agreed to 12 tranches of 1% each.[352]

Translating the above, the Board agreed to the size demanded by Musk but preferred to base it on total outstanding shares, consistent with their discussion during the November 16 meeting. With his meeting notes, Chang indicated that he would "send another email shortly with the grant size numbers."[353] A few minutes later, he sent an email to the same people attaching a spreadsheet and stating the following:

> Contemplated size of grant is here. Details attached.
>
> This is based on 12% of total outstanding shares (TOS as of 11/8, should update to close to grant, but this should still get us very close).
>
> Grant size would be 20,173,860 shares.

---

[350] PTO ¶ 229.

[351] JX-701.

[352] *Id.* There is some indication that the 12-tranche structure was being considered prior to this meeting. On December 6, Ahuja circulated a spreadsheet concerning operational milestones to Chang and Maron. That spreadsheet reflected a 12-tranche structure, suggesting that Ahuja, Chang, and Maron had discussed this possibility prior to that time. JX-688.

[353] JX-701.

- 12% of TOS

- 9.8% of FDS[354]

On December 11, Ahuja emailed Chang and Tesla's corporate controller to confirm that the 2018 Grant would award 20,173,860 shares (12% of total outstanding or 9.8% of fully diluted) over 12 tranches.[355]

On December 12, Ehrenpreis told the Board that Musk was prepared to accept this Grant size.[356]

There is no discussion in any of the minutes or notes of the November 16, or December 8, 10, or 12 meetings indicating that the Board desired 12 tranches because it was better for the minority stockholders. To the contrary, the only explanation in the record for the 12-tranche structure is that the Board preferred to measure the Grant by total outstanding shares for simplicity's sake.

There is also no evidence that the Board pushed for the 12%/12-tranche structure. Maron did not recall the Board pushing or Musk conceding anything. He testified that although "the size of the overall plan" was one of the features that was "different than I think were initially thought of by Elon . . . I don't want to say that it was necessarily over his objection."[357] Reinforcing the similarity between Musk's 10%

---

[354] JX-702.

[355] JX-715.

[356] JX-729 (12/12/17 special Board meeting minutes).

[357] Maron Dep Tr. at 428:20–430:3.

fully diluted ask and the Board's 12% total outstanding offer, Musk confused the two at trial, mistakenly testifying that the Grant awarded "10 percent."[358]

### b.    The Operational Milestones

During the November 16 Board meeting, the Board "discussed the structure of the operational milestones," came to a consensus to use both sales and profits metrics, and "directed the Compensation Committee and management to develop operational milestones" using revenue and EBITDA.[359]

Ahuja and his team took up the mantle. On December 7 and 8, Ahuja developed a number of alternatives using a comparatively low 10% EBITDA/revenue margin.[360] By December 10, Ahuja had refined the model to three options for six, eight, or 12 of each of revenue and adjusted EBITDA milestones, all at a 10% EBITDA/revenue margin.[361]

Recall that, in September 2017, Tesla sought to develop achievable operational milestones and analyzed information regarding the adjusted EBITDA/revenue ratios

---

[358] Trial Tr. at 581:13–582:6 (Musk) ("Q. You think it was half a percent for the 2018 plan as opposed to the 2012 plan? A. Sorry. 2012 -- I think -- I think it was 12 tranches for normally 10 percent-ish, approximately."). Musk also testified that during the first conversation about the 2018 Grant he proposed a 10% incremental increase to his Tesla holdings. Musk Dep Tr. at 144:13–146:6. In context, this explanation appears implausible.

[359] JX-669 at 2.

[360] JX-691 (12/8/17 email from Ahuja to Maron laying out four alternatives for revenue and EBITDA as operational milestones); JX-694 (Ahuja, Chang, and Maron planning to discuss milestone approach on December 8); JX-698 at 1 (12/9/17 email from Ahuja to Maron and Chang re: Revised CEO Comp alternatives, with attachment).

[361] JX-698 at 1.

certain peers (*e.g.*, Amazon (8%), Apple (34%), and Google (42%)).[362]  The 10% EBITDA/revenue ratio modeled by Ahuja, therefore, was comparatively low and thus easier to achieve.[363]  Tesla ultimately based the Grant's EBITDA milestones on an 8% EBITDA/revenue margin,[364] making them even easier to achieve.[365]

Ahuja explained his methodology at trial.  He "started with" the $50 billion market capitalization milestones and backed into the revenue and EBITDA targets.[366]  Chang similarly explained that the operational and market capitalization milestones "have to be somewhat aligned.  It has to make sense to be able to be achieved around the same time or what you think is the same time."[367]  So to establish the operational milestones, the Working Group asked: "at this valuation what would . . . revenue and EBITDA look like . . . ?"[368]

---

[362] JX-641 at 4; JX-643; JX-733 at 6.

[363] Trial Tr. at 893:18–894:21 (Restaino).

[364] JX-733 at 6.

[365] Trial Tr. at 893:18–894:21 (Restaino).

[366] *Id.* at 463:15–464:8 (Ahuja).

[367] *Id.* at 1094:17–1095:14 (Chang); *see also, e.g.*, *id.* at 1061:23–1064:21 (Burg) ("Question: And was that work in connection with looking at revenue to market cap ratio, was that related to some sort of correlation between market cap, on the one hand, and revenue, on the other, and/or how an increase in one of those inputs might impact the other one? Answer: Yes. Essentially, it was trying to get a feel for -- trying to get a feel for market cap to revenue ratios and how those change over time as companies grow very big.").

[368] *See id.* at 1093:7–12 (Chang).

During the December 12 meeting, the Board also reviewed Tesla's then-current operating plan and projections.[369] Ahuja developed, and Musk approved, the projections in December prior to the meeting (the "December 2017 Projections").[370] The one-year projections underlying the operating plan forecasted $27.4B in total revenue and $4.3B in adjusted EBITDA by late 2018, and thus predicted achievement of three milestones in 2018 alone.[371] The three-year long-run projections ("LRP") underlying that plan reflected that, by 2019 and 2020, Tesla would achieve seven and eleven operational milestones, respectively.[372] The following chart reflects the corollaries:

| | Revenue | | Adjusted EBITDA | |
|---|---|---|---|---|
| | **2017 3-Yr LRP** | **The Grant** | | **2017 3-Yr LRP** |
| FY2018 | $27.5B | $20B | $1.5B | $3.8B |
| FY2019 | $41.9B | $35B | $3B | $8.1B |
| FY2020 | $69.6B | $55B | $4.5B | $14.4B |
| | | $75B | $6B | |
| | | $100B | $8B | |
| | | $125B | $10B | |
| | | $150B | $12B | |
| | | $175B | $14B | |

---

[369] JX-740 at 2 (email attaching 2018 operating plan 12/12/17 slide deck); Trial Tr. at 523:12–16 (Ahuja) (confirming the full Board saw the projections before approving the Grant, including in December 2017).

[370] JX-728 at 1–2; JX-372 at 6 (text messages between Maron and Ahuja); Trial Tr. at 515:18–516:7, 517:8–518:11 (Ahuja).

[371] JX-749 at 20; Trial Tr. at 518:18–519:5 (Ahuja).

[372] JX-529 at 2; JX-543 at 2; JX-555 at 5; JX-573 at 408; JX-582 at 4; JX-587.

73

## F.    The Last Leg

The day after the December 12 Board meeting, Chang provided Burg and Brown the "near final" term sheet (the "December 13 Term Sheet"), stating that Musk was "well aligned" on the terms and that he expected Board approval in early January 2018.[373]    The key terms concerning structure and milestones had been finalized, which allowed Burg to complete the grant date fair value.    Other terms, such as a Leadership Requirement (defined below), the Hold Period, and the M&A Adjustment would fall into place in the weeks ahead.

### 1.    The Leadership Requirement

The December 13 Term Sheet reflected agreement on a "Leadership Requirement," conditioning vesting under the Grant on Musk being "CEO or Executive Chairman and Chief Product Officer[.]"[374]

The 2012 Grant contained a stricter Leadership Requirement, which conditioned vesting on Musk remaining CEO.[375]    The Board materials for the September 19 meeting reflect that the Board considered a Leadership Requirement similar to that in the 2012 Grant.[376]    At some point between September 19 and December 13, the Board relaxed its request to allow vesting if Musk was not CEO but was Executive Chairman and Chief Product Officer.[377]    There is no indication how or

---

[373] JX-743 at 1.

[374] *Id.* at 4–5.

[375] JX-137 at 1 (2012 Grant).

[376] *Id.*; JX-633 at 9 ("Based on the 2012 Award, should the Company continue to require Mr. Musk to be CEO in order to continue vesting under the new award?").

[377] JX-878 at 52 (2/8/18 Schedule 14A Proxy Statement).

when the decision was made, whether it was raised with Musk, or when the term was finalized, but it appears in the final Grant.

At trial, Gracias explained that the more lenient Leadership Requirement reflected the Board's belief that Musk's "most valuable function[]" was as the "chief product officer," not as the CEO.[378]  There is no evidence that the Board ever discussed or negotiated this with Musk.

### 2. The M&A Adjustment

The December 13 Term Sheet reflected the Board's intent to include an M&A Adjustment in the Grant.[379]  The 2018 Grant included an M&A Adjustment, which had been under discussion since at least the June 23 Compensation Committee meeting.[380]  In its final form, the M&A Adjustment excluded from the market capitalization milestone acquisitions with a purchase price over $1 billion, and the revenue and adjusted EBITDA milestones excluded amounts attributable to acquisitions providing more than $500 million or $100 million of each, respectively.[381]

At trial, Ehrenpreis described this as a negotiated term, testifying that Musk wanted "the M&A adjustments just to apply to a single milestone at the point of M&A, and we ultimately got those adjustments to apply across the entire basis of the -- of

[378] Trial Tr. at 726:4–15 (Gracias).

[379] JX-743 at 4–5.

[380] JX-475 at 6.

[381] JX-878 at 19 (2/8/18 Schedule 14A Proxy Statement).

all the milestones."[382]  Ehrenpreis was referring to a January 16 demand from Musk to Maron that the M&A Adjustment threshold be 5% of the then-current market capitalization rather than a flat $5 billion.[383]  Musk also told Maron that adjusting the revenue and adjusted EBITDA milestones would be too complicated and unnecessary.[384]

Musk, however, would eventually come around to the M&A Adjustment as proposed by the Board and even suggested stricter terms.  After speaking to Ahuja, on January 16, Maron proposed a threshold that would exclude acquisition-based market capitalization growth amounting to the lesser of (i) 5% market capitalization at the time of the acquisition and (ii) a flat number between $5 and $10 billion.[385]  Musk countered—again, against himself—with a threshold at the lower of 2% of then-

---

[382] Trial Tr. at 227:9–13 (Ehrenpreis); *see id.* at 63:5–15 (Ehrenpreis) ("We further negotiated the idea of creating adjustments to both the revenue and EBITDA and market cap numbers if there was M&A that caused -- if, through acquisition, either the market cap or those financial metrics increased. And so there was a negotiation around the idea that we didn't want the plan to have the unintended consequence of Elon being able to buy his way into it through M&A."); *see also* JX-783 at 1–2 (1/16/18 email from Maron to Compensation Committee stating that Musk wanted that "[a]ny M&A in which [Tesla] buy[s] a company for no more than 5% of [Tesla's] then current market cap will have no adjustment").

[383] JX-783 at 2.

[384] *See id.* at 1.

[385] JX-781 at 2 (1/16/18 email from Maron to Musk stating, "Deepak and I were just talking and think we should make a slight tweak to what we discussed.  Because setting the threshold at 5% of our then current market cap could result in pretty big numbers as we grow, and thus one deal that's under 5% could still be a big chunk of a $50B market cap increment, we propose setting the threshold at the *lesser* of (a) 5% of our then current market cap or (b) some number between $5B and $10B.").

current market capitalization or $1 billion.[386]  He told Maron and Ahuja, "I don't think we will be making big acquisitions[]" and "[t]here is no chance I will game the economics here, so I'm fine with limits that prevent that."[387]  After discussing the issue with the Compensation Committee, all agreed to the following exclusion triggers for acquisition-based growth: the lower of 2% of then-current market capitalization or $1 billion for market capitalization milestones; revenue exceeding $500 million for the revenue milestones; and adjusted EBITDA exceeding $100 million for the adjusted EBITDA milestones.[388]

### 3. The Hold Period

The December 13 Term Sheet reflected that the duration of the Hold Period was an open issue.[389]  The December 13 Term Sheet stated that the Hold Period was "likely to be 5 years," but it was still uncertain.[390]  The 2018 Grant included the Five-Year Hold Period.

At trial, Ehrenpreis described the Five-Year Hold Period as a negotiated term.[391]  Musk similarly testified that the Board "pushed" for this term, which was

---

[386] JX-781 at 1.

[387] *Id.* at 1–2.

[388] JX-782 at 1.

[389] JX-743 at 4–5.

[390] *Id.* at 5 (12/13/17 term sheet); *see also* JX-746 at 3 (Liu 12/13/17 email stating "[i]t seems we'll likely have 5 years holding period after exercise").

[391] Trial Tr. at 63:20–64:1 (Ehrenpreis) (stating the Board "negotiated an agreement that [Musk] would hold for five years after both the achievement and vesting and exercise of the options"); *id.* at 210:24–211:2 (Ehrenpreis) ("It did. I mean, we didn't have one in the beginning, and we ultimately were able to get five years."); *see also id.* at 342:15–21 (Denholm) ("There were also some questions or some comments

his "biggest concern, because it would mean that either [he] would need to run the company for another five years after the stock vested or [he] would need to find someone who would run the company well enough to not cause the valuation to subsequently decline significantly. . . . A lot can happen in five years."[392]

But there is nothing in the record reflecting any actual negotiation with Musk over this term. The only explanation in the record for a five-year period came in July, when Ehrenpreis raised the possibility as a "creative option[]" for "getting a bigger discount[]" on the publicly disclosed value of the Grant.[393]

### 4. The Grant Date Fair Value

On December 22, Burg provided a valuation letter based on the December 13 Term Sheet.[394] Burg used Monte Carlo simulations to estimate the probability of hitting the market capitalization milestones, which is a "generally accepted statistical technique" that "simulate[s] a range of possible future" outcomes over a given timeframe using constantly repeating, random potential scenarios.[395]

---

about the retention period after, you know, assuming that the plan was achieved over a period of time, that he needed to hold the equity for five years. I remember that coming up as being a virtuous feature of the actual program, because it, again, aligned shareholder interest.").

[392] *Id.* at 584:12–585:2 (Musk).

[393] JX-535 at 1–2 (7/18/17 email from Phillips to Radford and Compensia asking them to compute what the discount would be if "Elon had to hold all exercised shares for 5 years?"); *see also* JX-792 at 7 (1/21/18 Radford report) (stating that five year hold period would result in an "illiquidity discount"); Trial Tr. at 133:5–134:4 (Ehrenpreis) (agreeing that imposing a five-year hold period would produce the highest discount).

[394] JX-752 (12/22/17 email from Burg to Radford, other Tesla employees, and PricewaterhouseCoopers attaching a valuation letter).

[395] *See id.* at 5, 11 (describing the Monte Carlo simulation method and showing formula).

Burg determined that the first market capitalization goal—described as $100 billion, or $50 billion of growth—would occur 45.55% of the time, after which the likelihood of achieving subsequent milestones rapidly declined to below 10% from milestone six onward.[396] The Monte Carlo valuation did not account for the probability of hitting the operational milestones, nor did it incorporate Tesla's internal projections.[397]

Based on these estimates, Burg reached an initial grant date fair value for the 2018 Grant of $2,656,430,639. He then applied a 10.52% illiquidity discount based on the Five-Year Hold Period, arriving at a final value of $2,377,077,626.[398] Burg and Ahuja's team continued to refine this valuation in the following weeks by tweaking assumptions, including the holding period and dilution rate.[399]

Burg provided an updated valuation letter on January 19.[400] This letter included a slightly higher final valuation of $2,575,342,854 (again taking into account the holding period illiquidity discount) compared to the December 22 valuation of $2,377,077,626.[401] Another updated letter, dated January 21, provided a still higher final valuation of $2,615,190,052, resulting from intervening increases in the total number of shares, a higher stock price, and slight changes to other assumptions.[402]

---

[396] *Id.* at 12.

[397] *See id.* at 4–5.

[398] *Id.* at 6–9.

[399] *See* JX-767 at 1–4; JX-772 at 1–2.

[400] JX-785 at 1–2.

[401] *Compare* JX-785 at 10, *with,* JX-752 at 6–9.

[402] JX-792 at 7; JX-799 at 3.

### G. The Board Approves The Grant.

On January 21, 2018, the Board held a special meeting to approve the 2018 Grant.[403] Musk and Kimbal recused themselves and Jurvetson was on leave.[404] The other six directors—Ehrenpreis, Denholm, Gracias, Buss, Murdoch, and Johnson Rice—unanimously approved the 2018 Grant.[405]

In its final form, the 2018 Grant is divided into 12 vesting tranches.[406] Each tranche vests upon satisfaction of one market capitalization milestone and achievement of one operational milestone.[407] The 12 market capitalization milestones increase in $50 billion increments, beginning at $100 billion and ending at $650 billion.[408] The 2018 Grant has 16 operational milestones: eight based on revenue and eight based on adjusted EBITDA.[409] For each tranche to vest, the

---

[403] *See* PTO ¶¶ 231–33.

[404] JX-791 at 1 (1/21/18 special Board meeting minutes).

[405] *Id.* at 1–2.

[406] PTO ¶ 238.

[407] *Id.*

[408] *See id.* ¶ 241. Market capitalization was measured by "(i) the sum of Tesla's daily market capitalization for each trading day during the six (6) calendar month period immediately prior to and including the determination date, divided by the number of trading days during such period and (ii) the sum of Tesla's daily market capitalization for each trading day during the thirty (30) calendar day period immediately prior to and including the determination date, divided by the number of trading days during such period." *Id.* ¶ 242.

[409] *Id.* ¶ 244; *see also id.* ¶ 245 (defining revenue as "total Tesla revenues, as reported in Tesla's financial statements on Forms 10-Q or 10-K filed with the SEC for the previous four consecutive fiscal quarters"); *id.* ¶ 246 (defining adjusted EBITDA "as (i) net income (loss) attributable to common stockholders before (ii) interest expense, (iii) (benefit) provision for income taxes, (iv) depreciation and amortization, and (v) stock-based compensation, as each such item is reported in Tesla's financial

achievement of any one of the operational milestones can be paired with achievement of any one of the market capitalization milestones.[410] The increments of the operational milestones are shown in the table below.[411]

| | Revenue-Based Operational Milestones (in billions) | Adjusted EBITDA-Based Operational Milestones (in billions) |
|---|---|---|
| 1 | $20.0 | $1.5 |
| 2 | $35.0 | $3.0 |
| 3 | $55.0 | $4.5 |
| 4 | $75.0 | $6.0 |
| 5 | $100.0 | $8.0 |
| 6 | $125.0 | $10.0 |
| 7 | $150.0 | $12.0 |
| 8 | $175.0 | $14.0 |

To complete each tranche, the Grant requires that Tesla achieve one market capitalization milestone and one operational milestone.[412] Each completed tranche earns Musk options to purchase 1% of Tesla's common stock outstanding as of January 19, 2018. Before a five-for-one stock split in 2020 and a three-for-one stock split in 2022, this 1% was equivalent to 1,688,670 shares.[413] If fully vested, the 2018 Grant would therefore grant Musk options to purchase 20,264,042 (pre-split) shares.[414] The strike price of these options was $350.02, the closing price of Tesla's

statements on Forms 10-Q or 10-K filed with the SEC for the previous four consecutive fiscal quarters").

[410] *Id.* ¶ 243.

[411] *Id.* ¶ 244.

[412] *Id.* ¶ 238.

[413] *Id.* ¶¶ 42–43, 239.

[414] *Id.* ¶ 236.

common stock on January 19, 2018.[415]  Adjusting for Tesla's two stock splits, the strike price was $23.33.[416]

The Grant also included the Clawback Provision, Leadership Requirement, M&A Adjustment, and Five-Year Hold Period.  Like the 2012 Grant, the 2018 Grant expired after ten years.[417]

### H.     The Stockholders Approve The Grant.

Board approval was not the finish line, because the Board conditioned the 2018 Grant on approval by a majority vote of disinterested stockholders.[418]

#### 1.     The Proxy Statement

Tesla announced the 2018 Grant to the public and filed a preliminary proxy statement on January 23, 2018.[419]  Tesla filed its definitive proxy statement (the "Proxy") on February 8, which notified stockholders of a vote to approve the 2018 Grant on March 21, 2018.[420]

The Proxy included statements at issue in this litigation.  It described all Compensation Committee members as "independent directors," despite Gracias's

---

[415] *Id.* ¶ 237.

[416] Calculated as $350.02 divided by (5 x 3).

[417] JX-878 at 52 (stating that the Grant expires on January 20, 2028); JX-137 at 1.

[418] PTO ¶ 233; JX-791 at 4–5.

[419] PTO ¶ 234.

[420] *Id.* ¶ 235; *see also* JX-878 at 29.

close relationship with Musk.[421]  The Proxy did not disclose the financial or personal connections between the members of the Compensation Committee and Musk.

The Proxy did not disclose the April 9 conversation between Musk and Ehrenpreis, during which Musk established the key terms of the 2018 Grant.  A discussion of this conversation appeared in at least four earlier drafts of the Proxy.[422] In its final form, the Proxy states:

> With the 2012 Performance Award nearing completion, the Board engaged in more than six months of active and ongoing discussions regarding a new compensation program for Mr. Musk, ultimately concluding in its decision to grant the CEO Performance Award. These discussions first took place among the members of the Compensation Committee of the Board (the 'Compensation Committee'), all of whom are independent directors, and then with the Board's other independent directors, including its two newest independent directors, Linda Johnson Rice and James Murdoch.[423]

The Proxy stated that: "each of the requirements underlying the performance milestones was selected to be very difficult to achieve";[424]  the Board "based this new award on stretch goals";[425] the Grant's milestones were "ambitious" and "challenging";[426] "[l]ike the Revenue milestones described above, the Adjusted

---

[421] JX-878 at 10.  The Proxy also describes Johnson Rice and Murdoch as independent. *Id.*

[422] *See* JX-1597 at 9; JX-1598 at 3; JX-1599 at 14; JX-1700 at 12.

[423] JX-878 at 10.

[424] *Id.* at 41.

[425] *Id.* at 4.

[426] *Id.* at 22.

EBITDA milestones are designed to be challenging";[427] and "[t]he Board considers the Market Capitalization Milestones to be challenging hurdles."[428]

The Proxy disclosed that, when setting the milestones, "the Board carefully considered a variety of factors, including Tesla's growth trajectory and internal growth plans and the historical performance of other high-growth and high-multiples companies in the technology space that have invested in new businesses and tangible assets."[429] "Internal growth plans" referred to Tesla's projections.[430]

Tesla prepared three sets of projections during the process. During July 2017, Tesla updated its internal three-year financial projections ("July 2017 Projections").[431] The July 2017 Projections reflected that the S-curve's exponential growth phase was imminent.[432] Tesla shared the July 2017 Projections, which the Audit Committee approved,[433] with S&P and Moody's in connection with a debt

---

[427] *Id.* at 18.

[428] *Id.* at 17.

[429] *Id.* at 18.

[430] Trial Tr. at 481:14–481:24 (Ahuja).

[431] JX-529 at 2. JX-529 at 2. The Model 3 was Tesla's first mass production vehicle. *See* Trial Tr. at 574:14–18 (Musk). When mass production is successful, the production curve resembles the letter S. *Id.* at 1197:9–13 (Gompers); JX-1539. Musk explained: "[T]he production starts off slowly and then you gradually eliminate the constraints and eventually it starts taking off exponentially." JX-390 at 9; Trial Tr. at 667:11–16 (Musk).

[432] JX-1540 at 84 (10/31/17 Audit Committee meeting materials) ("The production rate will soon enter the steep portion of the manufacturing S-curve, which should result in non-linear production growth in the weeks ahead.").

[433] JX-580 at 1; JX-573 at 1; Trial Tr. at 521:16–522:21 (Ahuja) (testifying that he discussed the projections with the Audit Committee, including Denholm, Gracias, and Buss).

offering.[434] The 2017 Projections showed revenue growth of $69.6B and adjusted EBITDA growth of $14.4B in 2020.[435] Under the July 2017 Projections, Tesla would achieve three of the revenue milestones and all of the adjusted EBITDA milestones in 2020. The Proxy did not disclose this.

Ahuja developed and Musk approved a new operating plan and projections in December—the December 2017 Projections.[436] As discussed above, the Board reviewed those projections on December 12.[437] The one-year projections underlying the operating plan forecasted $27.4B in revenue and $4.3B in EBITDA by late 2018, and thus predicted achievement of three milestones in 2018 alone.[438] The longer three-year projections underlying that plan reflected that by 2019 and 2020, Tesla would achieve seven and eleven operational milestones, respectively.[439] The Proxy did not disclose this.

After Tesla issued the Proxy, but before the stockholder vote, Ahuja presented the Board with a three-year operating plan (the "March 2018 Projections"), which Tesla later shared with Moody's.[440] Musk reviewed and approved the March 2018

---

[434] Trial Tr. at 466:14–469:24 (Ahuja).

[435] JX-529 at 2.

[436] JX-728 at 1–2; JX-372 at 6 (text messages between Maron and Ahuja); Trial Tr. at 515:18–516:7, 517:8–518:11 (Ahuja).

[437] JX-740 at 1–2; Trial Tr. at 523:12–16 (Ahuja) (confirming the full Board saw the projections before approving the Grant, including in December 2017).

[438] JX-740 at 18; Trial Tr. at 518:18–519:5 (Ahuja).

[439] JX-529 at 2; JX-543 at 2; JX-555 at 5; JX-573 at 408; JX-582 at 4; JX-587.

[440] JX-948 at 2 (3/13/18 Board meeting minutes); JX-973 at 1; JX-974 (March 13 Projections).

Projections before they were presented to the Board.[441] The March 2018 Projections were more pessimistic than previous projections but still predicted achievement of one revenue and two adjusted EBITDA milestones by March 31, 2019, and further two revenue and four adjusted EBITDA milestones by the end of 2020.[442] As discussed below, Tesla would issue a supplemental disclosure with this information, but not until after the stockholder vote.

### 2. The Public Reaction

Tesla tracked support and opposition to the 2018 Grant among stockholders and engaged in outreach.[443] The two largest proxy advisors, ISS and Glass Lewis, both recommended voting against the 2018 Grant.[444]

Glass Lewis expressed concern with the size and potential dilutive effect of the grant, noting that "any relative comparison of the grant's size would be akin to stacking nickels against dollars[]"and that "the lower tiers of the goals are relatively much more attainable given the time periods in question, potentially allowing for sizable payments without commensurately exceptional achievement."[445]

ISS described the grant value as "staggering" and concluded that even the "challenging" and "far-reaching performance goals do not justify the extraordinary

---

[441] Trial Tr. at 511:8–19 (Ahuja).

[442] JX-974; JX-1023 at 6.

[443] *See* JX-901 at 3–7.

[444] JX-987 at 6 (3/21/18 ISS proxy analysis & benchmark policy voting recommendations); JX-931 at 7 (3/6/18 Glass Lewis proxy paper on Tesla).

[445] JX-931 at 5, 7.

grant magnitude[.]"[446] In an internal email, ISS noted that it "steered clear of getting too deep into this[]" because "making that argument essentially puts us in the situation of saying Tesla's board is not strong enough to stand up to Musk[.]"[447]

Also, both recommendations expressed concern with Musk's non-Tesla interests, although Glass Lewis stated that "Musk's extracurricular exploits undoubtedly contribute to his value to the Company[.]"[448]

Stockholders also criticized the Grant, noting that Musk's Tesla equity provided sufficient motivation for Musk to perform,[449] the Grant's size and dilutive effects were excessive,[450] the EBITDA milestones were too low,[451] and that linear milestones were inappropriate for an "exponential company" like Tesla.[452]

Five days before the stockholder vote, on March 16, Maron informed the Board that the outcome of the stockholder vote was "not yet clear."[453] Maron reported that although initial vote tallies were favorable, many big stockholders had not yet voted and their intentions remained unclear.[454]

---

[446] JX-987 at 3, 6. An earlier internal ISS email also described the amount as "just absurd." JX-841 at 1.

[447] JX-940 at 1.

[448] JX-931 at 7; JX-987 at 6.

[449] JX-547.

[450] JX-968 at 3; JX-1541 at 1.

[451] JX-838 at 1–2; JX-899.

[452] JX-899.

[453] JX-964 at 1.

[454] *Id.*

By March 20, Maron informed Musk that the Grant would likely receive approval, but that two large Tesla stockholders were voting against the Grant on the grounds that its size was excessive.[455]  In response, Musk asked Maron to tell one of the large stockholders that he was "very offended by their action if they choose to vote that way, but but [sic] by all means do so."[456]  Musk also asked Maron to set up a call with one of the stockholders following the vote, during which Musk would "convince them to divest from Tesla and any of [his] companies ever.  They are not welcome."[457] It appears that a non-Musk employee at Tesla called that stockholder after the vote.[458]

### 3. The Stockholder Vote

The stockholders approved the Grant at a special stockholder meeting on March 21, 2018, with 73% of votes cast at the meeting (excluding Musk's and Kimbal's ownership) in favor.[459]

### I. Subsequent Events

Events relevant to evaluating the fairness of the Grant occurred after stockholders approved the Grant.  Namely, Tesla disclosed that several Grant milestones were greater than 70% probable of achievement, nearly all the tranches

---

[455] JX-972 at 1–2 (stating Vanguard found the size was "simply too high[]" and Capital most likely opposed "the size").

[456] *Id.* at 1.

[457] *Id.*

[458] Trial Tr. at 441:11–24 (Maron); *see* JX-1017 at 1 (4/11/18 email from Musk to Maron asking about the call with Capital).

[459] JX-979 at 3 (3/21/18 Form 8-K dated March 21, 2018).

vested, Musk got in trouble with the SEC, named himself Technoking, and acquired Twitter, Inc.

### 1. Tesla Discloses That Several Of The Grant's Milestones Are Probable Of Achievement.

For accounting purposes, on March 27, Burg provided a final fair value letter arriving at a grant date fair value of $2,283,988,223.[460] Ahuja and his team then had to determine when Tesla was likely to hit the performance milestones, which Tesla needed to disclose to stockholders in its March 31, 2018 Form 10-Q (the "March 31 10-Q").[461] Tesla determined that three operational milestones were "considered probable of achievement," which meant that they were greater than 70% probable of achievement within approximately one year of the Grant date.[462]

Tesla's methodology to determine the probability of milestone achievement was to "us[e] the operating plan of record[.]"[463] Tesla's operating plan was a set of internal one-year forecasts.[464] Tesla developed and updated one-year and three-year

---

[460] JX-997 at 7. $2,562,885,538 before applying a 10.88% illiquidity discount due to the Five-Year Hold Period. *See id.* Changes from previous valuations are primarily due to an intervening decline in the stock price. *See* JX-1003 at 1.

[461] *See* JX-990 at 1; JX-1004 at 1; JX-1019 at 2; JX-1011 (3/31/18 Form 10-Q for Q1).

[462] JX-1011 at 27.

[463] JX-1019 at 2; Trial Tr. at 743:11–23 (Gracias) ("[T]here's only one plan. . . . We didn't show anything else to the banks . . . or to The Street, literally one set of numbers. That's it."); Trial Tr. at 791:13–792:2 (Gracias) (confirming Tesla had one financial plan as of 2017 and 2018, and during that period everyone—including Musk—relied on that plan to run Tesla, and "Musk himself was integrally involved in creating Tesla's operating plan"); *see id.* at 498:1–499:2 (Ahuja) (confirming Musk was "extremely involved" in the three-year financial plan).

[464] *See* JX-953 (2018 operating plan slide deck).

89

internal projections on a regular basis.[465] They were not the product of bottom-up forecasting. They were used to drive and motivate rather than plan, and Tesla frequently missed its projections.[466] They reflected what Tesla would need to do to reach aggressive goals set by Musk.[467]

Tesla based the March disclosures on the March 2018 Projections. Ahuja described the March 2018 Projections as "extremely aggressive and challenging" based on "stretch goals" and "very large . . . risks[.]"[468] Yet Tesla disclosed that "the following performance milestones were considered probable of achievement: total revenue of $20.0 billion; adjusted EBITDA of $1.5 billion; and adjusted EBITDA of $3.0 billion."[469] The March 31 10-Q included the usual disclaimer, stating that "[t]he probability of meeting an operational milestone is based on a subjective assessment of our future financial projections."[470] According to Ahuja, this disclosure meant that

---

[465] *Id.* at 466:14–19, 467:18–468:2 (Ahuja).

[466] *Id.* at 223:8–224:1 (Ehrenpreis) (testifying that the "projections . . . were mostly used to drive the company . . . [so he] was absolutely not surprised at the number of misses and the frequency of new forecasts"); *see id.* at 746:11–20 (Gracias) (describing these projections as "a very aggressive stretch plan[] . . . to get people motivated and incented[] . . . to drive the internal operations"); *id.* at 333:20–334:18 (Denholm) (testifying that the projections reflected what "we're trying to achieve" and the Board did not view the projections "as being realistic and achievable plans").

[467] *Id.* at 466:23–467:7 (Ahuja) (testifying that Tesla set "really stretch goals, which reflected Elon's general philosophy of really pushing himself and the team to deliver impossible things").

[468] *Id.* at 488:12–489:24; 504:24–505:5 (Ahuja).

[469] JX-1011 at 27.

[470] *Id.*

90

"the three operational milestones . . . are 70 percent probable of achievement in the late 2018 and 2019 time frame."[471]

Ahuja characterized the probability assessment as an inherently "conservative approach" from an accounting perspective.[472] Still, it is not clear how Tesla management reconciled their views that the milestones were both "risky" and a "stretch" yet simultaneously more than 70% likely to occur.

Regardless, management stuck to its guns. On April 3, Ahuja told his team that "to be consistent in our methodology of using the operating plan of record, we should assume that the second EBITDA milestone has greater than 70% chance of vesting by 6/30/2019."[473] And an Audit Committee presentation dated April 27, 2018 indicated that, based on the March 2018 Projections, Tesla considered the $20 billion revenue milestone and the $1.5 billion adjusted EBITDA milestone more than 70% likely by December 31, 2018, and the $3 billion adjusted EBITDA milestone more than 70% likely by March 31, 2019.[474] On May 7, 2018, Tesla filed a Form 10-Q disclosing to stockholders that, as of March 31, 2018, three operational milestones "were considered probable of achievement[.]"[475]

---

[471] Trial Tr. at 493:21–494:5 (Ahuja); *id.* at 503:18–22 (Ahuja).

[472] *Id.* at 488:1–489:24 (Ahuja).

[473] JX-1019 at 2.

[474] JX-1023 at 6.

[475] JX-1031 at 27 (5/7/18 Form 10-Q for Q1).

### 2. Tesla's Performance

The Grant began vesting in 2020 as Tesla's business took off. Although Tesla's business performance between 2018 and 2020 fell short of the March 2018 Projections, Tesla slightly exceeded its projected adjusted EBITDA for 2018.[476] Four tranches vested by the end of 2020, and three more vested the following year.[477] As of April 29, 2022, eleven of the Grant's 12 tranches had vested.[478] As of June 30, 2022, all market capitalization milestones had been achieved, all adjusted EBITDA milestones had been achieved, and three revenue milestones had been achieved, with one more deemed probable of achievement.[479]

### 3. The SEC Settlement

On September 29, 2018, the SEC announced that it had reached a settlement with Musk over fraud charges stemming from a tweet he sent in August 2018.[480] As part of the settlement, Musk agreed to pay a penalty of $20 million, resign as Chair of the Tesla Board, submit communications relating to the company for pre-approval subject to procedures implemented by Tesla, and not "make . . . any public statement

---

[476] Trial Tr. at 479:6–21 (Ahuja).

[477] PTO ¶¶ 265–71.

[478] *Id.* ¶¶ 272–75.

[479] *Id.* ¶ 276.

[480] JX-1070 at 1 (9/29/18 SEC Press Release: Elon Musk Settles SEC Fraud Charges; Tesla Charged With and Resolves Securities Law Charge). On August 7, 2018, Musk tweeted: "Am considering taking Tesla private at $420. Funding Secured." JX-1057 (Aug. 7, 2018, 12:48 p.m. Musk tweet). The SEC charged that Musk's Tweet was misleading because he had not "discussed specific deal terms, including price, with any potential financing partners." JX-1070 at 1.

denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis[.]"[481]

Tesla also agreed to add two new independent directors and create a permanent committee of independent directors charged with overseeing implementation of the settlement, controls regarding Tesla's public statements, and the "review and resolution of human resources issues or conflict of interest issues" involving Tesla's management.[482]

On April 30, 2019, the final judgment enshrining the SEC Settlement was amended to clarify that Musk must "obtain the pre-approval of an experienced securities lawyer employed by the company ('Securities Counsel') of any written communication that contains information regarding" a long list of topics, including Tesla's finances, its non-public projections, and "events regarding the Company's securities."[483]

As part of the settlement, Musk stepped down as Board chair.[484] Kimbal proposed that Denholm replace him.[485] Denholm initially declined, but then Musk

---

[481] JX-1075 ¶ 13 (10/16/18 Consent Motion for Entry of Final Judgment, *United States Sec. & Exch. Comm'n v. Musk*, C.A. No. 1:18-cv-8865-AJN-GWG (S.D.N.Y.)).

[482] JX-1076 at 2 (10/16/18 Form 8-K).

[483] JX-1075 at 15–16.

[484] Trial Tr. at 1081:23–1082:5 (Kimbal).

[485] *Id.* at 1082:6–10 (Kimbal).

asked Denholm to reconsider.[486] Denholm agreed, and the Board appointed Denholm chair on November 7, 2018.[487]

To comply with the terms of the SEC Settlement, which required the Board to establish a new independent committee, the Board created a "Disclosure Committee."[488] Denholm's testimony revealed a lack of understanding concerning how this committee worked. She testified that she did not know whether the Disclosure Committee "received reports concerning human resource issues or conflicts of interest involving senior management"[489] in order to fulfill its mandate. Denholm testified that "issues of conflict are reviewed by the audit committee, which is a group of independent board members who are also members of the disclosure committee."[490]

Musk testified that he complies with the SEC Settlement using the following process: He "decide[s] a tweet might be one that is required to be reviewed under the settlement . . . submit[s] it to an in-house lawyer in advance of making it, wait[s] for some period of time that [he] decide[s] upon, and then tweet[s] if the lawyer hasn't given comments[.]"[491]

---

[486] Denholm Dep. Tr. at 95:11–18.

[487] JX-1083 at 4.

[488] Trial Tr. at 372:6–373:22, 375:1–8 (Denholm).

[489] *Id.* at 375:9–22 (Denholm).

[490] *Id.* at 378:11–18 (Denholm).

[491] *Id.* at 616:3–11 (Musk).

Denholm described this process as "self-regulat[ing]" and was "aware that [Musk] waits for some unspecified period of time and then just [tweets] if he doesn't hear back[.]"[492] After the SEC Settlement was amended, Musk made public statements about Tesla's business prospects or plans without clearing them with anyone first.[493]

At trial, Musk stated that the SEC Settlement "was made under duress" because "lenders put a gun to [his] head."[494] He also conceded that he had previously given public interviews where he stated that the SEC was wrong and that he had actually secured funding to take Tesla private.[495] He did so despite the requirement as part of the SEC Settlement that Musk not "make . . . any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis[.]"[496] Musk has also publicly referred to the SEC's San Francisco office as "bastards[]" and "shameless puppets of Wall Street short seller sharks who did nothing to protect actual shareholders[.]"[497]

---

[492] *Id.* at 386:8–12 (Denholm); *id.* at 382:5–12 (Denholm) ("A. Do you mean does he self-regulate under the policy? Q. You bet. That's exactly what I mean. A. So he does self-regulate under the policy, yes.").

[493] *See id.* at 619:12–622:3 (Musk).

[494] *Id.* at 624:3–625:21 (Musk).

[495] *Id.* at 625:14–21 (Musk).

[496] JX-1075 ¶ 13.

[497] Trial Tr. at 623:4–22 (Musk).

### 4. The Technoking

On March 15, 2021, Musk changed his title to "Technoking of Tesla."[498] Musk testified that this role was distinguishable from a traditional chief technology officer role by the presence of "panache" and joked that a Technoking had "[g]reat dance moves and sick beats."[499] During his deposition, Musk testified that he did not consult with the Board about this new title, but that it was communicated to at least Denholm before Tesla filed the 8-K announcing the new title.[500] At trial, Musk testified he did in fact consult with the Board before giving himself the title.[501]

### 5. Then Came Twitter

On April 25, 2022, Twitter, Inc. and Musk announced the execution of a merger agreement in which Musk would acquire Twitter.[502] Musk subsequently sought to terminate the merger agreement, and Twitter sued for specific enforcement.[503]

The amount of time Musk spent on the Twitter acquisition was undoubtedly a concern at Tesla. Also, in the Twitter litigation, Musk filed a pleading affirming that

---

[498] JX-1331 at 2 (3/15/21 Form 8-K).

[499] Musk Dep Tr. at 24:11–25:9.

[500] *Id.* at 25:13–22.

[501] Trial Tr. at 599:4–10 (Musk); *but see id.* at 1085:1–7 (Kimbal) ("Question: Have you heard the word 'Technoking' before? Answer: Yes, I have. Question: When did you first hear that word? Answer: I heard it over Twitter, when Elon changed his Twitter account."); *id.* at 854:21– 855:3 (Murdoch) ("Q. Now, you're aware that Elon Musk has added Technoking to his Tesla title. Correct? A. Yes, I am aware of that. Q. And you believe you likely first learned about that development via a tweet. Is that correct? A. I might have. I think so. Yeah.").

[502] JX-1457 at 2 (4/25/22 Twitter, Inc. Form 8-K).

[503] *Twitter, Inc. v. Elon R. Musk, et al.*, C.A. No. 2022-0613-KSJM.

no one at Tesla is authorized to view his Tesla email accounts without his consent, except to the extent legally required.[504] Musk ultimately acquired Twitter and named himself "chief twit," a role analogous to CEO.[505] Musk also testified that he asked approximately 50 Tesla engineers to "volunteer" to help him evaluate Twitter's engineering team.[506] No one on the Board called Musk to tell him not to do this.[507] In the weeks prior to trial, Musk spent the "lion's share" of his time at Twitter.[508]

## J. This Litigation

Plaintiff Richard Tornetta ("Plaintiff"), a Tesla stockholder, filed his complaint on June 5, 2018.[509] His original complaint asserted four counts: Count I for breach of fiduciary duty against Musk in his capacity as a then-controlling stockholder; Count II for breach of fiduciary duty against Musk, Kimbal, Gracias, Jurvetson, Ehrenpreis, Buss, Denholm, Murdoch, and Johnson Rice as directors (together, "Defendants"); Count III for unjust enrichment against Musk; and Count IV for waste.[510] Counts I and II were asserted as both direct and derivative claims. Counts III and IV were asserted as derivative claims.[511]

---

[504] Trial Tr. at 602:2–10 (Musk).

[505] *Id.* at 614:13–23 (Musk).

[506] *Id.* at 656:6–657:20 (Musk).

[507] *Id.* at 657:9–658:2 (Musk).

[508] *Id.* at 662:4–9 (Musk).

[509] Dkt. 1 ("Compl.").

[510] *See* Compl. ¶¶ 106–23.

[511] *See id.*

Defendants moved to dismiss the complaint, and the court denied the motion as to Counts I through III, dismissing only the waste claim.[512] For purposes of the motion to dismiss, Defendants conceded that Musk controlled Tesla.[513] Defendants argued that the stockholder vote approving the Grant qualified as a ratifying vote justifying business judgment deference under Section 216 of the Delaware General Corporation Law ("DGCL").[514] Vice Chancellor Joseph R. Slights III rejected this argument, concluding that a fully informed stockholder vote was insufficient to restore business judgment deference in a conflicted-controller transaction like the Grant.[515] The Vice Chancellor held that *MFW* provides the "roadmap" for a controller seeking to avoid review under the entire fairness standard, even outside of the squeeze-out context.[516] The Vice Chancellor also rejected Defendants' alternative dismissal argument—that the complaint lacked well-pled allegations that the Grant was unfair.[517]

The case proceeded to discovery. On January 25, 2021, the court entered a stipulated order granting class certification.[518]

---

[512] *See* Dkt. 10.

[513] *See Tornetta v. Musk*, 250 A.3d 793, 805 (Del. Ch. 2019) ("Defendants acknowledge (for purposes of this motion only) that Musk is a controlling shareholder and that he dominated the Board and the Compensation Committee during the time the Award was negotiated and approved.").

[514] *Tornetta*, 250 A.3d at 806–07 (Del. Ch. 2019).

[515] *Id.* at 807–09.

[516] *Id.* at 810–12.

[517] *Id.* at 812–13.

[518] Dkt. 94.

On September 20, 2021, the Delaware Supreme Court issued *Brookfield Asset Management, Inc. v. Rosson*, which overturned *Gentile v. Rossette*[519] and thus eliminated the legal basis for the dual-natured Counts I and II.[520] *Brookfield* determined that fiduciary duty claims alleging overpayment or dilution of voting power are categorically derivative, rather than dual-natured, even when asserted against a controlling stockholder.[521] As a result of *Brookfield*, Plaintiff filed a motion for leave to amend his complaint on September 30, 2021.[522] The proposed amended complaint asserted the same claims as the original complaint, but asserted Counts I and II as entirely derivative rather than dual-natured.[523]

The next day, Plaintiff and Defendants Kimbal and Jurvetson cross-moved for summary judgment.[524] Plaintiff argued that the 2018 Grant was invalid because it was conditioned on stockholder approval, but that the Proxy failed to disclose material information. For instance, Plaintiff argued that Tesla failed to disclose how achievable Tesla management thought the milestones were, or to fully appraise stockholders of the close professional and personal relationships Ehrenpreis and Gracias each had with Musk.[525] Kimbal and Jurvetson moved for summary judgment

---

[519] 906 A.2d 91 (Del. 2006).

[520] 261 A.3d 1251.

[521] *Id.* at 1275.

[522] Dkt. 161.

[523] Dkt. 161, Ex. A ¶¶ 284–93.

[524] Dkts. 162, 163.

[525] *See* Dkt. 163 at 20–26.

on all Counts on the grounds that they had minimal or non-existent roles in the 2018 Grant process.[526]

While these motions were pending, on October 27, 2021, the parties stipulated to decertify the class, dismiss the direct claim components of Counts I and II, and to voluntarily dismiss all claims against Kimbal and Jurvetson with prejudice.[527] The stipulation preserved Plaintiff's motion for leave to file the amended complaint to change the action from a direct to a derivative action under Court of Chancery Rule 23.1.[528] Collectively, those moves averted the *Gentile* issue at the heart of the original complaint.

The court granted the stipulation on October 27, 2021.[529] The remaining Defendants sought summary judgment on November 19, 2021, advancing a ratification theory on the basis that Tesla stockholders received all material information ahead of the vote.[530]

The court substituted jurists on January 12, 2022, in light of Vice Chancellor Slights' retirement from the bench.[531] This court held a status conference on February 7, 2022,[532] and resolved the pending motions to amend and for summary

---

[526] *See* Dkt. 162 at 6–12.

[527] Dkt. 173.

[528] *See* Dkt. 173 ¶ 1; Dkt. 174.

[529] Dkt. 175.

[530] *See* Dkt. 184 at 64–65; Dkt. 188.

[531] Dkt. 199.

[532] Dkt. 206.

judgment in a letter decision dated February 24, 2022.[533] The court granted Plaintiff's motion for leave to amend but denied the cross-motions for summary judgment, voicing "skeptic[ism] that this litigation can be resolved based on the undisputed facts."[534]

Plaintiff filed his amended complaint on March 2, 2022.[535] The court entered a revised case schedule on August 12, 2022.[536] The parties tried their case from November 14 through 18, 2022.[537] The court heard post-trial oral argument on February 21, 2023.[538]

---

[533] Dkt. 207.

[534] *See id.* at 2.

[535] Dkt. 209.

[536] Dkt. 219. There were earlier case schedules that this one amended. But that fuller history is irrelevant.

[537] Dkt. 244.

[538] Dkt. 281. *See* Defs.' Post-Trial Opening Br.; Dkt. 264 ("Pl.'s Post-Trial Opening Br."); Dkt. 274 ("Pl.'s Post-Trial Answering Br."); Dkt. 275 ("Defs.' Post-Trial Answering Br."); Dkt. 284 ("Post-Trial Oral Arg. Tr.").

Post-trial oral argument revealed several topics that warranted further development. The court requested supplemental briefing in a letter to counsel dated February 22.[539] The parties completed supplemental briefing on April 11.[540]

## II.    LEGAL ANALYSIS

Plaintiff claims that awarding the Grant constituted a breach of fiduciary duty.[541] He argues that the entire fairness standard governs for two independent reasons—because the Grant was a conflicted-controller transaction and, separately, because the Grant was approved by a majority conflicted Board. He further argues that Defendants failed to demonstrate that the Grant was fair, and that the court should invalidate and rescind the Grant either in its entirety or in part. Defendants

---

[539] Dkt. 280. The letter specified the following topics for supplemental briefing: (i) whether a material omission in the Proxy invalidates the Grant; (ii) whether focusing on the give-get exchange within an entire fairness fair price analysis is an accurate framing of the inquiry, as Defendants asserted; (iii) whether disclosures about the Grant development process are unlikely to be material here because the key economic terms were fully disclosed; and (iv) any responses to the *amicus* brief filed by Professor Charles M. Elson to aid the court in understanding the origin and purpose of equity-linked compensation and how it relates to the Grant here. *See* Dkt. 266 ("Elson Amicus Br.").

[540] *See* Dkt. 285 ("Defs.' Post-Trial Suppl. Opening Br."); Dkt. 288 ("Pl.'s Post-Trial Suppl. Answering Br."); Dkt. 289 ("Defs.' Post-Trial Suppl. Reply. Br.").

[541] Plaintiff asserts a derivative claim and, typically, litigation of a derivative claim would begin with an assessment of whether the plaintiff met the demand requirement. Demand futility is a gating issue that must be raised (and, in this jurist's view, should only be raised) at the pleading stage. *See generally In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 699–700 (Del. Ch. 2023) ("The defendants generally should expect one bite at the demand-futility apple."). In this case, however, Defendants did not argue demand futility at the pleading stage due to this court's decision in another action involving Tesla. *See SolarCity I*, 2018 WL 1560293, at *17–19 (holding that the plaintiffs had adequately alleged that demand was excused with respect to a majority of the Tesla Board).

dispute that the entire fairness standard applies and argue that, if entire fairness applies, Plaintiff bears the burden of proof because the stockholder vote was fully informed.

This analysis proceeds in four parts. The court first addresses the gating issue—the standard of review—and concludes that entire fairness applies because Musk exercised control over the Grant. The court next addresses Defendants' argument that the stockholder vote shifted the burden under the entire fairness standard to Plaintiff, concluding that Defendants retain the burden because the stockholder vote was not fully informed. The court then evaluates the Grant under the entire fairness standard, concluding that Defendants failed to prove that the Grant was entirely fair. The court last turns to the remedy, concluding that Plaintiff is entitled to rescission of the Grant in its entirety.

## A. The Entire Fairness Standard Applies Because Musk Is A Controller.

When determining whether corporate fiduciaries have breached their duties, a court applying Delaware law evaluates the fiduciaries' conduct through a standard of review.[542] Delaware law has three levels of transactional standards of review: business judgment, enhanced scrutiny, and entire fairness.[543]

---

[542] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

[543] *Chen*, 87 A.3d at 666 (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

Plaintiff argues that Delaware's most onerous standard of review, entire fairness, applies because the Grant was a conflicted-controller transaction.[544] Alternatively, Plaintiff argues that entire fairness applies because half of the directors who approved the Grant lacked independence from Musk.[545] Plaintiff wins on the first argument—Musk is a controller. Because Plaintiff wins on the first argument, the court does not address the second argument.[546]

Delaware law imposes fiduciary duties on those who control a corporation.[547] Why? Because fiduciary duties exist in part to minimize agency costs caused by the divide between economic ownership and legal control.[548] Delaware law vests control over a corporation in a board of directors and imposes attendant fiduciary obligations

---

[544] Pl.'s Post-Trial Opening Br. at 82.

[545] *Id.*

[546] The factual findings that render Musk a controller, however, support a finding that the majority of the Board lacked independence.

[547] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) ("This Court has held that a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." (cleaned up)); *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989) (holding that a stockholder who dominates and has actual control of the corporation's activities has fiduciary status); *Ivanhoe P'rs v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del. 1987) ("A shareholder owes a fiduciary duty . . . if it . . . exercises control over the business affairs of the corporation.").

[548] *See generally* Adolf Berle & Gardiner Means, *The Modern Corporation and Private Property* (2d ed. 1991).

on the board as a consequence.[549] When a controller displaces or neutralizes a board's power to direct corporate action, then the controller assumes fiduciary obligations.[550]

The most straightforward way for a plaintiff to demonstrate control is to show that a defendant holds a mathematical majority of the corporation's voting power.[551] This is so because the DGCL requires stockholder approval of transformational transactions.[552] The DGCL also permits stockholder action by written consent, through which a majority stockholder can remove directors and fill vacancies.[553] "A stockholder who owns a mathematical majority of the corporation's voting power," therefore, "has the ability to exercise affirmative control" by directing the outcome of

---

[549] 8 *Del. C.* § 141(a).

[550] *See, e.g.*, *Harris v. Carter,* 582 A.2d 222, 234 (Del. Ch. 1990) ("[W]hen a shareholder presumes to exercise control over a corporation, to direct its actions, that shareholder assumes a fiduciary duty of the same kind as that owed by a director to the corporation." (citing *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–10 (Del. 1952)).

[551] *Lynch*, 638 A.2d at 1113 (noting that a stockholder becomes a fiduciary if he or she "owns a majority interest in . . . the corporation" (quoting *Newmont,* 535 A.2d at 1344); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) ("Under our law, a controlling stockholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation[.]" (citation omitted)); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation[.]" (citation omitted))).

[552] *Voigt v. Metcalf*, 2020 WL 614999, at *17 (Del. Ch. Feb. 10, 2020) (citing 8 *Del. C.* §§ 242(b)(1), 251(c), 275(b)).

[553] *Id.* (citing 8 *Del. C.* §§ 141(k), 211(b), 216(2)).

a stockholder vote or acting by written consent.[554]  Musk controlled only 21.9% of Tesla's voting power, so he lacked mathematical voting control.

Mathematical voting control, however, is only one method of establishing controller status.[555]  "[C]ontrol of the ballot box is not always dispositive of the controlling stockholder inquiry[.]"[556]  A plaintiff can establish controller status by

[554] *Id.* at *17; *see also Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del. 1994) ("In the absence of devices protecting the minority stockholders, stockholder votes are likely to become mere formalities where there is a majority stockholder.").

[555] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014).

[556] *SolarCity I*, 2018 WL 1560293, at *14 (citing cases); *see, e.g., In re Pattern Energy Gp. Inc. S'holders Litig.,* 2021 WL 1812674, at *41–46 (Del. Ch. May 6, 2021) (finding it reasonably conceivable on a motion to dismiss that a stockholder owning "slightly more than 10%" was a controller who had consent rights and threatened to use it in order to control decisions); *Skye Mineral Invs., LLC v. DXS Cap. (U.S.) Ltd.,* 2020 WL 881544, at *24–29 (Del. Ch. Feb. 24, 2020) (finding it reasonably conceivable on a motion to dismiss that a group of investors collectively owning 28.07% of the company's equity was a control group because it had contractual blocking rights that could restrict capital raises and drive the company into bankruptcy); *Reith v. Lichtenstein*, 2019 WL 2714065, at *7–10 (Del. Ch. June 28, 2019) (finding it reasonably conceivable on a motion to dismiss that a stockholder owning 35.6% of the company's stock was a controller where the controller's affiliates and former executives took on senior leadership roles, provided key investment banking services, and significantly "influenced management"); *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *21–24 (Del. Ch. Mar. 11, 2019) (finding post-trial that stockholders who collectively owned "less than 15%" of the company's stock were controllers where the stockholders were the founders and officers of the company, managed the day-to-day operations, and had control of deal structures and information flow); *SolarCity I*, 2018 WL 1560293, at *19 (finding it reasonably conceivable on a motion to dismiss that Musk, who owned 22% of company's common stock, was a controller based on well-pled allegations related to "Musk's voting influence, his domination of the Board during the process leading up to the [challenged acquisition] against the backdrop of his extraordinary influence within the Company generally, the Board level conflicts that diminished the Board's resistance to Musk's influence, and the Company's and Musk's own acknowledgements of his outsized influence"); *Calesa Assocs. v. Am. Cap., Ltd.*, 2016 WL 770251, at *10–12 (Del. Ch. Feb. 29, 2016) (finding it reasonably

demonstrating that the defendant "exercises control over the business affairs of the corporation."[557]  For this purpose, a plaintiff need not argue that the defendant

conceivable on a motion to dismiss that a stockholder <u>owning 26%</u> of the company's stock exercised actual control where the plaintiff alleged instances of actual control beyond the fact that the stockholder "exercised duly obtained *contractual* rights to its benefit and to the detriment of the company" (emphasis in original)); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7–8 (Del. Ch. Nov. 26, 2014) (finding it reasonably conceivable on a motion to dismiss that a stockholder <u>owning 17.3%</u> of the company's stock was a controller because the stockholder was CEO and the company's 10-K stated that the stockholder effectively controlled the company), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21–22 (Del. Ch. Sept. 19, 2008) (finding post-trial that a stockholder <u>owning 35.9%</u> of the company's stock was a controller where the controller had rights to block important strategic initiatives, was a significant creditor that could unilaterally force redemption of notes, and maintained publicly that it controlled the board); *Cox Commc'ns*, 2006 WL 1586375, at *4–5 (finding it reasonably conceivable on a motion to dismiss that two stockholders, <u>owning collectively 17.1%</u> of the company's stock, jointly controlled the company based on their ability to nominate two of the five directors, their ability to influence the flow of revenue into the corporation, and their potential "veto" power over certain corporate decisions); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 535, 551–52 (Del. Ch. 2003) (finding post-trial that a stockholder <u>owning 35%</u> of the company's stock controlled the company because he was a "hands-on" "Chairman and CEO of [the company]," and because he had the ability to "elect a new slate [of independent directors] more to his liking without having to attract much, if any, support from public stockholders[,]" through his familial ties with the company's other stockholders); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912–13, 915–16 (Del. Ch. 1999) (finding it reasonably conceivable on a motion to dismiss that a stockholder <u>owning 49%</u> of the company's stock exercised actual control where the plaintiff alleged that the stockholder forced the board to comply with its terms on the merger through threats). *See also Voigt*, 2020 WL 61499 at *19 n.20 (noting "that '[t]his Court and others have recognized that substantial minority interests ranging <u>from 20% to 40%</u> often provide the holder with working control'" (quoting *Robbins & Co. v. A.C. Israel Enters., Inc.*, 1985 WL 149627, at *5 (Del. Ch. Oct. 2, 1985) (alteration in original))); 8 *Del. C.* § 203(c)(4) ("[a] person who is the <u>owner of 20%</u> or more of the outstanding voting stock of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary"); *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 110–11 (Del. 1948) (finding ten percent ownership of the outstanding common stock sufficient to infer control).

[557] *Newmont*, 535 A.2d at 1344 (citations omitted).

exercised general control over the business and affairs of the corporation. Although a showing of "general control" is sufficient to establish fiduciary status, a plaintiff can establish fiduciary status by demonstrating that the defendant controlled the particular transaction at issue, referred to as "transaction-specific" control.[558]

To establish general control, a plaintiff must show "that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are no differently situated than if they had majority voting control.'"[559] "One means of doing so is to show that the defendant, 'as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes.'"[560] The analysis of effective control looks to a stockholders' ability to exert influence as a stockholder, in the boardroom, and outside of the boardroom through managerial roles. Breaking these categories down to "indicia of effective control," the factors include:

- "ownership of a significant equity stake (albeit less than a majority),"

- "the right to designate directors (albeit less than a majority),"

- "decisional rules in governing documents that enhance the power of a minority stockholder or board-level position," and

---

[558] *Voigt*, 2020 WL 614999, at *11–12; *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018) ("The requisite degree of control can be shown to exist generally or with regard to the particular transaction that is being challenged." (quoting *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013)), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE).

[559] *Basho*, 2018 WL 3326693, at *25 (quoting *PNB*, 2006 WL 2403999, at *9).

[560] *Id.* (quoting *Cysive*, 836 A.2d at 553).

108

- "the ability to exercise outsized influence in the board room, such as through high-status roles like CEO, Chairman, or founder."[561]

To establish transaction-specific control, a plaintiff must show that the stockholder "exercise[d] actual control over the board of directors during the course of a particular transaction[.]"[562] This analysis often focuses on relationships "with key managers or advisors who play a critical role in presenting options, providing information, and making recommendations[.]"[563] It can also address "the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths," and "commercial relationships," although those factors are less relevant here.[564] Ultimately, "[i]t is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision."[565]

Both general control and transaction-specific control call for a holistic evaluation of sources of influence. "Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary

---

[561] *Id.* at *27 (citations omitted).

[562] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000) (citation omitted).

[563] *Basho*, 2018 WL 3326693, at *26 (concluding on a motion to dismiss that the defendant's relationship with management, including tips received by defendant from company's officers that provided negotiating leverage, supported an inference of control (citing *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 704, 706–07, 715, n.1 (Del. Ch. 2014)).

[564] *Basho*, 2018 WL 3326693, at *26 (citations omitted); *see also Skye Mineral,* 2020 WL 881544, at *26–27; *Cox Commc'ns,* 2006 WL 1586375, at *4.

[565] *Basho*, 2018 WL 3326693, at *26.

showing."[566]  "Different sources of influence that would not support an inference of control if held in isolation may, in the aggregate, support an inference of control."[567] "Sources of influence and authority must be evaluated holistically, because they can be additive."[568]  "Invariably, the facts and circumstances surrounding the particular transaction will loom large."[569]

Here, Plaintiff advances theories of both general and transaction-specific control.  To streamline the sprawling set of issues presented, this analysis addresses whether Musk held transaction-specific control with respect to the Grant.  Because "[b]roader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision[,]"[570] the sources of influence identified by Plaintiff in support of a finding of general control factor into the transaction-specific analysis.

Plaintiff's argument that Musk controls Tesla might conjure a sense of *déjà vu*. That is because Delaware courts have confronted this precise issue before in a prior lawsuit challenging Tesla's 2016 acquisition of SolarCity when Musk was SolarCity's largest stockholder and board chair.  Although the *SolarCity* case resulted in three opinions, none of them included a finding concerning Musk's status as a controller. In the first, Vice Chancellor Slights denied the defendants' motion to dismiss where

---

[566] *Id.* at *28 (citations omitted).

[567] *Voigt*, 2020 WL 614999, at *13.

[568] *Id.*

[569] *Basho*, 2018 WL 3326693, at *28.

[570] *Id.* at *27.

it was reasonably conceivable that Musk controlled Tesla.[571] On a motion to dismiss, however, a court must assume the truth of the plaintiff's factual allegations. Accordingly, the Vice Chancellor's dismissal decision did not constitute a finding that Musk was a controller. Post-trial, the Vice Chancellor held that even if Musk were a controller so as to trigger entire fairness, the transaction was entirely fair.[572] For this reason, it was unnecessary to make a post-trial finding on whether Musk controlled Tesla. The Vice Chancellor's approach dexterously relieved the Delaware Supreme Court from the burden of resolving the issue when affirming the post-trial decision.[573]

---

[571] *SolarCity I*, 2018 WL 1560293, at *13 (finding it reasonably conceivable that Musk controlled Tesla due to allegations concerning: Musk's ability to influence the stockholder vote through his 21.9% ownership; Musk's influence over the board as Tesla's visionary, CEO, and chairman; Musk's strong connections with members of the board and the fact that a majority of the board was interested in the transaction; and Tesla's acknowledgment of Musk's control in public filings).

[572] *SolarCity II*, 2022 WL 1237185, at *2. Although the Vice Chancellor found that there were significant flaws in the process that led to the SolarCity acquisition, the court held that "any control [Musk] may have attempted to wield in connection with the Acquisition was effectively neutralized by a board focused on the *bona fides* of the Acquisition, with an indisputably independent director leading the way." *Id.* at *33 (citation omitted). In reaching this conclusion, the Vice Chancellor emphasized that the board rebuffed multiple of Musk's demands during the process, that Denholm "emerged as an independent, powerful and positive force during the deal process who doggedly viewed the Acquisition solely through the lens of Tesla and its stockholders," and was an "effective buffer between" Musk and the conflicted board. *Id.* at *37–38. The Vice Chancellor then credited as evidence of a fair price the fully informed stockholder vote, SolarCity's unaffected trading price, SolarCity's cash flows, the financial advisor's fairness opinion, and potential synergies.

[573] *SolarCity III*, 298 A.3d at 699.

This question of whether Musk controls Tesla has thus proven evasive. It is as good a time as any to run it to ground. And so, "[o]nce more unto the breach, dear friends, once more."[574]

The analysis begins by discussing Musk's stock ownership, which is a significant but not dispositive indicium of control. The analysis then turns to the factors that play a bigger role in the court's conclusion, which are Musk's influence over managerial decisions, decision makers, and the process. Musk wielded the maximum influence that a manager can wield over a company. His ties to three of the eight directors (Kimbal, Gracias, and Murdoch) rendered those directors beholden to him; with Musk, they comprised half of the Board (given Jurvetson's departure). The rest of the fiduciaries acted beholden to Musk in the process leading to the Grant, allowing Musk to dictate the timing of the process and the terms of the Grant. Ultimately, the key witnesses said it all—they were there to cooperate with Musk, not negotiate against him. This unique suite of allegations makes it undeniable that, with respect to the Grant, Musk controlled Tesla.

### 1. Stock Ownership

"All else equal, a relatively larger block size should make an inference of actual control more likely[]" for a few reasons discussed at length by Vice Chancellor J. Travis Laster in *Voigt*.[575] This is due in part to quorum requirements and stockholder turnout, which give a 40% block holder the same effective power in most

---

[574] William Shakespeare, *Henry V* act 3 sc. 1, lns. 1–2.

[575] *Voigt,* 2020 WL 614999, at *17–19 (emphasis omitted).

circumstances as the holder of a mathematical majority.[576] Meanwhile, "stockholders who oppose the blockholder's position can only prevail by polling votes at supermajority rates."[577] Relatedly, compared to a small blockholder, a large blockholder needs the support of fewer other investors to carry a vote.[578]

Musk wields significant influence over Tesla by virtue of his stock holdings. Just prior to the Board's approval of the Grant, Musk owned approximately 21.9% of Tesla's outstanding common stock.[579] Applying the assumptions used in *Voigt*, if the holder of a 21.9% block favors a particular outcome, then the holder will win as long as holders of approximately one-in-three shares vote the same way.[580] By contrast, an opponent must garner approximately 71% of the unaffiliated shares to win.

It is thus no surprise that this court has found that holders of similar or lesser percentages of stock are controlling stockholders.[581] It is also no surprise that under

---

[576] *Id.* at *18 ("[O]nce a quorum is present, the general standard for taking action is the affirmative vote of a majority of the shares present and entitled to vote. For the election of directors, the general standard is a plurality of the shares present and entitled to vote. Meetings typically attract participation from just under 80% of the outstanding shares. At that level, the holder of a 40% block can deliver the vote needed to prevail at a meeting." (citations omitted)).

[577] *Id.* at *18 (citation omitted). For example, "assuming a meeting where holders with 80% of the voting power turn out, and the standard is a majority of the shares present and entitled to vote . . . if the holder of a 35% block favors a particular outcome at a meeting, then the blockholder will win as long as holders of 1-in-7 shares vote the same way. The opponents must garner over 90% of the unaffiliated shares to win." *Id.*

[578] *See generally id.* at *18–19 (discussing the mathematics behind this principle in detail).

[579] PTO ¶ 64.

[580] *Voigt*, 2020 WL 614999, at *18.

[581] *See supra* note 556.

113

Section 203 of the DGCL, "[a] person who is the owner of 20% or more of the outstanding voting stock of any corporation . . . shall be presumed to have control of such entity, in the absence of proof by a preponderance of the evidence to the contrary."[582] Nor is it any surprise that the original stockholder rights plan triggered at 20% ownership, or that rights plans now routinely cap ownership at 15% or less, thereby forcing a stockholder to stop short of the 20% figure.[583] At a minimum, a 21.9% holding supplies a powerful "rhetorical card[] to play in the boardroom."[584]

For Musk, his significant block operated in conjunction with a supermajority voting requirement for any amendment to Tesla's bylaws governing stockholder meetings, directors, indemnification rights, and the supermajority voting requirement itself.[585] Assuming an 80% turn-out, Musk needed the support of less than 10% of the minority stockholders to block a bylaw amendment at a stockholder meeting. By contrast, a proponent would have to garner over 93% of the unaffiliated shares to win. This means that, with the support of insiders or directors, Musk can

---

[582] 8 *Del. C.* § 203(c)(4).

[583] *See Williams Cos. S'holder Litig.*, 2021 WL 754593, at *1 (Del. Ch. Feb. 26, 2021) (citing Marcel Kahan & Edward Rock, *Anti-Activist Poison Pills*, 99 B.U. L. Rev. 915, 922 (2019)).

[584] *Voigt*, 2020 WL 614999 at *19.

[585] JX-323 at 33 (2/1/17 Form 8-K) (stating that Article X requires a supermajority of outstanding shares vote to amend Articles II, VIII, and X, and certain provisions of Article III).

easily block bylaw amendments that require a supermajority vote. Indeed, Musk has been able to do so two separate times.[586]

Musk's 21.9% block, therefore, gives him a sizable leg-up for stockholder votes generally and the ability to block specific categories of bylaw amendments. The block also gives him great influence in the boardroom. This undoubtedly contributes to his clout and sway.

If this case involved a failed bylaw amendment subject to a supermajority vote, then Musk's stock holdings would likely prove dispositive to the control analysis. But that is not the situation, so Musk's stock holdings must be considered in connection with the other indicia of control.

### 2. Boardroom And Managerial Supremacy

"[T]he ability to exercise outsized influence in the board room[]"can contribute to a finding of control.[587] Boardroom influence can come in a variety of forms. An individual might hold "high-status roles like CEO, Chairman, or founder."[588] Or an

---

[586] JX-1234 at 25–26 (5/28/20 Schedule 14A) (noting Tesla's successful opposition to the 2014 and 2016 proposals to move to simple majority voting).

[587] *Basho*, 2018 WL 3326693, at *27, n.322 ("[T]he explicit or implicit threat of retaliation will carry much more weight if it comes from a . . . defendant who controls 25% of the voting power of the company, . . . and serves as Chairman of the Board with the power to call board meetings and set the agenda."); *see also Cysive*, 836 A.2d at 551–53 (incorporating defendants' status as CEO and chairman into the control analysis).

[588] *Basho*, 2018 WL 3326683, at *27 (citations omitted); *SolarCity I*, 2018 WL 1560293, at *13 (considering for purposes of the control analysis "Musk's influence over the Board as Tesla's visionary, CEO and Chairman of the Board"); *Zhongpin*, 2014 WL 6735457, at *9 (denying a motion to dismiss where it was reasonably conceivable that the defendant was a controller, in part because "[t]he Company relied so heavily on him to manage its business and operations that his departure

individual might have other key executive or managerial roles. An individual can wield influence if he can interfere with or kibosh management decisions.[589] An individual will have substantial influence if he can replace management.[590]

Musk wields considerable power in the boardroom by virtue of his high-status roles and managerial supremacy. Indeed, describing Musk's role at Tesla as "high-status"[591] would be a dramatic understatement. At relevant times, Musk occupied the most powerful trifecta of roles within a corporation—CEO, chair, and founder. He also exercised managerial authority over all aspects of Tesla and often without

from [the Company] would have had a material adverse impact on the Company"), *rev'd on other grounds sub nom.*, *Cornerstone*, 115 A.3d 1173; *Cysive*, 836 A.2d at 551–53 (finding post-trial that a minority stockholder had controller status where the stockholder was the chairman and CEO "and a hands-on one, to boot[,]" was "by admission, involved in all aspects of the company's business, was the company's creator" and "inspirational force"). Although this court has held that high-status roles contribute to a finding of control, this court has declined to find that a defendant held controller status based *solely* on those roles. *See In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *23–24 (Del. Ch. May 25, 2021) (granting motion to dismiss where the alleged controller was the chairman and no other factors were present), *aff'd in part, rev'd in part and remanded*, 282 A.3d 37 (Del. 2022); *In re Rouse Props., Inc.*, 2018 WL 1226015, at *19–20 (Del. Ch. Mar. 9, 2018) (same, where no facts of actual control alleged); *Larkin v. Shah*, 2016 WL 4485447, at *13–15 (Del. Ch. Aug. 25, 2016) (same); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 664 (Del. Ch. 2013) (same, where alleged controller previously owned the company but did not exert actual control).

[589] *See, e.g.*, *Basho*, 2018 WL 3326693, at *32 (finding post-trial that a minority stockholder had controller status, in part because the stockholder "exerted control over management" who would "subvert . . . , threaten . . . or get rid of" any "member of management [who] did not support" the stockholder's interests).

[590] *See, e.g.*, *Reith*, 2019 WL 2714065, at *8 (denying a motion to dismiss where it was reasonably conceivable that the defendant was a controller, in part because the defendant had "replaced the company's management with alleged affiliates . . . and the Company paid an affiliated entity significant funds every month under the Management Services Agreement").

[591] *Voigt,* 2020 WL 614999, at *12.

regard to Board authority, rendering Tesla highly dependent on him. Truly, the avalanche of evidence on this point is so overwhelming that it is burdensome to set out in prose, hence these blunt bullet points:

- Tesla and Musk are intertwined, almost in a Mary Shelley ("You are my creator . . .") sort of way.[592] As Kimbal explained, "Tesla created Elon Musk's persona and Elon Musk's persona is attached to Tesla."[593] Musk is Tesla's public face, and he describes Tesla as "my company."[594]

- Tesla's entire corporate strategy is Musk's brainchild—he conceived both the "Master Plan" and "Master Plan, Part Deux."[595]

- Tesla is highly dependent on Musk, as it has made clear in public disclosures.[596] Musk did not dispute this characterization or that his departure would "likely" cause such disruptions.[597]

- Musk has admitted that he has "the power to direct operational decisions at Tesla[.]"[598]

---

[592] *See generally* Mary Shelley, *Frankenstein; or, The Modern Prometheus* (Lackington, Hughes, Harding, Mavor & Jones, 1st ed. 1818).

[593] Trial Tr. at 1085:11–24 (Kimbal); *see also id.* at 644:11–15 (Musk) (Musk agreeing that, as of May 2017, he was "heavily invested in Tesla, both financially and emotionally and . . . viewed Tesla as part of [his] family").

[594] *Id.* at 625:22–626:21 (Musk); *see also* JX-1031 at 52 (Tesla disclosing that "[w]e are highly dependent on the services of Elon Musk, our Chief Executive Officer, Chairman of our Board of Directors and largest stockholder.").

[595] Trial Tr. at 566:11–18, 610:24–611:2 (Musk) (Musk agreeing at trial that Part Deux is "still guiding Tesla's strategy"); PTO ¶¶ 47–48.

[596] JX-335 at 25–26 ("The loss of the services of any of our key employees could disrupt our operations, delay the development and introduction of our vehicles and services, and negatively impact our business, prospects and operating results. In particular, we are highly dependent on the services of Elon Musk, our Chief Executive Officer, and Jeffrey B. Straubel, our Chief Technical Officer."); JX-1031 at 52 ("We are highly dependent on the services of Elon Musk, our Chief Executive Officer, Chairman of our Board of Directors and largest stockholder.").

[597] Trial Tr. at 603:12–20 (Musk).

[598] *Id.* at 601:6–10 (Musk).

- Gracias testified that Musk "could have sold the entire company if he wanted to."[599]

- Musk is extremely involved in financial planning and supplies inputs for models and plans.[600] All financial plans must be approved by Musk.[601]

- Musk makes the hiring, compensation, and firing decisions for high-level positions.[602] Tesla employees described Musk as having a reputation among employees as a "tyrant" who fires people "on a whim."[603]

- Musk operates under his own set of rules at Tesla. For example, due to his "special position of trust" at Tesla, no one at Tesla could review his email account without permission except when legally required.[604]

- Musk has made up positions and titles for himself. In 2021, without first consulting with the Board,[605] Musk appointed himself "Technoking"—a position he compared to being a monarch.[606]

---

[599] *Id.* at 782:5–22 (Gracias).

[600] *Id.* at 498:22–499:7 (Ahuja).

[601] *Id.* at 511:8–19 (Ahuja).

[602] *Id.* at 851:6–852:5 (Murdoch); *id.* at 612:23–613:6 (Musk).

[603] JX-924 at 6 (Tesla employee survey); *see also* JX-857 at 1 (Tesla's former chief people officer, in a January 2018 email, stating: "Elon will fire me Tuesday anyway for sending market rate compensation to him").

[604] Trial Tr. at 601:11–602:10 (Musk).

[605] *Id.* at 1085:1–7 (Kimbal) ("Question: Have you heard the word 'Technoking' before? Answer: Yes, I have. Question: When did you first hear that word? Answer: I heard it over Twitter, when Elon changed his Twitter account."); *id.* at 854:21–855:3 (Murdoch) ("Q. Now, you're aware that Elon Musk has added Technoking to his Tesla title. Correct? A. Yes, I am aware of that. Q. And you believe you likely first learned about that development via a tweet. Is that correct? A. I might have. I think so. Yeah."); Musk Dep. Tr. at 25:13–25 ("Q . . . Did you consult with the board about the new title before -- before filing it on 8-K? A. No, but it was communicated to the board."); *but see* Trial Tr. at 599:4–10 (Musk) (stating that he was "wrong" in his deposition when he stated he did not consult the Board before giving himself the title of Technoking); *see also* JX-1331 at 2 (3/15/21 Form 8-K announcing the name change).

[606] Musk Dep. Tr. at 22:24–23:1.

Ehrenpreis described that decision as "Elon being Elon[,]"[607] which suggests that the behavior is not unusual for Musk. Musk testified that the title was intended as a joke,[608] but that is a problem in itself. Organizational structures, including titles, promote accountability by clarifying responsibilities. They are not a joke.

- Musk operates as if free of Board oversight, as shown by his treatment of the SEC Settlement.[609] Musk's "self-regulat[ory][610] process for compliance and the Board's desultory enforcement paint a vivid picture of their inability or unwillingness to rein in Musk.[611] Even after the settlement, the Disclosure Committee did not review his tweets.[612] At trial, Denholm was not sure whether the Disclosure Committee was fulfilling its obligations under the SEC Settlement.[613]

- Musk has ignored specific Board directives, such as unilaterally pausing Tesla's acceptance of Bitcoin after the Board approved it.[614] Other surprise announcements include Musk discussing the idea of Tesla repurchasing billions of dollars of stock during an earnings call and without Board knowledge.[615]

- Musk regularly uses Tesla resources to address projects at other companies he owns. For example, after Musk acquired Twitter, he asked approximately 50 Tesla engineers to "volunteer" to help him evaluate Twitter's engineering team.[616] No one on the Board challenged

---

[607] Trial Tr. at 189:19–24 (Ehrenpreis).

[608] *See id.* at 599:16–22 (Musk).

[609] *See* JX-1070 at 1 (9/29/18 SEC Press Release: Elon Musk Settles SEC Fraud Charges; Tesla Charged With and Resolves Securities Law Charge).

[610] Trial Tr. at 382:5–12 (Denholm).

[611] *See id.* at 616:3–11, 619:12–622:3 (Musk); *id.* at 382:5–12, 386:8–12 (Denholm).

[612] *Id.* at 615:8–616:2 (Musk); JX-1550 at 3–4 (12/9/18 60 Minutes interview transcript).

[613] Trial Tr. at 379:7–380:7 (Denholm).

[614] *Id*. at 613:19–614:10 (Musk).

[615] *Id.* at 619:13–24 (Musk). Musk's general aversion to oversight extends to the SEC. *See generally id.* at 623:4–22, 624:3–625:21 (Musk); JX-1555 (7/2/20 tweet from Musk stating: "SEC, three letter acronym, middle word is Elon's").

[616] Trial Tr. at 656:6–657:20 (Musk).

this decision.[617]  Murdoch testified that this was "being monitored by the [Audit Committee] and being paid for."[618]  But Murdoch was not able to even "ballpark" the number of Tesla engineers involved, even though the monitoring he described had taken place at most "a few weeks" prior to his testimony.[619]  Murdoch's testimony also showed that any monitoring by the Audit Committee, such as it was, took place after the fact.[620]  Similarly, in 2020, Musk directed Tesla management to send Tesla's "smartest micro grid designer [] with a bunch of Powerpacks to [SpaceX][.]"[621]

This evidence, though not exhaustive, demonstrates the scope of Musk's influence as a member of management and in the Boardroom.  Based on this list alone, it could be said that Musk wields unusually expansive managerial authority, equaling or even exceeding the imperial CEOs of the 1960s.[622]

One set of scholars have created a term for this sort of person—a "Superstar CEO," defined as an "individual[] who directors, investors, and markets believe make a unique contribution to company value."[623]  As the authors explain, the reasons for believing that a CEO is uniquely valuable to the corporation might vary, and those

---

[617] *Id.* at 657:9–658:2 (Musk).

[618] *Id.* at 870:18–871:2 (Murdoch).

[619] *Id.* at 869:14–870:17 (Murdoch).

[620] *Id.* at 870:18–871:2 (Murdoch).

[621] JX-1195 at 1.

[622] *See generally* Myles L. Mace, *Directors: Myth and Reality* 77–85 (1971).

[623] *Superstar CEOs* at 1367.

beliefs could be wrongly held.[624] But the reasons and their accuracy are irrelevant.[625] "[W]hat matters is only that such a belief does exist."[626]

CEO superstardom is relevant to controller status because the belief in the CEO's *singular* importance shifts the balance of power between management, the board, and the stockholders. When directors believe a CEO is uniquely critical to the corporation's mission, even independent actors are likely to be unduly deferential. They believe that "letting the CEO go would be harmful to the company and that alienating the CEO might have a similar effect."[627] They "doubt their own judgment and hesitate to question the decisions of their superstar CEO."[628] They view CEO self-dealing as the trade-off for the CEO's value.[629] In essence, Superstar CEO status

---

[624] *Id.* at 1367–68 ("Markets may believe, for example, that only the CEO possesses the idiosyncratic vision that is essential to make the company outperform the competition. Or that only she possesses exceptional skills or other rare qualities that are crucial for implementing the company's strategy. Another explanation is that the CEO possesses the charisma and ability to sell their vision that is crucial for attracting investors, employees, or other constituencies. . . . [T]hese are CEOs who directors, investors, and markets *believe* have *charismatic power* or other *extraordinary qualities* that set them apart from other ordinary CEOs . . . ." (emphasis in original)); *id.* at 1368 ("Moreover, the perception that a CEO is uniquely valuable could be wrong as a matter of principle or in the case of certain individuals.").

[625] *Id.*

[626] *Id.* (emphasis omitted).

[627] *Id.* at 1379.

[628] *Id.*

[629] *See, e.g., id.* at 1392 ("As long as the CEO is perceived as a star and the company depends on her vision and leadership, investors are less likely to challenge the CEO. Regardless of their financial savvy, investors might even approve self-dealing and other value reducing transactions. They will not rush to discipline CEOs with star qualities even when they engage in misconduct. They will challenge the CEO only when they believe that [s]he has lost h[er] magic touch or that the harm from h[er] misconduct exceeds her singular contribution to company value.").

creates a "distortion field"[630] that interferes with board oversight. As discussed later in this analysis, the distortion field can weaken mechanisms by which stockholders hold fiduciaries accountable, a risk that becomes more severe when the Superstar CEO owns a large block of shares.[631]

Faith in a Superstar CEO changes the dynamics of corporate decision making. That is true for all corporate decisions, but the risk becomes more acute for issues where the Superstar CEO's interests are directly concerned. Nowhere is that truer than the Superstar CEO's compensation. In the face of a Superstar CEO, it is even more imperative than usual for a company to employ robust protections for minority stockholders, such as staunchly independent directors. In this case, Tesla's fiduciaries were not staunchly independent—quite the opposite, as discussed next.[632]

---

[630] This phrase, first used to describe Steve Jobs, applies here. *See* Elson Amicus Br. at 1 (citing Waters *supra* note 12).

[631] *Superstar CEOs* at 1400–02.

[632] To be sure, the Superstar CEO designation lacks definitional precision. It is hard to distinguish between an executive who is valuable to a corporation and a Superstar who is singularly or uniquely valuable to a corporation. As the scholars have acknowledged, this definitional imprecision could lead to "vague standards" that "create uncertainty and encourage litigation[,]" thus diminishing the utility of the Superstar CEO label. *Id.* at 1400–02; *see also* Lawrence Hamermesh, Jack B. Jacobs, and Leo E. Strine, Jr., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective And Look Ahead*, 77 Bus. Law. 321, 346 (2022) (raising concerns with the theory, noting that a CEO's value to a company standing alone does not make the CEO a controlling stockholder). For that reason, the concept should not be deployed far and wide. When deployed, doubtless there will be close cases. But not here. Musk is a dead ringer. *See generally Superstar CEOs* at 1354–56 (identifying Musk as the paradigmatic Superstar CEO). If nothing else, the Superstar CEO concept is valuable for its descriptive power, because it explains what took place in this case.

122

### 3. Relationships With The Board

A director lacks independence if he or she is "so beholden to an interested director that his or her discretion would be sterilized."[633] Both past and future rewards are relevant to this analysis.[634] The inquiry is "highly fact specific" and there is "no magic formula to find control."[635]

Nine directors served on the Board at relevant times. Jurvetson can be excluded given his early departure. Of the remaining eight, Musk was one and his brother another.[636] That is one fourth of the relevant directors. The other six had varying degrees of ties to Musk. The analysis begins with the four Compensation Committee members (Ehrenpreis, Buss, Denholm, and Gracias) and then turns to Murdoch and Johnson Rice.

Gracias had the most extensive business and personal dealings with Musk and Kimbal. Prior to approving the Grant, Gracias held interests worth over $1 billion in Musk-controlled entities, which Gracias admitted provided him "dynastic or generational wealth."[637] Gracias and Musk had a decades-long relationship, which included joint family vacations and attendance at family birthday parties. Gracias

---

[633] *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (citing cases).

[634] *See generally* Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 550 (2019). Prospective rewards might be more difficult to prove than past relationships, but that does not mean they do not exist.

[635] *Calesa*, 2016 WL 770251, at *11 (citing *Crimson*, 2014 WL 5449419, at *10).

[636] Defendants do not dispute this; nor could they. Kimbal is Musk's brother and business partner, and he recused himself from discussion of or voting on the 2018 Grant due to this conflict. PTO ¶ 232; *see* JX-791 at 1.

[637] Trial Tr. at 774:22–24 (Gracias).

had a 20-year friendship with Kimbal and was an investor in Kimbal's business ventures. Gracias also received millions in Valor investments from Musk and Kimbal, and was a director of SpaceX and SolarCity, the latter until its acquisition by Tesla.

Gracias's business ties to Musk, standing alone, support a finding that Gracias lacked independence from Musk.[638] Similarly, Gracias's personal relationship with Musk, standing alone, support a finding that Gracias lacked independence from Musk.[639] The combination of business and personal ties make it undeniable that Gracias lacked independence from Musk.

---

[638] *See generally Sandys v. Pincus,* 152 A.3d 124, 134 (Del. 2016) (finding it reasonably conceivable on appeal from a dismissal decision that two directors were not independent of a controller for purposes of Rule 23.1 where they had "a mutually beneficial network of ongoing business relations" based on past investments and service on company boards); *SolarCity I,* 2018 WL 1560293, at *18 (finding it reasonably conceivable on a motion to dismiss that a director lacked independence where the controller was a "frequent investing partner" in the director's venture); *Cumming v. Edens,* 2018 WL 992877, at *15 (Del. Ch. Feb. 20, 2018) (finding it reasonably conceivable on a motion to dismiss that a director was not independent for demand futility purposes because the director and the controller owned a professional sports team together and worked together to build a new stadium); *Trados,* 73 A.3d at 54–55 (finding post-trial that a director lacked independence where, among other allegations, the director "had a long history with" the controller, had served previously as an executive at one of the controller's portfolio companies, was asked "to work with [the controller] on other companies," and invested "about $300,000 in three [controller] funds"); *In re New Valley Corp. Deriv. Litig.,* 2001 WL 50212, at *7 (Del. Ch. Jan. 11, 2001) (finding it reasonably conceivable on a motion to dismiss that directors were not disinterested and independent based on intertwined, long-standing business relationships such as being paid to be a director nominee in a separate proxy bid); *Loral,* 2008 WL 5293781, at *20–22 (finding post-trial that a director lacked independence where, among other things, the director had successfully solicited investments from the controller's companies).

[639] *See generally Marchand v. Barnhill,* 212 A.3d 805, 819 (Del. 2019) (finding it reasonably conceivable on appeal that a director's long-standing personal ties to the

124

Ehrenpreis also had extensive business and personal relationships with Musk. Prior to the Grant, Ehrenpreis held interests worth at least $75 million in Musk-controlled companies other than Tesla and had invested in Kimbal's business ventures. Ehrenpreis also had longstanding personal and professional relationships with Musk and Kimbal that Ehrenpreis admitted had a "significant influence" on his professional career.[640] Although Ehrenpreis's relationship with Musk was not as thick as that enjoyed by Gracias, it was weighty. Given the critical role he played as chair of the Compensation Committee, it was too weighty. Even if one could debate whether these ties rendered Ehrenpreis beholden to Musk in general, his actions in connection with the Grant demonstrate that he was beholden for that purpose.

The same is true of Denholm and Buss. Their most significant, potentially comprising factor is the compensation each received as a Tesla director. For Denholm, it was "life-changing."[641] For Buss, it was a large portion of his wealth.[642] Ordinary, market-rate compensation does not compromise a director's

controller compromised independence); *Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015) (finding it reasonably conceivable on appeal from a dismissal decision that a director lacked independence because the director had a friendship of over 50 years with an interested party); *Sandys*, 152 A.3d at 130 (finding it reasonably conceivable on appeal from a dismissal decision that co-owning a private plane with a close friend indicates a lack of independence because it is unusual and would require close cooperation in use and a continuing, close personal friendship); *In re BGC P'rs, Inc. Deriv. Litig.*, 2019 WL 4745121, at *11–12 (Del. Ch. Sept. 30, 2019) (finding it reasonably conceivable on a motion to dismiss that a director lacked independence where the director and the controller attended exclusive events together and had a close relationship for 20 years).

[640] Trial Tr. at 192:6–10 (Ehrenpreis).

[641] *Id.* at 397:6–12 (Denholm).

[642] *See supra* § I.C.1.a.ii.

independence.[643]  Outsized director compensation can.[644]  But Plaintiff does not argue that Musk established Buss and Denholm's compensation so as to render them beholden.[645]  Instead, it is a factor that must be considered when evaluating how Denholm and Buss acted when negotiating the Grant.

The remaining directors present clearer calls.  Murdoch lacked independence due to personal connection with Musk.  He was a long-time friend of Musk before he joined the Board and they repeatedly vacationed together with their respective

---

[643] *See generally In re Kraft Heinz Co. Deriv. Litig.*, 2021 WL 6012632, at *11 (Del. Ch. Dec. 15, 2021) (finding standard director compensation "alone cannot create a reasonable basis to doubt a director's impartiality[]" (quoting *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *15 (Del. Ch. Jan. 14, 2010))).

[644] *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997) (finding that a director was beholden to majority stockholder where, three years previously, the company had retained his consulting services for $10,000 per month and awarded more than $325,000 in bonuses); *Kahn v. Portnoy*, 2008 WL 5197164, at *8–9 (Del. Ch. Dec. 11, 2008) (finding it reasonably conceivable that directors' fees derived from controller's companies, which exceeded compensation from other employment, rendered the director beholden to the controller); *see also Cumming*, 2018 WL 992877, at *17 (finding it reasonably conceivable on a motion to dismiss that a director lacked independence from a controller where the director was alleged to have derived 60% of his publicly reported income from service on a board to which the controller appointed him).

[645] As to Denholm, this court previously held that Denholm was "an independent, powerful and positive force during the deal process" that led to the SolarCity acquisition.  *SolarCity II*, 2022 WL 1237185, at *37–38.  And that was surely true at the time.  But it was not a factual finding that carries forward for all time.  Moreover, Denholm's approach to enforcement of the SEC Settlement, including unawareness of one of its key requirements, suggests a new lackadaisical approach to her oversight obligations.  *See supra* § I.I.3.

126

families.[646] It was during one such trip that Musk, Kimbal, and Gracias recruited Murdoch to the Board.[647]

Johnson Rice, by contrast, had no compromising personal or business ties to Musk. Plaintiff concedes as much.

Summing it up, it is easy to conclude based on the nature of their relationships with Musk that Kimbal, Gracias, and Murdoch lacked independence from Musk. After Jurvetson's departure, and along with Musk, that was half the Board. The rest of the Director Defendants fall along a spectrum ranging from Ehrenpreis's extensive relationships with Musk to Johnson Rice's lack thereof.

### 4. The Process

When assessing independence, Delaware courts consider not only the directors' relationships with the party to whom they are allegedly beholden, but also how they acted with respect to that party.[648] Directors with strong ties to a controller may demonstrate their independence.[649] And directors without strong individual ties to a

---

[646] Trial Tr. at 819:2–16, 820:20–821:2, 847:5–849:15 (Murdoch).

[647] *Id.* at 780:23–781:2 (Gracias); *id.* at 821:3–822:21 (Murdoch); *id.* at 1080:13–21 (Kimbal).

[648] *In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at *24 (noting that analysis of controller's influence on special committee focuses on how the committee actually negotiated the deal rather than just how the committee was set up); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 789 (Del. Ch. 2011) (same) (citations omitted), *aff'd sub nom.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012).

[649] *See In re Dole Food Co., Inc., S'holder Litig.*, 2015 WL 5052214, at *16 (Del. Ch. Aug. 27, 2015) ("Before trial, Conrad's role as Chair was not a reassuring fact. It was reasonable to infer from Conrad's ties to Murdock, the events surrounding Weinberg's resignation, and the insiders' desire to have Conrad as Chair that Conrad would be cooperative, if not malleable, when facing Murdock. But after hearing Conrad testify

127

controller may fall victim to a "controlled mindset."[650]  A controlled mindset can be

evidenced by the directors approaching negotiations seeming "less intent on

negotiating with [the controller] and more interested in achieving the result that [the

controller] wanted[.]"[651]

When evaluating control allegations in the context of a challenge to a merger,

Chief Justice (then-Vice Chancellor) Strine once observed:

> [T]he question of whether the large block holder has "control" may be relevant, and intertwined with, the question of whether the merger was approved by uncoerced, independent directors seeking solely to advance the interests of the corporation and its disinterested stockholders rather than by supine servants of an overweening master.[652]

The references to "supine servants" and "an overweening master" is hyperbolic, and

no doubt deliberately so to give emphasis to the difficulty of the standard.  But it hits

home here.  There is no greater evidence of Musk's status as a transaction-specific

controller than the Board's posture toward Musk during the process that led to the

Grant.  Put simply, neither the Compensation Committee nor the Board acted in the

best interests of the Company when negotiating Musk's compensation plan.  In fact,

there is barely any evidence of negotiations at all.  Rather than negotiate against

---

and interacting with him in person at trial, I am convinced that he was independent in fact.").

[650] *S. Peru*, 52 A.3d at 798 (finding that, "from inception, the Special Committee fell victim to a controlled mindset and allowed [the controlling stockholder] to dictate the terms and structure of the Merger").

[651] *Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, 2020 WL 2111476, at *35 (Del. Ch. May 4, 2020).

[652] *Cysive*, 836 A.2d at 550–51.

Musk with the mindset of a third party, the Compensation Committee worked alongside him, almost as an advisory body.

Multiple aspects of the process reveal Musk's control over it, including the timeline, the absence of negotiations over the magnitude of the Grant or its other terms, and the committee's failure to conduct a benchmarking analysis. In the end, the key witnesses said it all by effectively admitting that they did not view the process as an arm's length negotiation.

### a. Musk Controlled The Timing.

Defendants emphasize that nine months passed after the initial April 9 call between Musk and Ehrenpreis until the Board approved the Grant. In reality, however, most of the work on the Grant occurred during small segments of that nine-month timeline and under significant time pressure imposed by Musk.

Before the Board or Compensation Committee had any substantive discussion concerning the Grant, Musk's team proposed a highly accelerated schedule that contemplated approval of the Grant within less than two months.[653] A later version of the timeline was even more rushed, proposing only one Compensation Committee meeting (with an additional meeting if necessary) and giving the committee less than three weeks to complete its task.[654] This was a recklessly fast approach, yet

---

[653] JX-423 at 2–3 (6/19/17 email from Matt Tolland to Maron re "Re: Privileged - Comp Comm Process").

[654] JX-456 at 2 (6/26/17 email from Phillips to Ehrenpreis and Maron re: "Tesla | Executive Compensation Timeline"). This timeline envisioned that on July 7, the Compensation Committee would "[g]ain agreement on proposed approach, award size and metrics/goals" and "[g]ain preliminary approval of grant agreement." JX-456 at 2.

Ehrenpreis did not question it.[655] In fact, not one but Brown questioned it. And Brown's concerns were ignored.

The process decelerated to a reasonable pace only because Musk made it so. On July 6, a day before the first Compensation Committee meeting, Maron announced that the new goal was to issue a grant in August or September.[656] On July 30, a day before another Compensation Committee meeting, Musk emailed Maron to put the process on hold.[657] Although Musk agreed by email to let Maron "keep cranking[,]"[658] the wheels ground to a halt for several months. By August 12, Brown was telling his team there was "no need to spend any time" on a presentation relating to the 2018 Grant due to negotiations between Musk and the Board.[659] Similarly, on August 27, Ahuja told members of his team "[i]t was decided to defer this action by a few months."[660] And Ahuja's statement on September 17 that "[w]e are back on track to finalize a CEO comp package[]" turned out to be a false start.[661] There was no meaningful activity through the end of October.

---

[655] Trial Tr. at 124:11–125:11 (Ehrenpreis).

[656] JX-503 at 1.

[657] JX-564 at 1.

[658] *Id.* at 1.

[659] JX-596 at 1.

[660] JX-604 at 1.

[661] JX-640 at 3; *id.* at 1 (Ahuja stating on September 20 that "the priority on this effort has again been lowered[,] [s]o not critical at this point").

Defendants exaggerate how much work occurred in August and September.[662] Although the Compensation Committee did meet on August 14, there is no indication that this meeting involved a substantive discussion of the Grant.[663] The committee also met on September 8, but the minutes of that meeting describe the discussion of the Grant as featuring only a "brief update" and an agreement to "provide additional details to the broader Board group at the next Committee meeting."[664]

Musk restarted discussions on the Grant on the morning of November 9, just before a scheduled Compensation Committee meeting, telling Maron that he would "like to take board action as soon as possible if they feel comfortable and then it would go to shareholders."[665] This message was not relayed during the November 9 meeting.[666] But Maron conveyed the urgency three days later, emailing the full Board and members of the Working Group with a request for "another meeting on the issue of CEO compensation at everyone's first available opportunity."[667]

---

[662] *See* Defs.' Post-Trial Answering Br. at 17 ("[I]n August and September 2017, there were three Compensation Committee meetings, a Working Group call, and a Board meeting discussing the Plan." (citing DDX-1 at 2)).

[663] JX-597 at 2 ("Mr. Ehrenpreis updated the Committee regarding the continuing efforts to develop Elon Musk's next compensation package. Questions were asked and discussion ensued.").

[664] JX-617 at 2.

[665] JX-664 at 1.

[666] *See* JX-663 at 3 ("Ehrenpreis provided an update regarding continued development of Elon Musk's next compensation package. Questions were asked and discussion ensued.").

[667] JX-667 at 1.

Musk tried to pause the process again on November 14 with another email to Maron, stating: "Given recent developments, let's pause for a week or two. This would be terrible timing[.]"[668] The Board held a special meeting to discuss the Grant on November 16, during which Ehrenpreis and Maron proposed approving the plan in December 2017 and seeking stockholder approval in early 2018.[669] The final timeline, however, included the delay Musk requested and extended into January 2018. Although Musk's November 14 attempt to pause work on the 2018 Grant did not stop a Board meeting in the following days, it had enough of an effect that those working on the Grant did not consider the process "back on" until well until December, which is when another period of urgency commenced.[670]

To sum it up, Musk unilaterally set the timeline or made last-minute proposals to the Board prior to six out of the ten Board or Compensation Committee meetings during which the Grant was discussed.[671] Musk dictated when the game clock started

---

[668] JX-668 at 1.

[669] JX-669 at 2.

[670] JX-717 at 1 (12/10/17 email noting the "importance and the timing on getting" an analysis of the stock-based compensation effects of the Grant "out quickly" because of a valuation deadline the next day); JX-717 at 1 (12/11/17 email marked as "high" importance stating, "[w]e are back on with a vengeance (apologies in advance). . . . I am just now digesting myself"); JX-718 at 1 (12/11/17 email stating that "[o]ur CEO grant[] is back and on a fast track now").

[671] JX-423 (6/19/17 email circulating, four days before the first Compensation Committee meeting, an accelerated timeline); JX-503 at 1 (7/6/17 email from Maron stating, a day before the Compensation Committee was supposed to give preliminary approval to the Grant, that "we're now going on a slower track with the CEO grant"); JX-564 at 1 (7/30/17 email from Musk stating, a day before the first Compensation Committee meeting, to "put [it] on hold for a few weeks"); JX-596 at 1 (8/12/17 email from Brown stating, two days before a Compensation Committee meeting, "no need

132

and stopped, thereby artificially compressing the work into short bursts that took place when he wished to move forward.  Musk's habit of shaking things up just before meetings also made it tough for the committee and its advisors to be prepared. Musk's persistent pattern cannot be chalked up to coincidence.  Musk controlled the timing.

### b. There Was No Negotiation Over The Size Of The Grant.

The most striking omission from the process is the absence of any evidence of adversarial negotiations between the Board and Musk concerning the size of the Grant.  Musk made an initial proposal, and that proposal was the only one seriously considered until Musk unilaterally changed it six months later.

Defendants did their best to paint a different picture, but the contemporaneous evidence betrayed them.  They cannot meaningfully deny that Musk made the initial

---

to spend any time on this for now.  Sounds like Elon and the Board are negotiating a little bit, which may impact where they land on some of the key program points"); JX-640 at 3 (9/17/17 email from Ahuja stating, two days before the Board meeting, that "[w]e are back on track to finalize a CEO comp package"); *id.* at 1 (9/20/17 email from Ahuja stating, the day after the Board meeting, that "the priority on [the CEO grant] has again been lowered"); JX-664 at 1 (11/9/17 email from Musk proposing a "reduced" award only hours before a Compensation Committee meeting); JX-668 (11/14/17 email from Musk stating, two days before another Board meeting at which the Grant was to be discussed, "let's pause for a week or two"); JX-717 at 1 (12/11/17 email from Tesla employee stating, a day before the December 12 special meeting of the Board to discuss the 2018 Grant, that "[w]e are back on with a vengeance"); JX-718 (12/11/17 email stating that "[o]ur CEO grant[] is back and on a fast track now").  The substance of the Compensation Committee's September 8 and December 8 meetings seemed to escape Musk's meddling, but neither were particularly substantial.  *See* JX-697 at 3. The other untouched meetings were the very first meeting on June 6 (where the Board's discussion was forgettable) and the last on January 21 where the Board approve the 2018 Grant.  *See* JX-407; JX-743 at 1; JX-773 at 4.

proposal. Although Ehrenpreis initiated the April 9 discussion,[672] Musk proposed the terms during that call.[673] Musk told Ehrenpreis that he wanted a grant with 15 tranches awarding 1% of Tesla's total outstanding shares for each market capitalization increase of $50 billion.[674] This proposal set the size and structure for the Grant until November 9.[675]

Defendants cannot deny that, on November 9, Musk unilaterally lowered his ask. He proposed what he believed was a "reduced" compensation plan, which would award him a fully diluted 10% increment in his Tesla ownership if he reached a $550 billion market capitalization.[676] After Musk learned that this proposal would result in greater compensation than his initial proposal, he changed it again. On December 1, he stated: "That is more than intended. Let's go with 10% of the current [fully diluted share] number[.]"[677] Defendants tout the reduced proposal of December 1 as a "negotiated price,"[678] but Musk was more honest. Unprompted, he described his "proposal on December 1" as "me negotiating against myself."[679]

---

[672] JX-362 at 2.

[673] *See* JX-1700 at 12 (1/12/18 Draft Schedule 14A Proxy).

[674] *See id.*; *see also* Trial Tr. at 269:17–270:8 (Maron) (testifying that "at the beginning of the process . . . the conception of the plan at a high level was to have $50 billion market cap increments").

[675] *See* JX-445 at 3–4; JX-464 at 5–7; JX-490 at 5–7; JX-640 at 3.

[676] JX-664 at 1.

[677] JX-682 at 1.

[678] Defs.' Post-Trial Opening Br. at 64–65; *see also* Trial Tr. at 584:9–19 (Musk).

[679] Trial Tr. at 696:7–697:7 (Musk).

To blunt the blow of Musk's candor, Defendants vigorously argue secondary points. For example, they contend that the Compensation Committee considered a variety of award sizes prior to Musk's new proposal on November 9.[680] They cite to the August 1 Compensia presentation, which identifies alternative market capitalization increments and corresponding award sizes of 7.5% and 10%.[681] But the presentation valued the 15% award only, and there is no record of any actual discussions concerning the alternative award sizes.[682] The minutes for the November 16, 2017 Board meeting suggest that there was no actual discussion concerning alternatives.[683] And when Maron received Musk's new offer, he compared it to Musk's original proposal and not any alternatives.[684] By July 2017, Musk's 15-tranche was locked-in as the operating assumption. The Compensation Committee did not consider alternatives.

---

[680] Defs.' Post-Trial Opening Br. at 60–61 (citing JX-566 at 14–16); *id.* at 33 (citing JX-566 at 14–16); Trial Tr. at 213:14–23 (Ehrenpreis).

[681] Defs.' Post-Trial Opening Br. at 60–61 (citing JX-566 at 14–16); *id.* at 33 (citing JX-566 at 14–16).

[682] JX-566 at 13–16, 23–24; *see* JX-633 at 17–21 (9/19/17 slide deck assuming 15% of total outstanding shares and providing 7.5% and 10% chart for comparison). The August 1 presentation included other possibilities and key questions that were never discussed. *See* JX-566 at 8 (8/1/17 slide deck) (asking "Should a new award be stock option-based? Should it be multi-year and highly performance-based or structured as a more traditional annual award?").

[683] JX-669 at 2 ("As discussed in previous meetings and again at this meeting, the Board continued to consider 1% of current total outstanding shares as the award for each vesting tranche, achievement of which required both an increase of $50 billion in the Company's market capitalization and a matching operational milestone.").

[684] JX-678 at 1.

As another example, Defendants emphasize that the Grant ultimately included 12 tranches, each awarding 1% of total outstanding shares and requiring $50 billion in market capitalization growth.[685] According to Defendants, this represented "an appreciation in market capitalization that was $100 billion more than what Musk had proposed in exchange for the same percentage of options."[686] Although Defendants are correct that, all else equal, requiring more market capitalization growth for the same number of shares means a better deal for stockholders, there is simply no credible evidence that the shift from ten tranches to 12 was the result of any actual negotiation with Musk. To the contrary, the record reflects that the Board preferred the simplicity of total outstanding shares.[687] Toward this end, they backed into 12 tranches when translating Musk's demand of 10% of fully diluted shares into a round percentage of total outstanding shares while maintaining the $50 billion/1% per tranche approach that Musk proposed in April.[688]

---

[685] Defs.' Post-Trial Opening Br. at 64–65.

[686] *Id.* at 65 (citing Trial Tr. at 225:21–227:18 (Ehrenpreis)).

[687] *See* JX-669 at 2 (11/16/17 Board meeting minutes) ("the directors expressed a general preference to measure the size of the grant as a percentage of total outstanding shares, and not allow for known dilution protection for Mr. Musk"); Maron Dep. Tr. at 407:17–25 (stating he believed the Board used TOS, instead of FDS, because "it was a simpler approach").

[688] JX-743 at 4–5; *see* JX-701 at 1 (12/10/17 email from Chang providing contemporaneous notes of the 12/10/17 special Compensation Committee meeting) ("We seem to be at the right place as far as size: 10% of FDS (~12% of TOS)").

The testimony from Ehrenpreis that Defendants cite does not support a finding that negotiations over the 12%/12-tranches occurred.[689] Ehrenpreis simply confirmed that he generally recalled "negotiations in the late part of 2017 about the terms of the" Grant.[690] When asked "[w]hat, if anything happened to the total amount of market capitalization that would accrue to the shareholders if Mr. Musk hit all of the targets in the plan as between the time of the negotiation and then the final plan," Ehrenpreis responded "[d]uring that period of time, the market cap milestones increased by $100 billion."[691] Although this describes what happened, it does not establish the existence of a negotiation. In a follow-up question, Ehrenpreis avoided saying that he or anyone else negotiated with Musk about the market capitalization increase, again merely describing the changes that took place.[692]

Maron also stopped short of describing this aspect of the process as a negotiation. He testified that although the final terms included the "size of the overall plan . . . were all different than I think were initially thought of by Elon. . . . I don't want to say that it was necessarily over his objection. They weren't things he thought of. They were things that the Board thought of and that he ultimately agreed

[689] *See* Defs.' Post-Trial Opening Br. at 65 (citing Trial Tr. at 225:21–227:18 (Ehrenpreis)).

[690] Trial Tr. at 225:21–24 (Ehrenpreis).

[691] *Id.* at 225:21–226:7 (Ehrenpreis).

[692] *See id.* at 226:17–227:18 (Ehrenpreis).

to."[693]   Aspects of this testimony ring true—Musk's various proposals lacked the detail necessary to implement them.

In short, the Compensation Committee and the Board failed to negotiate the overall size or difficulty of the Grant with Musk.

### c.   There Was No Meaningful Negotiation Over The Other Terms Of The Grant.

The other key terms of the Grant were: the Clawback Provision, the Leadership Requirement, the Five-Year Hold Period, and the M&A Adjustment.  As to these terms, the only back-and-forth in the record concerned the M&A Adjustment, but Musk himself conceded that this was at most a minor feature of his compensation plan that he did not care about.  He stated, at the end of negotiations on this point, "I don't think we will be making big acquisitions[]" and "[t]here is no chance I will game the economics here, so I'm fine with limits that prevent that."[694]   He then proceeded to propose a stricter M&A Adjustment than was on the table.[695]

Defendants argue that the Five-Year Hold Period was a negotiated point and a major concession.[696]  But neither the documentary record nor the witness testimony corroborates Musk's recollection of vigorous negotiation.  The closest testimony on point is to the contrary, where Maron stated "[w]hen you talk about holding periods and the M&A adjustments and the size of the overall plan, these were all different

---

[693] Maron Dep. Tr. at 428:20–430:3.

[694] JX-781 at 1–2.

[695] JX-874 at 2.

[696] Trial Tr. at 584:9–585:2 (Musk) (testifying that the Board "pushed significantly" on this point).

than I think were initially thought of by Elon. But I don't want to say that it was necessarily over his objection. They weren't things that he thought of."[697]

Meanwhile, one of the biggest purported concerns expressed by the Board was their desire to keep Musk engaged in Tesla despite his significant time commitments at his other companies, which included SpaceX, The Boring Company, Neuralink, and later, Twitter.[698] The Grant could have addressed this issue. The most obvious way would have been a requirement that Musk devote substantially all of his professional time and attention to Tesla-related matters. Another option could have been a restriction on the amount of time and attention he could devote to companies other than Tesla.[699] Still other possibilities might include a forfeiture or clawback provision if Musk failed to provide the requisite level of time and attention.[700] Yet no one proposed anything like that to Musk.

---

[697] Maron Dep. Tr. at 429:7–13; *see also id.* 428:20–430:3.

[698] Trial Tr. at 328:9–24 (Denholm) ("Elon had other business interests that competed for his time."); JX-612 at 2 ("How can the comp comm/board/shareholders be assured that [Musk] will devote adequate time to Tesla given his other commitments/businesses/. Should some type of commitment be included as part of comp structure?"); Murdoch Dep. Tr. at 292:1–293:20 ("But obviously as [SpaceX] grew and depending on … where Elon thinks his time is going to be most useful in terms of both … his own incentives as an executive, apropos of this plan, and also … where he can make the biggest impact, … we wanted to make sure that … Tesla was top of mind."); Ehrenpreis Dep. Tr. at 51:6–13 ("And so my thinking and the goal was how do we find a way to make sure that Elon still stays in this seat, number one.").

[699] *See* Dunn Opening Expert Rep. at 14–15.

[700] *See, e.g., id.*

Delaware law recognizes that "asking the controlling stockholder to consider alternative options can change the negotiating dynamic."[701]  Whether Musk should commit a level of time to Tesla was a planned topic of discussion for a September 8 call with Denholm, Ehrenpreis, and Musk.[702] During the September 8 call, however, *none* of the participants raised the issue.[703]  According to Musk, the issue "was not raised in this compensation structure" because the idea was "silly."[704]  Maron testified that the Board did not ask for such a requirement because "[t]hat would have been like saying goodbye to Elon[.]"[705]  Defendants claim Musk would have rejected such restrictions, but the court will "never know because the . . . Committee and its advisors never had the gumption to give it even the weakest of tries."[706]

### d. There Was No Benchmarking Analysis.

The Grant process lacked a traditional benchmarking analysis, which compares a proposed compensation plan to plans at comparable firms.[707]

---

[701] *S. Peru,* 52 A.3d at 800 ("[A]sking the controlling stockholder to consider alternative options can change the negotiating dynamic . . . . [T]he Special Committee might discover certain weaknesses of the controlling stockholder, thus creating an opportunity for the committee to use this new-found negotiating leverage to extract benefits for the minority.").

[702] JX-612 at 1–2.

[703] *See* JX-629 at 2–3 (summary of call omitting the issue); Trial Tr. at 139:17–141:1 (Ehrenpreis); Denholm Dep. Tr. at 389:15–390:20 ("I don't recall the specifics of that other than in general terms we talked mainly about energy, focus, and commitment as opposed to time."); Musk Dep. Tr. at 154:12–21, 160:11–161:4.

[704] Musk Dep. Tr. at 160:11–161:4.

[705] Trial Tr. at 263:11–264:1 (Maron).

[706] *Loral,* 2008 WL 4293781, at *25.

[707] Trial Tr. at 1461:10–1462:6 (Brown) ("Q. So did Compensia's work on the 2018 plan include such traditional benchmarking?  A.  It did not for a few reasons.").

Benchmarking "provides the compensation committee with a frame of reference with respect to what other companies are doing with respect to compensation[.]"[708] Benchmarking is the foundation of a compensation advisor's analysis.[709]

The witnesses agreed that benchmarking is typical and critical. Defendants' expert, Professor Kevin Murphy, previously opined that "the market for similarly situated executives provides a critical benchmark" the "board must consider in deciding whether to pursue" an executive and "how much to offer."[710] Plaintiff's expert, Professor Brian D. Dunn, opined that benchmarking is a "critical aspect and requirement of an effective compensation plan process."[711] Brown confirmed that Compensia typically provides benchmarking consisting of an identified peer group

---

[708] *Id.* at 1475:20–24 (Brown).

[709] *Id.* at 1058:7–1059:18 (Burg) (testifying that compensation advisors provide benchmarking data to "fulfill their responsibilities"); *id.* at 1312:8–12 (Murphy) (agreeing that benchmarking studies are "customary" when setting CEO compensation), 1313:10–13 (confirming that competitive pay analysis is "industry standard" in advising clients on executive compensation), 1315:2–16 (prior testimony stating benchmarking is "absolutely routine" and "what every compensation consultant will do"), 1317:10–1319:3 (prior testimony that "the market for similarly situated executives provides a critical benchmark that [the] board ***must*** consider in deciding whether to pursue [the CEO candidate] and in deciding how much to offer" (emphasis added)); *id.* at 786:12–21 (Gracias) (confirming it is "wise" for the Compensation Committee to have benchmarking information); *id.* at 347:3–10, 350:7–11, 351:2–7 (Denholm) (acknowledging prior use of benchmarking data for other executives).

[710] Trial Tr. at 1317:10–1319:3 (Murphy); *see, e.g., id.* at 1312:8–12 (Murphy) (agreeing that benchmarking studies are "customary"), 1313:10–13 (confirming that competitive pay analysis is "industry standard"), 1315:2–16 (prior testimony stating benchmarking is "what every compensation consultant will do").

[711] Dunn Opening Expert Rep. at 83; *see also* Trial Tr. at 983:3–22 (Dunn).

and comparable positions at peer companies.[712] Burg too recognized that providing such information is necessary for the Compensation Committee's advisors to "fulfill their responsibilities."[713] Nevertheless, no traditional benchmarking study was conducted in connection with the Grant.[714]

Defendants proffered reasons for not performing a traditional benchmarking study, but each rang hollow. For starters, Defendants argued that the Board considered "a lot of data that all fit within the overall bucket of benchmarking" throughout the process.[715] The primary evidence is the Compensia presentation from the July 7, 2017 meeting, which included information about other CEOs.[716] For example, one of the slides lists the largest CEO pay packages in 2016. But no one contends that this market data constituted a benchmarking analysis. And none of the slides involved direct comparisons to the Grant.[717]

Brown also testified that it would have been difficult to find comparable companies for a benchmarking study.[718] At trial, Brown conceded that he could have developed a peer group after using "some judgment" in a timeframe "similar to

---

[712] Trial Tr. at 1461:10–1462:4 (Brown); *id.* at 1475:16–1476:24 (Brown).

[713] *Id.* at 1058:7–1059:18 (Burg).

[714] *Id.* at 1477:1–5 (Brown) (affirming that Compensia did not conduct a benchmarking study for the Grant); *id.* at 786:12–21, 787:5–10 (Gracias) (same); *id.* at 1059:19–1060:5 (Burg) (stating that he had no memory of benchmarks being presented in connection with the 2018 Grant).

[715] *Id.* at 1293:10–1294:9 (Murphy).

[716] JX-512 at 16–20.

[717] *Id.*

[718] Trial Tr. at 1462:5–1463:7 (Brown).

[developing] any peer group."[719]  Dunn created a benchmarking analysis, demonstrating it was possible.[720]

More telling, Brown took the position that benchmarking was unnecessary because the award would be too large for useful comparison. Brown testified that he had a "really good idea" of what would happen if Compensia performed a traditional benchmarking study, and that "it wasn't going to be useful information for the committee" because the Grant was so divorced from the market for comparable executives.[721]  In a similar vein, Defendants argue that benchmarking was not needed because the 2018 Plan was "unprecedented" in that "no other CEO had been willing to condition his compensation on such audacious milestones," especially at a time when a company was struggling.[722]  They contend: "Traditional benchmarking is inapt if the companies, executives, and plans are not comparable."[723]

That is a hard sell. As CEO, Musk's job was the same as every other public company CEO: improve earnings and create value.  A benchmarking study would have shown the committee what other companies paid for executives to perform that same task.  Moreover, the extraordinary nature of the Grant should have made

[719] *Id.* at 1477:19–1478:6 (Brown).

[720] *Id.* at 983:3–985:1, 990:3–992:7 (Dunn); *id.* at 1477:14–1478:12 (Brown) (confirming Compensia could have—but did not—benchmark); PDX-2 at 5–6.

[721] Trial Tr. at 1462:5–1463:1 (Brown); *see also id.* at 786:12–21, 787:5–10 (Gracias); *id.* at 347:3–10, 350:7–11, 351:2–7, 362:10–13 (Denholm); Denholm Dep. Tr. at 287:12–21 ("[I]t was very difficult to find comparables in terms of the ambitious nature of this plan.").

[722] Defs.' Post-Trial Suppl. Reply Br. at 10–11.

[723] *Id.* at 10 n.44.

benchmarking *more* critical, not less. Benchmarking would have informed the decision makers of the magnitude of difference between the Grant and market comparables.[724]

### e. The Key Negotiators Said It All.

In the end, the defense witnesses said it all. Ehrenpreis and Gracias took the lead on the Grant for the Compensation Committee (recall that attendance at Working Group meetings was "optional" for Denholm and Buss).[725] Maron was one of the primary go-betweens.[726] When asked to describe the process, none viewed the process as an arm's length negotiation. Each viewed it is as a form of collaboration with Musk.

---

[724] *See Julian v. E. States Const. Serv., Inc.*, 2008 WL 2673300, at *19 (Del. Ch. July 8, 2008) (holding that the lack of historical precedent does not mean the size of the compensation plan can just be plucked out of thin air); Trial Tr. 1320:18–1321:16 (Murphy) (confirming that in a prior trial he testified that there should have been benchmarking for an executive if even he was the only person in the United States who was believed to be qualified and available to take that position).

[725] JX-474 (6/30/17 email from Chang to Denholm and Buss).

[726] *See, e.g.*, JX-783 at 1–2 (1/16/18 email from Maron to the Compensation Committee) (stating Musk wanted that "[a]ny M&A in which [Tesla] buy[s] a company for no more than 5% of [Tesla's] current market cap will have no adjustment"); *see* JX-664 at 1 (11/9/17 email from Musk to Maron stating Musk would "like to take board action as soon as possible" on his compensation plan); JX-667 at 1 (11/12/17 email from Maron to Board stating: "We'd like to have another meeting on the issue of CEO compensation[.]"); JX-668 (11/14/17 email from Musk telling Maron to "pause for a week or two[,]" his compensation plan discussions); JX-718 (12/11/17 email stating the CEO compensation plan discussions are "back and on a fast track now").

Ehrenpreis testified that "during the entire process, there were check-ins with Elon. *We were not on different sides of things.* We were trying to make sure if we were going to go through this exercise that he was on board."[727]

Gracias explained his understanding of "fairness" in this context and his approach to the process as follows:

> [W]hat is important is that [CEOs] feel like they're treated fairly. These plans are about incenting behavior. Behavior is a feeling. It comes from inside the mind. *And so we focus on what's fair and what feels fair to people and what's fair to the shareholders,* what's fair to us as investors, what's fair to the executives. That's how we think about it. *We never engage in these positional negotiations*, I want 10, you want 3, let's yell about it. That's not how we do things, not how anyone does things.[728]

That is, in lieu of objective market data and arm's length negotiation, the Compensation Committee opted for subjective feelings—"what feels fair." The committee did not take "positional negotiations" against Musk.[729]

---

[727] Ehrenpreis Dep. Tr. at 139:18–140:3 (emphasis added).

[728] Trial Tr. at 808:16–809:14 (Gracias) (emphasis added).

[729] *Id.*; *see also* Gracias Dep Tr. at 244:25–245:20 ("I did not have a positional negotiation with [Musk] about, hey, we want to give you one [tranche], and you want two and let's go negotiate back and forth. . . . I did not have a negotiation starting lower and going higher with him about the tranches or the size of the award."); *id.* at 255:22–256:9 ("Q. Okay. As a Tesla director and compensation committee member, do you think you have a duty to the company and the stockholders to try to negotiate for the smallest compensation package for Mr. Musk that would adequately incentivize him? A. That is not how I think about it, no. Q. Can you explain to me how you think about it? A. I think about compensation packages generally as what is fair to the executive and what is fair to the company. I don't think about it as trying to get the very smallest thing possible ever. That's just not my modus operandi with any company I deal with. I think about fairness.").

Maron described the process similarly: "It was a cooperative, collaborative process. It wasn't acrimonious. So when I say there wasn't a conflict of interest, I think I'm thinking in my own mind was there an actual active conflict between the two parties; and I don't think that there was. I think it was a cooperative collaborative process."[730] To deal with a conflict, one must first recognize a conflict. "Conflict blindness and its lesser cousin, conflict denial, have long afflicted the financially sophisticated."[731] Maron could not perceive the conflict, much less help deal with it.

The testimony from the key witnesses is perhaps as close to an admission of a controlled mindset as a stockholder-plaintiff will ever get.[732] The Compensation Committee and Musk were not on different sides. They did not acknowledge the existence of a conflict. It was a cooperative and collaborative process.[733]

---

[730] Maron Dep. Tr. at 100:2–102:11.

[731] *Trados*, 73 A.3d at 64.

[732] *See S. Peru*, 52 A.3d at 798 ("[F]rom inception, the Special Committee fell victim to a controlled mindset and allowed [the controller] to dictate the terms and structure of the [transaction].").

[733] Defendants concede that "[t]he Directors worked with Musk 'in a collaborative, cooperative way to get to the end point.'" Defs.' Post-Trial Opening Br. at 66 (quoting Trial Tr. at 243:15–244:3 (Maron)). They justify that soft approach by reasoning that "the board has to have an ongoing relationship with the CEO," and "it would be atypical for compensation negotiations between a board and a CEO to be adversarial." *Id.* In essence, they argue that, because the Grant was for a sitting CEO, the Board was justified in conducting a process short of "an effective proxy for arms-length bargaining, such that a fair outcome equivalent to a market-tested deal resulted." *Loral*, 2008 WL 4293781, at *22 (citations omitted). The court recognizes that negotiations over CEO compensation give rise to strange dynamics because the parties need to work collaboratively after the negotiations have ceased, but that is true in many negotiations and in virtually every salary negotiation. There is a huge

146

## B. Defendants Bore The Burden Of Proving That The Grant Was Entirely Fair.

Because Musk exercised transaction-specific control over the Grant, entire fairness is the standard of review, and Defendants presumptively bear the burden of proof.[734] In *Kahn v. Lynch Communication Systems, Inc.*,[735] the Delaware Supreme Court "held that when the entire fairness standard applies, the defendants may shift the burden of persuasion by one of two means: first, they may show that the transaction was approved by a well-functioning committee of independent directors; or second, they may show that the transaction was approved by an informed vote of a majority of the minority shareholders."[736] There was no well-functioning committee of independent directors here for the reasons discussed above. Thus, Defendants' only hope for burden shifting is to show that the stockholder vote was fully informed. For this purpose, Defendants bear the burden of proving that the vote was fully informed.[737]

---

gap between being respectful and civil versus cooperating with the CEO to give him exactly what he wants. Even assuming that some level of cooperation and collaboration is called for, what took place here went beyond it. And this was also not the place for it. When considering the largest compensation plan in the history of the public markets, the directors needed to do more than accommodate the CEO.

[734] *Ams. Mining Corp.*, 51 A.3d at 1239 ("When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion.").

[735] 638 A.2d 1110 (Del. 1994).

[736] *Ams. Mining*, 51 A.3d at 1240 (citing *Lynch*, 638 A.2d at 1117).

[737] *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch. Mar. 25, 1999) ("[W]hen it comes to claiming the sufficiency of disclosure and the concomitant legal effect of shareholder ratification after full disclosure (*e.g.*, . . . shift of the burden of proof of entire fairness from the defendant to the plaintiff) it is the defendant who bears the burden."), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

To show that the stockholder vote was fully informed, Defendants must establish that "stockholders were apprised of 'all material information' related to that transaction."[738] An omitted fact is material only where "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[739] In other words, to be material, an omitted fact must have "significantly altered the 'total mix' of information made available."[740] Further, "once defendants travel[] down the road of partial disclosure of the history leading up to the [transaction] and use[d] the vague language described, they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[741] In assessing materiality, courts must balance "the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information."[742]

Plaintiff advanced many arguments for why the stockholder vote was not fully informed.[743] Two are clear winners. The record establishes that the Proxy failed to

---

[738] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 748 (Del. Ch. June 30, 2016) (quoting *Solomon*, 747 A.2d at 1127–28).

[739] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[740] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (quoting *TSC Indus., Inc.*, 426 U.S. at 449).

[741] *Id.* at 1280 (citations omitted).

[742] *Volcano*, 143 A.3d at 749 (citations omitted); *see also Solomon*, 747 A.2d at 1128 ("The theory goes that there is a risk of information overload such that shareholders' interests are best served by an economy of words rather than an overflow of adjectives and adverbs in solicitation statements.").

[743] *See* Pl.'s Post-Trial Opening Br. at 68–81.

disclose the Compensation Committee members' potential conflicts and omitted material information concerning the process. Defendants sought to prove otherwise, and they generally contend that the stockholder vote was fully informed because the most important facts about the Grant—the economic terms—were disclosed.[744] But Defendants failed to carry their burden.

### 1. The Conflict Disclosures

A director's conflict with a transactional counterparty is material information that should be disclosed.[745] In fact, a director's *potential* conflict with a transactional counterparty is material information that should be disclosed.[746]

---

[744] Defs.' Post-Trial Opening Br. at 95–105.

[745] *See, e.g.*, *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 22 (Del. Ch. 2014) ("This court has held that special committee members' 'prior . . . relationships' with a controller 'should have been disclosed' because of the committee's 'role as negotiators on behalf of the minority stockholders.'" (quoting cases)); *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *37 (Del. Ch. May 3, 2004) ("[T]he disclosure documents misled minority stockholders . . . [because] there was no disclosure of [two committee members'] long-standing financial relationships with [the transaction counterparty] . . . . The disclosure documents misleadingly suggested that the Special Committee, and perhaps a majority of the entire board, were independent."); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 15–19 (Del. Ch. 2002) (finding the disclosures misleading when they failed to disclose supposedly independent directors' relationships with the CEO).

[746] *Millenco*, 824 A.2d at 15 ("[W]here, as here, the omitted information goes to the independence or disinterest of directors who are identified as the company's 'independent' or 'not interested' directors, the 'relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made'" (quoting *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 994 (2d Cir. 1988))); *see also Eisenberg v. Chi. Milwaukee Corp.*, 537 A.2d 1051, 1061 (Del. Ch. 1987) ("The only point made here is that . . . the potential conflict of half of [the company's] Board of Directors was a fact that should have been disclosed. . . . [S]hareholders were entitled to know that certain of their fiduciaries had a self-interest that was arguably in conflict with their own, and the omission of the fact was material." (citation omitted)).

149

The Proxy failed to disclose any of the Compensation Committee members' actual or potential conflicts with respect to Musk.[747] In fact, the Proxy repeatedly described the members of the Compensation Committee as independent, stating: "The[] [Grant] discussions first took place among the members of the Compensation Committee . . . *all of whom are independent directors*;"[748] and "[t]he *independent members of the Board*, led by the members of the Compensation Committee, spent more than six months designing [the Grant]."[749] The Proxy's introductory letter is "[f]rom the *Independent Members of Tesla's Board of Directors*," and the first four signatories are Compensation Committee members Gracias, Ehrenpreis, Denholm, and Buss.[750] Notably, Gracias signed as "Lead Independent Director."[751]

The description of the Compensation Committee members as "independent" was decidedly untrue as to Gracias and proved untrue as to the remaining committee members. At a minimum, Musk's relationships with Ehrenpreis and Gracias gave rise to potential conflicts that should have been disclosed.[752] Ultimately, all of the directors acted under a controlled mindset, calling into question the disclosure as to each of them.

---

[747] *See* Pl.'s Post-Trial Opening Br. at 69–73.

[748] JX-878 at 10 (emphasis added) (2/8/18 Schedule 14A Proxy Statement).

[749] *Id.* at 21 (emphasis added).

[750] *Id.* at 3–4 (emphasis added).

[751] *Id.* at 4.

[752] *See supra* §§ I.C.1.a.i, iv.

Defendants sought to prove that they disclosed the information at issue, both in the Proxy and elsewhere.[753] The Proxy disclosed the Tesla director compensation policy, which is one potential source of conflict.[754] Defendants also showed that they disclosed some potential sources of conflict in other public filings, such as Buss's tenure at SolarCity and Ehrenpreis's and Gracias's investments in SpaceX.[755] But those disclosures make no mention of important factors affecting independence, including Gracias's and Ehrenpreis's personal and other business relationships with Musk.[756] And even assuming such disclosures were comprehensive, "our law does not impose a duty on stockholders to rummage through a company's prior public filings to obtain information that might be material to a request for stockholder action."[757]

Defendants also sought to prove that disclosure of the potential conflicts was unnecessary because it would wrongly "oblige them to characterize their conduct in such a way as to admit wrongdoing."[758] That argument is strongest on the controlled-mindset point. But the Proxy could have discussed the relevant relationships while stating that the Board did not view them as serious impediments to independence, thereby allowing stockholders to make their own assessment. This is precisely what

---

[753] Defs.' Post-Trial Opening Br. at 100–01; Defs.' Post-Trial Answering Br. at 70–72.

[754] JX-878 at 46–47.

[755] JX-379 at 24–26.

[756] *See* JX-878 (2/8/18 Schedule 14A Proxy Statement); JX-379.

[757] *Zalmanoff v. Hardy*, 2018 WL 5994762, at *5 (Del. Ch. Nov. 13, 2018) (citation omitted), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE).

[758] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997); Defs.' Post-Trial Answering Br. at 71.

Tesla did in the other disclosure document that Defendants pointed to when seeking to prove that the total mix of information included information about Musk's financial connections with Gracias and Ehrenpreis.[759] "What defendants were not free to do was to take the position that the stockholders had no right to know this information because they, the defendants, had determined it was not important."[760]

Overall, Defendants failed to prove that the information about conflicts was adequately disclosed. The Proxy was materially deficient on this point.

### 2. The Process Disclosures

When asked to approve a transaction, stockholders are entitled to a full and accurate description of the material steps in the board or committee process that resulted in the transaction.[761] The components and effectiveness of a board or committee's process, including the parties' bargaining positions, are of "obvious importance" to stockholders.[762]

---

[759] *See* JX-379 at 24–26.

[760] *Millenco*, 824 A.2d at 18–19.

[761] *Bancorp*, 650 A.2d at 1280 ("[O]nce defendants traveled down the road of partial disclosure of the history leading up to the [transaction] and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." (citations omitted)).

[762] *Clements v. Rogers,* 790 A.2d 1222, 1242 (Del. Ch. 2001); *accord Morrison v. Berry*, 191 A.3d 268, 283–84 (Del. 2018) (holding that information on process is material if it helps a reasonable stockholder reach a "more accurate assessment of the probative value of the [transaction's] process"); *In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271, at *12 (Del. Ch. Oct. 21, 1988) ("No disclosure in a case such as this is presumably of greater importance to a shareholder than a disclosure that independent directors have actively negotiated on his behalf and have concluded, as here, that acceptance of the proposal is in his best interests."), *abrogated on other grounds by Lynch,* 638 A.2d 1110; *Weinberger*, 457 A.2d at 703 ("Material

152

Consequently, "a fiduciary's duty is best discharged through a broad rather than a restrictive approach to disclosure."[763] A board or committee may not create a false narrative as to the process for how a transaction was completed; partial disclosures that sterilize the actual events are insufficient.[764] Although a disclosure document need not give a "play-by-play[,]"[765] "when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with 'an accurate, full, and fair characterization of those historic events.'"[766] "Even if [] additional information independently would fall short of the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information

information, necessary to acquaint those shareholders with the bargaining positions of [the parties], was withheld under circumstances amounting to a breach of fiduciary duty."); *see, e.g.*, *McMullin v. Beran*, 765 A.2d 910, 925–26 (Del. 2000) (reversing dismissal where the defendants failed to disclose information regarding the handling of potential offers).

[763] *Zirn v. VLI Corp.,* 621 A.2d 773, 779–80 (Del. 1993).

[764] *In re Mindbody, Inc. S'holder Litig.*, 2023 WL 2518149, at *41 (Del. Ch. Mar. 15, 2023); *see also FrontFour*, 2019 WL 1313408, at *29 (holding that the proxy statement's failure to disclose that the special committee did not learn of "enormous pressure" facing controllers until after the merger agreement was executed was material).

[765] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008) (internal quotation marks and citation omitted).

[766] *Id.* (quoting *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007)); *In re Tele-Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *5–6 (Del. Ch. Dec. 21, 2005) (holding that language in proxy that the board gave "careful consideration" to premium to be paid to shareholders would be material if false); *Clements*, 790 A.2d at 1242–43 ("When a Proxy Statement details the functioning of [the committee's] process, it must do so in a fair and balanced manner that does not create a materially misleading impression of how the Committee actually operated in fact." (citation omitted)).

153

from being misleading."[767]  Even an assertion that a committee "carefully considered" a transaction, when inaccurate, could be falsely "reassuring" to stockholders and constitute a disclosure violation.[768]

Generally, when a plaintiff proves process defects as significant as those in this case, the defendants will find it difficult to prove that the stockholder vote was fully informed.[769]  That is true here.  The Proxy does not disclose the level of control that Musk exercised over the process—e.g., his control over the timing, the fact that he made the initial offer, the fact that his initial offer set the terms until he changed them six months later, the lack of negotiations, and the failure to benchmark, among other things.

The parties focus on one specific omission.  The Proxy does not disclose the April 9 conversation between Musk and Ehrenpreis during which Musk established the key terms of the 2018 Grant.  A discussion of this conversation appeared in at least four earlier drafts of the Proxy.[770]  The final Proxy instead opens its discussion of the development of the 2018 Grant with the following passage:

> With the 2012 Performance Award nearing completion, the Board engaged in more than six months of active and ongoing discussions regarding a new compensation program for Mr. Musk, ultimately concluding in its decision to grant the CEO Performance Award. These

---

[767] *Chen*, 87 A.3d at 689 (citing *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002)).

[768] *Gantler v. Stephens*, 965 A.2d 695, 711 (Del. 2009) (internal quotation marks omitted).

[769] *Cf. In re Mindbody, Inc. S'holder Litig.*, 2020 WL 5870084, at *27 (Del. Ch. Oct. 2, 2020) (making a similar point as to a well-pled *Revlon* claim).

[770] *See* JX-1597 at 9; JX-1598 at 3; JX-1599 at 14; JX-1700 at 12.

154

> discussions first took place among the members of the
> Compensation Committee of the Board (the "Compensation
> Committee"), all of whom are independent directors, and
> then with the Board's other independent directors,
> including its two newest independent directors, Linda
> Johnson Rice and James Murdoch.[771]

Plaintiff contends that, in addition to describing the Compensation Committee members and Murdoch as "independent," the statement is inaccurate because the "discussion[] first took place" between Ehrenpreis and Musk, not among the members of the Compensation Committee.[772] Defendants claim that Plaintiff is misreading the sentence, which they say means only that discussions among the Compensation Committee were "first" as compared to subsequent discussions with the full Board, not the "first" discussions in the process as a whole.[773]

Even accepting Defendants' borderline reading, the April 9 conversation between Ehrenpreis and Musk was material and should have been disclosed.[774] Musk's April 9 proposal to Ehrenpreis set the terms of discussion for the first six or

---

[771] JX-878 at 10 (2/8/18 Schedule 14A Proxy Statement).

[772] Pl.'s Post-Trial Opening Br. at 73, 78–79 (quoting JX-878 at 10).

[773] Defs.' Post-Trial Opening Br. at 102–03 (quoting JX-878 at 10).

[774] *Weinberger*, 457 A.2d at 703 ("Material information, necessary to acquaint those shareholders with the bargaining positions of [the parties], was withheld under circumstances amounting to a breach of fiduciary duty."); *see Plumtree*, 2007 WL 4292024, at *14) ("Once defendants travel down the road of partial disclosure of the history leading up to a merger, they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." (citing *Bancorp*, 650 A.2d at 1280)).

so months of the Grant's development, and many of its features persisted in the final structure.[775] The Proxy was materially deficient on this point.

### 3. The Key-Terms Argument

During post-trial argument, Defendants argued that the stockholder vote was fully informed because the most important details of the Grant—the economic terms—were disclosed. Implicitly, Defendants argue that stockholders only need to know the economics of a transaction to cast an informed vote.

Defendants' position finds no support in Delaware law. No case has held that a corporation needs to disclose only the economic terms of a transaction when securing a stockholder vote. In fact, then-Vice Chancellor Strine rejected as "frivolous" the argument that "the only material facts necessary to be disclosed" regarding a stock incentive plan are the "exact" economic terms of the plan.[776] This

---

[775] *See* JX-445 at 3–4; JX-464 at 5–7; JX-479; JX-490 at 5–7; JX-640 at 3; JX-631 at 2; *see also* JX-664 (Musk asking to "move forward" with the 2018 Grant "in a reduced manner from before"); Trial Tr. at 676:18–677:1 (Musk) ("Q. And the only number we've seen from you so far is 15 percent of total outstanding shares, so I assume that means something less than 15 percent of total outstanding shares. Right? A. Yes."); JX-678 at 1–2 (email from Maron comparing Musk's "reduced" request with the original request). Defendants do not appear to deny the materiality of this information. Instead, they take the factually inaccurate contention that "Ehrenpreis originated the initial proposal for the 2018 Plan." Defs.' Post-Trial Opening Br. at 102 (citation omitted). Plaintiff argues that the Proxy also suffered from disclosure issues relating to the ability to meet the milestones and Musk's commitments outside Tesla. Although likely material, the court defers making a factual finding on this purported disclosure violation having found Plaintiff already proved the transaction was not entirely fair.

[776] *Sample v. Morgan*, 914 A.2d 647, 652, 663–67 (Del. Ch. Jan. 23, 2007) (rejecting the "frivolous" argument because stockholders would also want to know where the plan originated, the self-interested purpose of the plan by those who conjured it up, and information regarding the comparative size of the plan to other corporate equity plans).

156

holding recognizes that materiality extends beyond economics to information regarding process, conflicts, incentives, and more.[777] Defendants' authorities do not support the new rule that they advance.[778]

Moreover, "once defendants travel[] down the road of partial disclosure of the history leading up to the [transaction] . . . , they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[779] Here, Defendants chose to disclose aspects of the process. Having done

---

[777] *See, e.g.*, *Mindbody*, 2023 WL 2518149, at *43–44 (finding a disclosure violation where a party was tipped off as to the timing of a sales process); *Atheros Commc'ns, Inc.*, 2011 WL 864928, at *11 (Del. Ch. Mar. 4, 2011) (holding that the terms of the incoming CEO's employment after a merger were material where the proxy did not fully describe the negotiating process); *van der Fluit v. Yates*, 2017 WL 5953514, at *8–13 (Del. Ch. Nov. 30, 2017) (stating that "vague language regarding the identities of the negotiators" who received post-transaction employment constituted a material disclosure that prevented dismissal under *Corwin*); *Lear Corp. S'holder Litig.*, 926 A.2d 94, 114 (Del. Ch. 2007) ("[A] reasonable stockholder would want to know an important economic motivation of the negotiator singularly employed by the board to obtain the best price for the stockholders, when that motivation could rationally lead that negotiator to favor a deal at a less than optimal price[.]"); *see also Maric Cap. Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1179 (Del. Ch. 2010) (imposing an injunction because the proxy failed to disclose a future CEO's stock options and future management makeup and other accompanying incentives).

[778] Defendants cite to *Cambridge Retirement System v. Bosnjak*, where the court held that the "absence of benchmarking information" was not a material omission "because the proxy statements disclosed all material terms of the precise equity awards that the stockholders were being asked to approve." 2014 WL 2930869, at *9 (Del. Ch. June 26, 2014). But no one claims here that the absence of disclosed benchmarking information rendered the stockholder vote uninformed. Defendants further cite *In re 3COM Corp.* for the proposition that Delaware courts do not require the disclosure of a projected options' value, and thus Tesla went above and beyond by disclosing the approximately $55.8 billion maximum theoretical value of the Grant. 1999 WL 1009210, at *6–8 (Del. Ch. Oct. 25, 1999); JX-878 at 24–25 (2/8/18 Schedule 14A Proxy Statement). But the fact that Tesla disclosed some information does not excuse the Company's other disclosure deficiencies.

[779] *Bancorp*, 650 A.2d at 1280 (citations omitted).

157

so, they had an obligation to provide accurate, full, and fair information about that process, which they failed to do. At a minimum, a corporation cannot disclose false information, such as describing key negotiators as independent. That is what happened here.

## C. Defendants Failed To Prove That The Grant Was Entirely Fair.

Because Defendants failed to show that the stockholder vote was fully informed, they bore the burden of proving entire fairness. "The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."[780]

The Delaware Supreme Court provided guidance on the entire fairness review in *SolarCity III*.[781] Quoting *Weinberger v. UOP, Inc.*, the high court described the entire fairness review as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock. However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue

---

[780] *SolarCity III*, 298 A.3d at 700 (emphasis omitted) (quoting *Weinberger*, 457 A.2d at 710).

[781] *Id.* at 698–734.

158

must be examined as a whole since the question is one of entire fairness.[782]

Entire fairness review calls upon the court to "carefully analyze the factual circumstances, apply a disciplined balancing test to its findings, and articulate the bases upon which it decides the ultimate question of entire fairness."[783] "Given the unitary nature of the test, findings in one area may seep into the findings of the other. As a result, 'a fair process usually results in a fair price.' The opposite is also true: 'an unfair process can infect the price.'"[784]

Here, Defendants failed to prove that the Grant was the product of fair dealing or at a fair price.

### a. Fair Dealing

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[785] When discussing fair process in *SolarCity III*, the Delaware Supreme Court encouraged this court to focus on what it refers to as the "*Weinberger* factors."[786] Those factors are "how the deal was initiated

---

[782] *Id.* at 700 (quoting *Weinberger*, 457 A.2d at 711).

[783] *Id.* (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1179 (Del. 1995) [hereinafter "*Cinerama II*"]).

[784] *Id.* at 702 (first quoting *Ams. Mining*, 51 A.3d at 1244, then quoting *Trados*, 73 A.3d at 78).

[785] *Id.* at 701 (quoting *Tremont*, 694 A.2d at 430).

[786] *Id.* at 702.

and timed, how it was structured and negotiated, and how it was approved[.]"[787] Those factors "form the core of a court's fair dealing analysis."[788]

This decision already addressed most of the facts pertinent to the fair dealing inquiry when discussing how Musk controlled the process and the disclosure deficiencies. This section largely restates those findings while mapping them onto the *Weinberger* factors. They fare no better in their repackaged form. Defendants have failed to demonstrate that the process leading to the Grant was fair.

### i. Initiation And Timing

The first *Weinberger* factor "examines how the decision under challenge was initiated."[789] "The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal."[790] The goal of the analysis is to determine whether the controller timed the proposal opportunistically to take advantage of the minority stockholders.[791] In *SolarCity II*, for example, the court asked whether Musk timed the transaction to "exploit any inherent coercion[.]"[792]

---

[787] *Id.* (citing *Weinberger*, 457 A.2d at 711).

[788] *Id.*

[789] *Frederick Hsu*, 2020 WL 2111476, at *36.

[790] *Dole*, 2015 WL 5052214, at *26.

[791] *In re BGC P'rs, Inc. Deriv. Litig.*, 2022 WL 3581641, at *18 (Del. Ch. Aug. 19, 2022) ("The . . . initiation of a transaction can evidence a lack of fair dealing where it favors the controller to the minority's detriment."), *aff'd*, 303 A.3d 337 (Del. 2023) (TABLE).

[792] *SolarCity III*, 298 A.3d at 703–04; *see also Dole*, 2015 WL 5052214, at *27–28 (finding unfair dealing where the controller planned on taking target private for eighteen months prior to the formal process, during which time the controller engaged in a calculated effort to depress the market price of the target's stock); *Sealy*

As to this factor, Defendants have a handful of facts in their favor. The timing of the first discussion was dictated by Ehrenpreis, not Musk. Ehrenpreis credibly testified that he initiated this discussion because Tesla had reached nearly all of the milestones of Musk's prior compensation plan. There is no evidence that Musk was secretly behind the start of negotiations, or that a starting negotiation in April 2017 gave Musk any significant advantage at the expense of the minority stockholders.

Nor is there any evidence that Musk set the table for the negotiations by acting in a manipulative or duplicitous manner. To show manipulative conduct, Plaintiff points to Musk's May 2018 public statement that he would not remain CEO forever. Plaintiff argues that this statement was intended to pressure the Board. That is not a far-fetched theory, but it is not supported by the record. The more likely explanation is that Musk was considering stepping down from CEO to become Chief Products Officer. Another likely explanation is that Musk lacks a filter, so his public statement easily could have been a momentary thought that immediately found expression. In all events, he clarified his intentions at the time and at trial: Musk is committed, Tesla forever.

*Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (finding unfair dealing in light of "a calculated effort to depress the [market] price" of a stock "until the minority stockholders [are] eliminated by merger or some other form of acquisition"); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 599 (Del. Ch. 1986) (observing that "[t]he prototyp[ical] instance in which the timing of a merger would itself likely constitute a breach of a controlling shareholder's duty is when it could be shown both (1) that the minority was financially injured by the timing (i.e., from their point of view it was an especially poor time to be required to liquidate their investment) and (2) that the controlling shareholder gained from the timing of the transaction what the minority lost"); *Weinberger*, 457 A.2d at 711 (citing the "serious time constraints" as a negative factor in the discussion of process).

Although Musk did not manipulate the *initial timing* of the process, he repeatedly and unilaterally manipulated the timeline of the process. To summarize the facts discussed above, before the Board or Compensation Committee had a substantive discussion concerning the Grant, Musk's team proposed a highly accelerated schedule that contemplated approval of the Grant within less than two months. The committee's independent advisors asked for more time and were told no. It was Musk who unilaterally extended the July deadline to August or September. Musk then unilaterally put the process on hold again at the end of July, causing work to slow and then stop entirely. Musk restarted discussions on the morning of November 9. Musk asked to pause the process again on November 14 and was ultimately successful in delaying work until December. Musk instigated another period of urgency on December 11, placing the Grant "on a fast track,"[793] and resetting the target date for Board approval to January. The Board eventually approved the 2018 Grant on January 21.

As *Weinberger* teaches, time constraints standing alone are "not necessarily indicative of any lack of fairness by a majority shareholder. It [is] what occurred, or more properly did not occur," that matters.[794] Put differently, one must look to how the time constraints affected the process.

Here, Musk's "red light, green light" approach negatively affected the process in two ways. First, although the process spanned nine months, most of the work

---

[793] JX-718.

[794] 457 A.2d at 711.

occurred during small bursts and under Musk-imposed time pressure. Second, Musk made determinations at the last minute, compressing the timeline, adjusting the timeline, or proposing new terms prior to six out of the ten Board or Compensation Committee meetings during which the Grant was discussed. Musk's habit of shaking up the timeline or changing his proposal just before a meeting made it tough for the directors and their advisors to meaningfully evaluate the Grant and respond. The time constraints and last-minute adjustments impaired the process.

### ii. Negotiations

The next *Weinberger* factor examines how the transaction was negotiated and structured. This factor proves pivotal, because arm's-length negotiations can make

up for other flaws.[795] But the opposite is also true. The lack of arm's-length negotiations can overshadow positive aspects of a process.[796]

Perhaps for this reason, Defendants rely heavily on the negotiations to demonstrate fair process. They emphasize the number of Board, Compensation Committee, and Working Group meetings. They tally months spent (both the total

---

[795] *See, e.g., SolarCity III*, 298 A.3d at 710 (agreeing with the trial court that although the process had flaws, the process included several "redeeming features that emulated arms-length bargaining" (citing *SolarCity II*, 2022 WL 1237185, at *36)); *BGC P'rs*, 2022 WL 3581641, at *42 (finding that although "[t]here were certainly flaws," "[t]he record demonstrates that the Special Committee undertook good faith, arm's length negotiations . . . that resulted in a deal with a favorable structure and a fair price"); *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, 2011 WL 863007, at *9–10 & n.73 (Del. Ch. Mar. 9, 2011) (finding process was entirely fair where, among other things, "the Special Committee was independent, fully informed, and . . . negotiated . . . at arm's length"), *aff'd*, 35 A.3d 419 (Del. 2011) (TABLE); *Cinerama II,* 663 A.2d at 1144 (concluding that despite the process being "flawed," the transaction was fair where "the board was insufficiently informed to make a judgment worthy of presumptive deference, nevertheless considering the whole course of events, including the process that was followed, the price that was achieved, and the honest motivation of the board to achieve the most financially beneficial transaction available[]"), *aff'd*, 663 A.2d 1156 (Del. 1995); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991) ("The most persuasive evidence of the fairness of the $21 per share merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available."); *Rosenblatt*, 493 A.2d at 937–38 (observing that controller established separate negotiating terms to recreate arm's length bargaining, that negotiations were adversarial, and that the result was "more than the theoretical concept of what an independent board might do under the circumstances[]" and "[i]nstead . . . it [was] clear that these contending parties to the merger in fact exerted their bargaining power against one another at arm's length" (citations omitted)).

[796] *See, e.g.*, *FrontFour*, 2019 WL 1313408, at *26 (finding that because the special committee "was not truly independent and did not negotiate at arm's length[]" that the defendants did not prove the proposed transactions were the product of fair dealing).

and those involving "active deliberation") and even estimate total hours worked.[797] Defendants also tout their advisors' qualifications and integrity.[798]

Although Defendants cast the negotiations as the strongest aspect of the process, they are actually the most dramatic failure. Defendants elevate form over substance, proffering what Plaintiff's counsel aptly described as "a false equivalency between length of the process and fairness."[799] Defendants' tallies of time spent are merely "superficial indicia"—total hours spent is meaningless if the time was not used to benefit stockholders.[800]

One important dimension of arm's-length bargaining is the existence of an independent bargaining agent. As this decision has found, the Compensation Committee was compromised by conflicts. They could not negotiate at arm's length against Musk.

Not surprisingly, there is no evidence of any adversarial negotiation with Musk concerning the size of the Grant. Rather, Musk made an initial proposal, and that proposal was the only one seriously considered until Musk unilaterally changed it six months later. Defendants are correct that, in the final stretch of the process, the Grant went from a 10%/10-tranche FDS structure to a 12%/12-tranche TOS structure.

---

[797] Defs.' Post-Trial Opening Br. at 58–59.

[798] *Id.*

[799] Pl.'s Post-Trial Answering Br. at 39.

[800] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007); *see also Loral*, 2008 WL 4293781, at *23 (finding "troubling" that advisors "seemed intent on making the [transaction] appear more fair rather than providing an objective opinion to the Special Committee and helping the Special Committee use any leverage it had to strike a better deal").

Defendants are correct that, all else equal, requiring more growth in market capitalization for the same number of shares means a better deal for stockholders. But there is no credible evidence that the shift from ten tranches to 12 and the associated increase in the difficulty of the market capitalization targets resulted from any actual negotiation with Musk. To the contrary, as discussed above, the Board backed into 12 tranches when translating Musk's demand of 10% of fully diluted shares into a round percentage of total outstanding shares while maintaining the $50 billion/1% per tranche approach that Musk proposed back in April.

As to the other terms, the purported concessions secured by the Compensation Committee did not result from negotiations either. The Clawback Provision was the bare minimum necessary to comport with existing Tesla policy and did not address other key Board goals, such as the Board's desire to retain Musk. The Leadership Requirement was less restrictive than in the prior Grant and not tailored to fit the retention goal either. The Five-Year Hold Period resulted from Ehrenpreis's directive to find "creative options" for reducing the grant date fair value. It does not protect stockholders because Musk is not restricted from selling or pledging his nearly 21.9% stake.[801] The industry-standard M&A Adjustment—which merely prohibited Musk from gaming the Grant's milestones through inorganic growth—were a non-issue for

---

[801] JX-530 at 8.

Musk.[802]  And his acknowledgement that Tesla would not "be making any big acquisitions" rendered that provision functionally irrelevant.[803]

The Compensation Committee's independent advisors cannot help the analysis because they played no role in any negotiations and were not tasked with challenging the committee's thinking or presenting alternatives to the Grant.[804]  Defendants agree that benchmarking is standard and essential.  They knew benchmarking would expose the Grant as many multiples larger than any conceivable comparison.  But the Compensation Committee did not ask its advisors to provide a benchmarking analysis, which would have given them some perspective on how (in Musk's words) "really crazy" the Grant was.[805]

The Compensation Committee relied more on conflicted management members than on its outside advisors.  Illustrating this point, many of the documents Defendants cited as proof of a fair process were drafted, pushed out, or endorsed by

[802] Trial Tr. at 255:6–13 (Maron).

[803] JX-781 at 1–2 (Musk emailing Maron concerning the M&A provision that "I don't think we will be making big acquisitions" and "[o]ur only acquisitions have been relatively small automation companies").

[804] *See* Trial Tr. at 1481:8–14, 1466:21–1469:4 (Brown) (testifying that "[Compensia consultants] weren't retained necessarily to challenge what they were doing," but instead "to help them think really carefully about how to do it").

[805] JX-398.

Musk's divorce-attorney-turned-general-counsel Maron,[806] whose admiration for Musk moved Maron to tears during his deposition.[807]

Suffice it to say, the Compensation Committee operated under a "controlled mindset."[808] Rather than negotiating against Musk, the committee engaged in a "cooperative [and] collaborative" process[809] antithetical to arm's-length bargaining.[810] Worse, the committee seemed to actively advance Musk's interests—doing "what feels fair" for *Musk*[811]—including by devising ways to understate the Grant's value on the

---

[806] *See* Defs.' Post-Trial Opening Br. at 58–68 (citing JX-878 (Proxy prepared by Maron); JX-1592 (6/23/17 Compensation Committee Presentation prepared by Maron and his team); JX-628 (9/18/17 Presentation for CEO compensation discussion sent out by Maron); JX-566 (7/31/17 Slide Decks for Special Compensation Committee meeting circulated by Maron); JX-699 (11/16/17 Board minutes drafted by Maron (secretary)); JX-729 (12/12/17 special Board meeting minutes drafted by Maron (secretary)); JX-783 (1/17/18 emails from Maron to team); JX-784 (1/17/18 email from Maron to Musk); JX-678 (11/29/17 email from Maron to Musk on the steps for his proposal); JX-509 (7/7/17 Compensation Committee meeting minutes drafted by Maron (secretary)).

[807] Maron Dep. Tr. at 74:10–17 (becoming "emotional" about the decision to leave Tesla); *id.* at 200:9–15 ("Unfortunately I lost my cool earlier and cried because I love the company so much, and I loved my teammates and my colleagues and the people on the executive team."); Trial Tr. at 275:10–24 (Maron) (confirming he "choked up" at his deposition about his "incredible experience[]" at Tesla and the "very emotional decision" to leave).

[808] *See S. Peru*, 52 A.3d at 798 ("[F]rom inception, the Special Committee fell victim to a controlled mindset and allowed [the controller] to dictate the terms and structure of the [transaction].").

[809] Trial Tr. at 243:7–244:13 (Maron).

[810] *See S. Peru*, 52 A.3d at 798 (finding the special committee "accepted that only one type of transaction was on the table . . . [that] took off the table other options that would have generated a real market check and also deprived the Special Committee of negotiating leverage to extract better terms").

[811] *See* Trial Tr. at 809:8–14 (Maron); *see also* Gracias Dep Tr. at 244:25–245:20 ("I did not have a positional negotiation with [Musk] about, hey, we want to give you one

168

grant date and make the milestones easier to achieve. Those were "exercise[s] in rationalization."[812] In the end, Musk dictated the Grant's terms, and the committee effected those wishes.[813]

### iii.   Structure And Approval

The last *Weinberger* factor examines how the transaction was structured and approved. "Whether a transaction was structured to include procedural protections—such as requiring the approval of an independent board negotiating committee or a majority of the minority vote—is another important indicium of fairness."[814]   The

---

[tranche], and you want two and let's go negotiate back and forth . . . . I did not have a negotiation starting lower and going higher with him about the tranches or the size of the award."); *id.* at 255:22–256:9 ("Q.  Okay.  As a Tesla director and compensation committee member, do you think you have a duty to the company and the stockholders to try to negotiate for the smallest compensation package for Mr. Musk that would adequately incentivize him?  A.  That is not how I think about it, no.  Q. Can you explain to me how you think about it?  A.   I think about compensation packages generally as what is fair to the executive and what is fair to the company. I don't think about it as trying to get the very smallest thing possible ever.  That's just not my modus operandi with any company I deal with.  I think about fairness.").

[812] *See S. Peru*, 52 A.3d at 801; *see also id.* ("Throughout the negotiation process, the Special Committee's and Goldman's focus was on finding a way to get the [controller's proposed] terms to make sense[.]"); *Valeant*, 921 A.2d at 746 ("[The process was], from the outset, undertaken to justify a bonus on the order of $30 million to Panic, rather than determine if bonuses—and in what amounts—might be appropriate.").

[813] *See Loral*, 2008 WL 4293781, at *26 ("Loral's CEO, Targoff, was a more aggressive negotiator than the Special Committee itself or the Committee's financial advisor, North Point. By that stage, Harkey, Simon, and North Point seemed willing to sign off on terms that were more advantageous to MHR than Targoff himself wanted to accept.").

[814] *BGC P'rs*, 2022 WL 3581641, at *19 (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006) ("The Supreme Court observed as early as *Weinberger* that the establishment of an independent special committee can serve as powerful evidence of fair dealing.")); *Jedwab*, 509 A.2d at 599 ("As to the fact that the transaction was not structured to accord minority shareholders a veto, nor was an

169

Board approved the Grant. Musk and Kimbal recused themselves. Five of the six directors who voted on the Grant were beholden to Musk or had compromising conflicts.[815] Tesla voluntarily subjected the Grant to a majority of the minority vote, but the Board secured stockholder approval through the materially deficient Proxy.[816]

independent board committee established to negotiate the apportionment of merger consideration on behalf of the minority, these are pertinent factors in assessing whether fairness was accorded to the minority."); *Sealy*, 532 A.2d at 1336 ("A second indicium of fair dealing, or its absence, is whether the process by which the merger terms were arrived at involved procedural protections that would have tended to assure a fair result.")).

[815] *Gesoff*, 902 A.2d at 1150–51 (finding in a post-trial opinion, that the investment bank's relationship with the buy-side controlling stockholder "robs [its] fairness opinion of its value as an indicator of fairness, and is itself an indicator that the parties did not structure the process in a way that was entirely fair"); *see also In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 444 (Del. Ch. 2012) (noting that the conflicted negotiator has a duty "to squeeze the last drop of the lemon out for . . . stockholders," but that the conflict gave the negotiator "a motive to keep juice in the lemon that he could use to make a financial [deal] for himself").

[816] *Accord Weinberger*, 457 A.2d at 703 ("Material information . . . was withheld under circumstances amounting to a breach of fiduciary duty. We therefore conclude that this merger does not meet the test of fairness . . . ."); *Orchard*, 88 A.3d at 29 (concluding that a "disclosure issue on which the plaintiffs received summary judgment provide[d] some evidence of unfairness"); *see also Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 723 (Del. Ch. 2023) (finding entire fairness standard applied where defendants failed "to disclose the cash per share that Gig3 would invest in the combined company[]" and "the value that Gig3 and its non-redeeming stockholders could expect to receive in exchange[]" because "[b]oth pieces of information would be essential to a stockholder deciding whether it was preferable to redeem her funds from the trust or to invest them in New Lightning"); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 816 (Del. 2022) (stating plaintiff stated viable claim under the entire fairness standard where the defendants failed to disclose information necessary for the plaintiff to "knowledgeably exercise their redemption rights"); *Voigt*, 2020 WL 614999, at *24 (finding entire fairness standard applied where the proxy statement failed to disclose the equity of a purchased asset "because it directly addressed the fairness of the [c]hallenged [t]ransaction[]" (citation omitted)).

Neither Board approval nor stockholder approval is a positive factor here for the fair dealing analysis.

### b. Fair Price

"In the fair price analysis, the court looks at the economic and financial considerations of the transaction to determine if it was substantively fair."[817] "Fair price and fair value standards call for equivalent economic inquiries."[818] "The fair price aspect of the entire fairness test," however, "is not in itself a remedial calculation."[819] "Instead of picking a single number, the court's task is 'to determine whether the transaction price falls within a range of fairness.'"[820] The fair price aspect of the entire fairness standard involves consideration of "all relevant factors" and may encompass "proof of value by any techniques or methods which are generally considered acceptable in the financial community[.]"[821]

There is no absolute limit on the magnitude of a compensation grant that could be considered fair.[822] But "[p]rocess can infect price."[823] And "where the pricing terms of a transaction that is the product of an unfair process cannot be justified by

[817] *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *13 (Del. Ch. Mar. 21, 2018) (citation omitted).

[818] *Id.* (cleaned up).

[819] *Id.* (cleaned up).

[820] *SolarCity II*, 2022 WL 1237185, at *39 (quoting *Dole*, 2015 WL 5052214, at *33).

[821] *Weinberger*, 457 A.2d at 713; *SolarCity II*, 2022 WL 1237185, at *32.

[822] *See Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) ("the size and structure of executive compensation are inherently matters of judgment" (citation omitted)).

[823] *Reis*, 28 A.3d at 467 (citations omitted); *Bomarko, Inc. v. Int'l Telecharge Inc.*, 794 A.2d 1161, 1183 (Del. Ch. 1999) ("[T]he unfairness of the process also infects the fairness of the price."), *aff'd*, 766 A.2d 437 (Del. 2000).

reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult."[824]

Defendants' primarily urge the court to evaluate price by comparing the terms of the exchange—what Tesla "gave" against what Tesla "got."[825] This allows Defendants to argue that the Grant was "all upside" for the Tesla stockholders, who they say risked nothing and gave "6% for $600 billion[.]"[826] There are many alternative ways to analyze price fairness.[827] And there are good reasons to reject the give/get model where no market-based evidence supports the price.[828] But because Defendants bear the burden of proving fair price, the court starts with their give/get argument.

Defendants' other affirmative arguments go as follows. They argue that a unique set of circumstances warranted an unprecedented Grant, which was

---

[824] *Valeant*, 921 A.2d at 748–49; *see also Loral*, 2008 WL 4293781, at *22 ("When the process used involves no market check and the resulting transaction is a highly unusual one impossible to compare with confidence to other arms-length transactions, the court is left with no reasoned basis to conclude that the outcome was fair.").

[825] Defs.' Post-Trial Opening Br. at 69–70 (citing *S. Peru*, 52 A.3d at 801–02; *Dieckman v. Regency GP LP*, 2021 WL 537325, at *34–35 (Del. Ch. Feb. 15, 2021)).

[826] *Id.* at 70, 74.

[827] *See, e.g.*, *SolarCity II*, 2022 WL 1237185, at *39–48 (structuring the price analysis to follow the parties' competing price arguments).

[828] *Valeant*, 921 A.2d at 750 (observing that the price terms could not be "justified by reference to any reliable market[]" and that there was no "proof in the record of substantial comparable transactions to which the court might look to find support for the payment of bonuses").

"necessary . . . at this time, for this CEO, and in this form."[829]  They contend that the Grant was "only upside" for the additional reason that the Grant's structure aligned Musk's interests with the stockholders.  They assert that the Grant's milestones were ambitious and difficult to achieve.  They maintain that the Grant is an exceptional deal when compared to private equity compensation plans.  They say that the stockholder vote was an indicator of fair price.  And they insist that the Grant worked by delivering to stockholders all that was promised.

Each of Defendants' fair price arguments fail.  Defendants did not prove that the Grant falls within a range of fairness.

### i.     The Give/Get

A "get" in this context asks what terms advance a company's goals.  A "give" is only reasonable if it is calibrated to further those goals.  To contextualize the "give" and the "get" discussion, therefore, the court must first ask:  What did Tesla want?

As set out in the June 16 Compensation Committee meeting minutes, the goals in structuring Musk's compensation plan were to "retain[]" Musk, "properly incentiviz[e]" Musk, and "[k]eep . . . Musk as the Company's fully-engaged CEO" given the "multiple other successful large companies" he manages.[830]  The lawyer-curated record of the relevant Board and Compensation Committee meetings identifies these goals, in general terms, as well as the directors' desires to align

---

[829] Defs.' Post-Trial Opening Br. at 78.

[830] JX-439.

173

Musk's interests with stockholder value.[831]  These are all versions of commonly cited

and accepted goals of equity-based compensation plans.  Here, however, the words

[831] JX-407 (6/6/17 Board meeting minutes) ("Mr. Ehrenpreis then updated the Board on the status and near fulfillment of all performance milestones related to Mr. E. Musk's current compensation plan, and that plans were underway to design the next compensation program for Mr. E. Musk. The Board acknowledged Mr. E. Musk's extraordinary achievement of the stretch milestones it had set for him and for having increased the market capitalization of the Company by more than 10x over the last five years."); JX-439 (6/23/17 Compensation Committee meeting minutes) ("Mr. Ehrenpreis then led a Committee discussion evaluating the importance of retaining and properly incentivizing Mr. Musk. The Committee discussed how Mr. Musk had been and would likely remain a key driver of the Company's success and its prospects for growth, and that, accordingly, it would be in Tesla's interest, and in the interest of its stockholders, to structure a compensation package that would keep Mr. Musk as the Company's fully-engaged CEO. The Committee also discussed the fact that unlike most other Chief Executive Officers, Mr. Musk manages multiple successful large companies. The Committee discussed the importance of keeping Mr. Musk focused and deeply involved in the Company's business, and the corresponding need to formulate a compensation package that would best ensure that Mr. Musk focuses his innovation, strategy and leadership on the Company and its mission."); JX-509 (7/7/17 Compensation Committee meeting minutes) ("The Committee determined that one important theme for any compensation plan was to ensure that it created adequate structural incentives to focus on the long term growth and success of the Company and the creation of shareholder value as opposed to simply short-term increases in stock price, while at the same time properly balancing risks and rewards for the Company, its shareholders and Mr. Musk. With these principles in view, the Committee again deliberated the pros and cons of various structures, and various Committee members continued to express their views that the 2012 Compensation Plan had worked extremely well for the Company, its stockholders and in incentivizing Mr. Musk to spend the bulk of his time on the Company and create enormous value for the Company. In light of these factors, Committee members expressed their views that there could be significant benefits from creating a similarly structured program for Mr. Musk's next compensation plan, including providing strong shareholder alignment, while also recognizing the changed nature and size of the Company since the 2012 Plan was implemented. The Committee further recognized Mr. Musk's unique drive for major accomplishments and the desire and need to motivate him with significant goals and milestones. The Committee recognized and expressed its desire to properly balance the motivation of stretch goals for Mr. Musk against any de-motivating factors created by seemingly impractical, unrealistic or unachievable goals. The Committee then discussed with Compensia and Radford the valuation and accounting considerations for a potential

equity grant. Questions were asked and full discussion ensued."); JX-571 (8/1/17 Compensation Committee meeting minutes) ("The Committee discussed the overall size of the new program and how it should reflect Mr. Musk's qualities and motivations. They also discussed the need for stretch goals and a long term outlook heavily focused on the creation of significant shareholder value. The Committee discussed an overall framework of a plan that could last 10-15 years, while also noting the pace at which Mr. Musk achieved the ambitious goals set forth in the 2012 Compensation Program (including leading the Company during a period in which the market cap of the company grew over 10x in five years). As part of this discussion, the Committee considered whether it was appropriate to consider new and/or alternative metrics for milestones in light of the Company's increased size and focus, or whether the ultimate focus should be on the growth of the Company and the creation of significant shareholder value. The Committee further discussed the setting of major milestones and the importance of balancing the creation of aggressive incentives for Mr. Musk while not disincentivizing him with seemingly impracticable or achievable goals. The Committee also discussed the appropriateness of large stretch goals and a structure in which Mr. Musk would receive zero compensation unless he achieved an incredibly significant milestone and created significant shareholder value, and how this type of structure had served shareholders and the Company so effectively in the 2012 Compensation Program. The Committee acknowledged that if Mr. Musk agreed to accept the significant risk in such a structure, the reward would have to be likewise significant, but yet fair to the Company and optimal for the shareholders given the milestones that would be achieved and the value created. The Committee discussed the milestones and various metrics that could be used to measure performance. The members of the Committee expressed a preference for simplicity and their desire to fully align the performance metrics to, ultimately, the creation of shareholder value."); JX-631 (9/19/17 Board meeting minutes) ("Various topics were discussed, including the success of the previous 2012 CEO Compensation Program and how motivating it as for Mr. Musk; Mr. Musk's ambitions for the Company and its potential to be one of the most valuable companies in the world; Mr. Musk's passion and dedication to the Company and its mission; the directors' views of Mr. Musk's incentives; and Mr. Musk's other commitments and potential competing interests. The directors expressed their desire to significantly align Mr. Musk's compensation with shareholder interests; to focus on long term creation of value; and to balance risk and reward for all stakeholders. A full discussion ensued. During this discussion, the Board recognized, among other things, the challenges of the CEO role and Mr. Musk's value to the Company, its products and businesses, and its culture of innovation. In particular, the Board recognized Mr. Musk's ability to execute in the face of significant challenges. The Board further discussed Mr. Musk's motivations and how the CEO Compensation Program might best serve the Company and its shareholders, while properly incentivizing Mr. Musk's ambitions for the Company."); JX-729 (12/12/17 special Board meeting minutes) (stating that the "program was characterized by the . . . full

175

seem like empty phrases. One obvious reason to question these statements is that the Board said that it wished to retain Musk as the "fully engaged *CEO*," yet the Leadership Requirement allowed Musk to step down to the role of "Chief Product Officer."

There is a more fundamental issue. Professor Charles Elson submitted an *amicus* brief in this action persuasively arguing that "[e]quity compensation for corporate executives was designed to solve a specific problem at a specific time in American corporate history."[832] To summarize that lesson in broad strokes, the first half of the 1900s witnessed a transition from "era of the 'robber barons'" to the era of the Berle-Means corporation, where corporations were run by "professional managers with little skin in the game."[833] The theory behind equity-linked compensation plans was that "[b]road-based equity ownership throughout the organization by management, directors, and employees" is "the most effective motivation for continuous vigilance throughout the organization."[834] For that reason and due to

---

alignment of CEO gains with the creation of shareholder value" and that "[t]he Board acknowledged this alignment as one of their primary focuses and discussed their understanding that this full shareholder alignment was Mr. Musk's desire as well"); JX-791 (1/21/18 Board meeting minutes) (stating that "the Board concluded that the proposed CEO Performance Award created very close alignment with shareholder interests that had the potential to powerfully incentivize Mr. Musk, and created the greatest likelihood to propel the Company through its next stages of growth").

[832] Elson Amicus Br. at 4.

[833] *Id.* at 4 (citing Amy Deen Westbrook & David A. Westbrook, *Unicorns, Guardians, and the Concentration of the U.S. Equity Markets*, 96 Neb. L. Rev. 688, 693–94 (2018)).

[834] *Id.* at 7 (quoting *Report Of The NACD Best Practices Council: Coping With Fraud And Other Illegal Activity* 16 (1998)).

changes in federal tax law, by the 1980s, "pressure built on companies to . . . strengthen the link between pay and performance."[835] Corporations began "using much more equity-based compensation."[836]

Equity-based compensation continues to be a powerful way to reduce agency costs and align the interests of management with those of the stockholders,[837] as Delaware law recognizes.[838] But where an executive has a sizeable pre-existing equity stake, there is a good argument that the executive's interests are already aligned with those of the stockholders. There are many examples of visionaries with large pre-existing equity holdings foregoing compensation entirely: Zuckerberg,

---

[835] *Id.* at 6 (quoting Brian R. Cheffins, *Delaware and the Transformation of Corporate Governance*, 40 Del. J. Corp. L. 1, 14 (2015)); *see also* John C. Coffee, Jr., *What Caused Enron? A Capsule Social and Economic History of the 1990s*, 89 Cornell L. Rev. 269, 273–75 (2004) (discussing the trend toward equity-based compensation).

[836] Elson Amicus Br. at 6 (quoting Cheffins, *Delaware and the Transformation of Corporate Governance*, 40 Del. J. Corp. L. at 14).

[837] *See generally id.* at 7–8; *but see* Coffee, *What Caused Enron? A Capsule Social and Economic History of the 1990s*, 89 Cornell L. Rev. at 278–79 (cautioning that equity-based compensation can create perverse incentives when deployed without restrictions such as hold periods).

[838] *See, e.g.*, *Chen*, 87 A.3d at 670–71 (observing that owning material amounts of stock "aligns [fiduciaries'] interests with other stockholders by giving them a 'motivation to seek the highest price' and the 'personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so'" (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010))); *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002) ("A director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders."); *In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del. Ch. Jan. 7, 1991) (observing that directors' equity ownership created "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del. 1992) (TABLE).

177

Bezos, Gates, and others so familiar to the world that no first names are required.[839] In each instance, the CEO's board recognized that the executive's preexisting ownership stake provided sufficient incentive to grow the companies that they had built.[840]

So why not here? Why did Tesla have to "give" anything in these circumstances? Musk owned 21.9% of Tesla at the time of the Grant.[841] If the goals were retention, engagement, and alignment, then Musk's pre-existing equity stake

---

[839] Elson Amicus Br. at 1–4; *see also* Dunn Dep. Tr at 138:17–139:10 ("There are people, you know, like Jeff Bezos, for example, who doesn't take any compensation including no equity compensation. The only thing that shows up in his proxy is like his security expense. . . . Warren Buffett, I think his salary is $100,000. That what he takes in compensation, because he owns such a significant portion of the shares."); Dunn Opening Expert Report at 114–15 (showing how much more Musk's compensation for 2018 would be compared to similar high-profile executives for 2018 (Bezos, $1.6 million) (Pessina (Walgreens) $12.7 million) (Buffett, $390 thousand) (Zuckerberg, $22 million) (Musk, $2.3 billion) (numbers are approximate)). The three-year average compensation (from 2016–2018) paid to Musk (assuming the much lower $2.3 billion valuation of the 2018 Grant) is "over 110x what was paid to the median of the group" Dunn analyzed (approximately $6.8 million (others) to $761.4 million (Musk)). *Id.*

[840] *See generally* Elson Amicus Br. at 3 (citing 10/4/06 Microsoft Schedule 14A Proxy at 14 ("Messrs. Gates and Ballmer do not receive equity-based pay from the Company because they already own a significant amount of Company stock."); 4/29/16 Alphabet Schedule 14A Proxy at 30 ("Larry and Sergey have voluntarily elected to only receive nominal cash compensation. As significant stockholders, a large portion of their personal wealth is tied directly to Alphabet's stock price performance, which provides direct alignment with stockholder interests."); 4/14/22 Amazon Schedule 14A Proxy at 92 ("Due to Mr. Bezos's substantial stock ownership, he believes he is appropriately incentivized and his interests are appropriately aligned with shareholders' interests. Accordingly, Mr. Bezos has never received any stock-based compensation from Amazon."); 4/12/19 Facebook Schedule 14A Proxy at 28 ("Mr. Zuckerberg did not receive any additional equity awards . . . because our compensation & governance committee believed that his existing equity ownership position sufficiently aligns his interests with those of our stockholders.")).

[841] PTO ¶ 64.

provided a powerful incentive for Musk to stay and grow Tesla's market capitalization. After all, he stood to benefit by over $10 billion for every $50 billion increase. His equity stake was also a powerful incentive to avoid allowing Tesla to fall in what Musk might consider to be incapable hands.[842] Moreover, Musk was not going anywhere. He stated publicly at the outset of the process and repeated throughout this litigation that he was a lifer who intended to stay at Tesla for the remainder of his days (or until he becomes "too crazy"), with or without the Grant.[843]

The principal defect with Defendants' give/get argument (indeed, their fair price argument as a whole) is that it does not address the $55.8 billion question: Given Musk's pre-existing equity stake, was the Grant within the range of reasonable approaches to achieve the Board's purported goals? Or, at a minimum, could the Board have accomplished its goals with less, and would Musk have taken it?

Defendants' primary response is to reduce the issue to a straw man, stating that "Plaintiff's allegations boil down to the position that Musk should be happy to work *for free*."[844] They make a similar point elsewhere, stating that if Musk "fell short of achieving some or all of the [Grant's] milestones, the stockholders retained the benefit of any increase in Tesla's stock price, while Musk *risked receiving*

---

[842] Trial Tr. at 1421:9–13 (Buss) ("Q. Shifting gears, during your board tenure, the Tesla board had no formal documented succession plan to replace Mr. Musk; correct? A. Formally documented, no. We had various discussions. But correct, nothing documented."); *id.* at 857:9–858:10 (Murdoch) (confirming Musk had not identified a successor until the months after his 2021 deposition).

[843] *See e.g.,* JX-390 at 20–21.

[844] Dkt. 227 ("Defs.' Pre-Trial Br.") at 43 (emphasis added).

*nothing.*"[845] For free? Receive nothing? Defendants' arguments ignore the obvious: Musk stood to gain considerably from achieving the Grant's market capitalization milestones (over $10 billion for each $50 billion increase in market capitalization).

Defendants also neglect the magnitude of the give in their give/get argument. The Grant was, by Compensia's reckoning, the "larg[est] compensation opportunity to [a] CEO that [they] have seen."[846] Even other "highly leveraged plan designs with very aggressive performance requirements" did not compare to the Grant.[847] The Grant was more than 30x greater than its nearest comparable plan, and that was Musk's 2012 Grant.[848] ISS noted that the Grant was 250x greater than the median peer 2017 CEO compensation.[849] The incredible size of the biggest compensation plan ever—an unfathomable sum—seems to have been calibrated to help Musk achieve what he believed would make "a good future for humanity."[850]

A good future for humanity is a really good thing. Some might question whether colonizing Mars is the logical next step. But, in all events, that "get" had no relation to Tesla's goals with the compensation plan. Considering this glaring defect in Defendants' give/get argument, it does not support a finding of fair price.

---

[845] Defs.' Post-Trial Opening Br. at 70 (emphasis added).

[846] JX-440 at 106.

[847] *Id.* at 14.

[848] PDX-2 at 5.

[849] JX-916.

[850] JX-664 at 1. It is questionable as to whether the Grant would even make a dent in that goal, given that Musk testified that his space odyssey would cost trillions. Musk Dep. Tr. at 115:24–117 (Musk discussing his goals and stating that SpaceX's goals would require the help of "other companies and governments").

180

### ii. The Unique Circumstances And CEO

Defendants next argue that the Grant was suited for "this time" and "this CEO."[851] To support that argument, they advance the following factual narrative. Tesla was setting an ambitious course—to become "one of the most valuable companies in the world"[852] and "accomplish[] Tesla's mission of accelerating the world's transition to sustainable energy."[853] Tesla's ambitious goals forced it to the point of an existential crisis in 2017, and Musk was critical to Tesla's future.[854] Musk was on the verge of walking away and was distracted by his other ventures. Musk required an "added incentive" to stay "at the helm," and he is uniquely motivated by highly ambitious goals.[855] As Gracias explained, the Board looked to fashion milestones that would give Musk the "dopamine hits" he needed.[856]

There is no doubt that "this time" was precarious at Tesla, that the Board viewed "this CEO" as critical to Tesla's success, that Musk is a unique person who has been singularly instrumental to Tesla, and that Musk is genuinely motivated by highly ambitious goals. But there are reasons to question other aspects of Defendants' factual narrative. For example, if transformative growth is the goal, then why set milestones at the time of the Grant that were 70% likely to be achieved?

---

[851] Defs.' Post-Trial Opening Br. at 78.

[852] JX-878 at 3 (2/8/18 Schedule 14A Proxy Statement).

[853] *Id.*

[854] Trial Tr. at 1251:4–23 (Murphy).

[855] *Id.* at 1251:17–22 (Murphy); *id.* at 730:21–731:7 (Gracias).

[856] *Id.* at 728:23–729:13 (Gracias).

Even assuming that the 70% figure was a conservative accounting metric, it casts some doubt on the "stretch" nature of the early milestones. Further, how can one conclude that Musk was on the verge of walking away from a leadership role at Tesla when Musk made it clear that he "would not quit Tesla," is "heavily invested in Tesla, both financially and emotionally, and views Tesla as part of his family[?]"[857]

Defendants also argue that Musk needed additional incentives to stay on at Tesla or he would spend more time at SpaceX, where he could fulfill his galactic ambitions to establish interplanetary travel, colonize Mars, and potentially earn more money in the meantime.[858] That argument begs another question: if encouraging Musk to prioritize Tesla over his other ventures was so important, why not place guardrails on how much time or energy Musk had to put into Tesla?

Even assuming the truth of all of Defendants' points, they do not add up. There is simply no evidence that the "added incentive" provided by a Grant of *this* magnitude was necessary, much less fair. This unique circumstance and this unique CEO do not support a finding of fair price.

---

[857] JX-831 at 13–14; *see also* Trial Tr. at 644:11–15 (Musk) (affirming that as of early 2018, he was heavily invested in Tesla both financially and emotionally and viewed Tesla as part of his family); *id.* at 76:7–15 (Ehrenpreis) (confirming Musk affirmed his love for Tesla during the first discussion regarding a new grant); *id.* at 785:1–7 (Gracias) (testifying that Musk views Tesla as one of the most important things in his life).

[858] Defs.' Post-Trial Opening Br. at 15–16; Murphy Opening Rep., at 50–51; Defs.' Post-Trial Opening Suppl. Br. at 23 (suggesting that Musk, without the Grant, could work at SpaceX and keep his Tesla shares as a "passive investment").

### iii.    The "Only Upside" Argument

Defendants "only upside" argument relies on the Grant's structure, which they say ensured that Musk drove meaningful and sustained growth in four ways.

*First*, Defendants argue that pairing market capitalization milestones with operational milestones provided "safety in the structure."[859] The market capitalization milestones operated as the "primary goals," while the operational goals functioned as "support for those [market capitalization] goals."[860] Brown testified: "There's a high level of performance required to earn one of these. So then, if it was possible to drive that kind of growth on a solid operational basis and earn more than one of them in a year, that seemed like a win for . . . shareholders."[861] But of the two operational metrics, the revenue milestones were not dependent on profitability. As Compensia acknowledged, this aspect of the Grant "ignores profitability."[862] ISS noted that "up to eight tranches (three-quarters of the award, or nearly $2 billion in value) may vest based on market capitalization and revenue goals, even if earnings do not clear the EBITDA performance hurdles."[863] Thus, Musk could still receive billions under the Grant without Tesla experiencing the fundamental growth that the Grant was intended to incentivize.[864]

---

[859] Defs.' Post-Trial Opening Br. at 75.

[860] Trial Tr. at 1439:7–18 (Brown).

[861] *Id.*

[862] JX-530 at 5 (7/17/17 Working Group discussion document).

[863] JX-987 at 6 (3/21/18 ISS proxy analysis & benchmark policy voting recommendations).

[864] Dunn Opening Expert Rep. at 56.

*Second*, Defendants argue the Grant's trailing average requirements for the market capitalization milestones—and the four-consecutive-quarter requirement for the operational milestones—are stockholder-friendly.[865] The Board apparently "put in both the six-month trailing average and the 30-day trailing average to ensure that when the market capitalization would potentially increase to one of these milestones, it would stay there for a requisite period of time that it actually seemed fair to award the milestone to Elon."[866] Similarly, the operational milestones required sustained performance for four consecutive quarters.[867] Although those timing requirements do provide stockholders with protection, that protection is limited, because the Grant lacks any protection for lost value when the Company's performance falls below previously met thresholds.

*Third*, Defendants argue that the M&A Adjustment—which applied to both the market capitalization and operational milestones—prevented Musk from "gam[ing]" any of the milestones.[868] Maron explained that the adjustments "ensure that if Elon was going to benefit from this plan, that it was because he had led the Company to organic value creation, not just buying another big company and having that add significantly to the market capitalization of Tesla."[869] The adjustments would be triggered not only by stock deals, but also by cash deals, a term that

---

[865] Defs.' Post-Trial Opening Br. at 75 (citing Trial Tr. at 1274:23–1276:9 (Murphy)).

[866] Trial Tr. at 264:16–21 (Maron).

[867] JX-878 at 15 (2/8/18 Schedule 14A Proxy Statement).

[868] JX-784 at 1–2 (1/17/18 emails between Maron and Musk).

[869] Trial Tr. at 265:8–13 (Maron).

Compensia "hadn't put in . . . other plans before."[870]  But an M&A adjustment is standard in executive compensation,[871] and Musk acknowledged that Tesla would not "be making any big acquisitions," limiting the utility of this provision.[872]

*Fourth*, Defendants argue that the Five-Year Hold Period served stockholder interests.[873]  Defendants state that "[w]hile every other stockholder could have cashed in during the nearly 400 trading days that Tesla's market capitalization was over $650 billion,[874] Musk was unable to sell a single share of the compensation he earned under the 2018 [Grant]."[875]  This is true.[876]  But it ignores that there was no limit to Musk's ability to sell any of the millions of Tesla shares he already owned.

Certainly, the structural provisions on which Defendants rely have value.  But that value is limited as to each provision.  Given the other defects in the Grant, these provisions do not individually or in the aggregate lead to a finding of fair price.

### iv.    The Ambitious Milestones

Defendants argue that the Grant price was fair because its milestones were ambitious and difficult to achieve.  The defense witnesses all testified in harmony

---

[870] *Id.* at 1465:11–19 (Brown).

[871] *Id.* at 1010:20–24 (Dunn).

[872] JX-784 at 2.

[873] Defs.' Post-Trial Opening Br. at 76–77.

[874] *Id.* at 77 (citing JX-1510 at 1).

[875] *Id.*

[876] Trial Tr. at 255:6–13 (Maron) (discussing holding periods and the "lock" on Musk); *id.* at 63:20–64:1 (Ehrenpreis) (stating the Board "negotiated an agreement that [Musk] would hold for five years after both the achievement and vesting and exercise of the options").

that the milestones were "audacious" and "extraordinarily ambitious."[877] Defendants concede that three operational milestones aligned with internal projections but note that the Company routinely missed projections.[878]

It is hard to square Defendants' coordinated trial testimony concerning Tesla's internal projections with the contemporaneous evidence.[879] The Board deemed some of the milestones 70% likely to be achieved soon after the Grant was approved.[880] This assessment was made under a conservative accounting metric, but there are other indications that Tesla viewed its projections as reliable. They were developed in the ordinary course, approved by Musk and the Board, regularly updated, shared with investment banks and ratings agencies, and used by the Board to run Tesla.[881] Several Tesla executives affirmed their quality, accuracy, and reliability.[882] Plus, Tesla hit the first three milestones, consistent with its projections, by September 30, 2020. [883]

---

[877] Defs.' Post-Trial Opening Br. at 85.

[878] Defs.' Post-Trial Answering Br. at 67–68.

[879] *See, e.g.*, *BCIM Strategic Value Master Fund, LP v. HFF Inc.,* 2022 WL 304840, at *2 (Del. Ch. Feb. 2, 2022) ("The witness testimony often conflicted with the contemporaneous record. In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents.").

[880] JX-1028 at 15 (4/27/18 Audit Committee Agenda); JX-1023 at 6 (4/27/18 Significant Accounting Matters for 2018 Q1 Audit Committee).

[881] *See e.g., id.* at 353:6–355:15 (Ahuja) (projections were "accurate and truthful"); *id.* at 466:14–469:24 (Ahuja) (noting the projections were shared with outside rating agencies).

[882] *See e.g., id.* at 391:16–23 (Maron) ("Tesla would do its . . . earnest best to . . . provide quality information" to the rating agencies).

[883] PTO ¶¶ 265–71.

Defendants bore the burden of proving fair price. Given the conflicting testimony concerning the projections, Defendants failed to prove the factual predicate for their argument that all the milestones were "ambitious" and difficult to achieve. This argument does not support a finding of fair price.

### v. The Private-Equity Analogy

Defendants argue that the Grant price is fair by comparing the Grant to compensation structures common in the portfolio companies backed by venture capital and private equity funds, where CEOs often receive a percentage of the equity. That argument has one obvious problem: Tesla is not a privately held portfolio company.

Defendants offer no theoretical justification for comparing the Grant to venture capital or private equity compensation structures when Tesla is not a venture capital or private equity backed entity. This was something Defendants came up with for trial. During the negotiations, neither Defendants nor their experts benchmarked the Grant to venture capital compensation. They never considered an analogy to a venture capital or private equity investment. That is because Tesla was a publicly traded corporation with a market capitalization of $53 billion, tens of thousands of stockholders, and a CEO who already owned 21.9% of Tesla's equity.

Examined on its own terms, Defendants' private-equity analogy relies on valuing the Grant as a percentage of Tesla's fully diluted shares. Defendants peg that percentage at 6.4%, but there is no evidence that Musk, the Board, the Compensation Committee, or its advisors ever considered this figure during the

187

process. Defendants take the 6.4% figure from the Proxy, which based the figure on "illustrat[ive]" dilution assumptions.[884]

Focusing on the 6.4% figure alone, Defendants' financial expert testified that "something like 6 to 10 percent [equity] for a new CEO would be totally normal" in VC- and private-equity-backed companies.[885] Gracias testified that an equity stake of around 6% for a CEO would be considered "on the low end."[886] Defendants describe the Grant as riskier than VC compensation, because it was "100 percent risk-free" for Tesla and its stockholders,[887] but Musk would get "nothing if we hadn't doubled the market cap."[888] Referring to his portfolio companies, Gracias put it bluntly: "I don't have a CEO who would sign up for that."[889] Gracias's testimony, however, was simply not credible. Based on Tesla's April 25, 2022 market capitalization of just over $900 billion,[890] 6% of Tesla would be worth $54 billion, just under the maximum value

---

[884] JX-878 at 24 (2/8/18 Schedule 14A Proxy Statement). It represents one of many possible scenarios for what Musk could receive on a fully diluted basis if the Grant fully vests and all five of the assumptions listed in the Proxy hold. For example, for Musk to achieve a mere 6% under the Grant, "the 527,491 shares of common stock subject to the tenth and final tranche of the 2012 [Grant]" would need to "become fully vested, outstanding and held by Musk." *Id.* But the tenth tranche of the 2012 Grant never vested. PTO ¶¶ 209–10.

[885] Trial Tr. at 1112:2–24 (Gompers).

[886] *Id.* at 735:11–736:2 (Gracias).

[887] *Id.* at 1395:19–1398:3 (Buss).

[888] *Id.* at 736:24–737:11 (Gracias).

[889] *Id.* at 736:24–737:4 (Gracias).

[890] PTO ¶ 71.

disclosed in the Proxy.[891] Any number of CEOs would sign up for that. And many VC startups offer CEOs the prospect of great riches or nothing at all.

Even if the comparison holds, Musk already is earning more than the 20% a hedge fund would earn as a typical carried interest. So, while Musk is not receiving a base salary, he is already receiving more (incentive-wise) than a fund who would manage Tesla's assets. And given that Musk does not need a base salary to keep his pretend hedge fund afloat, it would not be necessary.

Regardless, there are other ways to value the Grant, such as its maximum value and its grant date fair value. The Board and stockholders were told that, if Musk achieved all 12 tranches of the Grant, he would receive a maximum value of $55.8 billion.[892] As disclosed to the Board and stockholders, the grant date fair value was $2,615,190,052.[893] By this measure, it was a massive award—an internal ISS email described it as "about 250 times the peer median."[894] Brown, Ehrenpreis, and Denholm all acknowledged that the award was exceptionally large, with Ehrenpreis agreeing it was "entirely without precedent." [895] Plaintiff's expert noted that the Grant was 33x larger than Musk's 2012 Grant's $78M grant date fair value.[896] By

---

[891] JX-878 at 18 (2/8/18 Schedule 14A Proxy Statement).

[892] *Id.* at 24.

[893] JX-792 at 7; JX-878 at 34.

[894] JX-916.

[895] Trial Tr. at 130:22–131:7 (Ehrenpreis); *id.* at 360:20–361:12 (Denholm); *id.* at 1480:9–14 (Brown).

[896] Dunn Opening Expert Rep. at 103; Dkt. 291 ("Pl.'s Demonstrative 2"), at 9 (showing the magnitude of the comparison); Trial Tr. 994:7–13 (noting the comparison between the two grants).

the most conservative comparison that Plaintiff's expert could conceivably devise, the Grant's grant date fair value was 11.7x larger than the median peer group.[897] Indeed, the Grant entitled Musk to *billions* even if Tesla significantly *underperformed* its historical results.[898] Just as they did during the negotiation process, Defendants ignored these figures.

Defendants' portfolio-company analogy misses the mark in multiple ways. It does not support a finding of fair price.

### vi. The Stockholder Vote

Defendants argue that disinterested stockholder approval is "compelling evidence" that the price was fair.[899] The stockholder vote is one component of the fair price analysis, but whether the vote represents a form of market evidence that can support a certain price depends on the sufficiency of the disclosure. Generally, a stockholder vote is only "compelling evidence" of fairness absent a disclosure violation.[900] The Delaware Supreme Court in *Weinberger* held that an uninformed

---

[897] Trial Tr. at 992:2–7 (Dunn); Pl.'s Demonstrative 2 at 6, 7. Dunn's most aggressive estimation reflected that the Grant was 544.8x greater than the median peer group. Pl.'s Demonstrative 2 at 6, 8.

[898] Gompers Dep. Tr. at 302:10–303:19.

[899] Defs.' Post-Trial Opening Suppl. Br. at 21 (citing *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *29 (Del. Ch. Aug. 8, 2017)).

[900] *ACP*, 2017 WL 3421142, at *29; *cf. Kahn v. Lynch Commc'ns Sys., Inc.*, 669 A.2d 79, 89 (Del. 1995) (holding that a finding of adequate disclosure in a parent-subsidiary merger was persuasive evidence of entire fairness, because "although the merger was not conditioned on a majority of the minority vote . . . more than 94 percent of the shares were tendered in response to [the] offer"); *Cinerama II*, 663 A.2d at 1176 (considering the stockholder vote as persuasive evidence of fair price where "the directors had complied with the disclosure duty").

190

stockholder vote is totally "meaningless."[901]    Under *Weinberger*, therefore, the stockholder vote is a meaningless indicator as to fair price.  In *SolarCity III*, the high court took a more nuanced approach, affording a stockholder vote some weight despite a deficient proxy statement where the key issue was SolarCity's value.  The high court noted that there was significant public information available concerning that issue, "SolarCity traded in an efficient market," and a strong independent fiduciary positively affected the process.[902]  Defendants did not establish those facts here.[903]

Because the stockholder vote was not fully informed, it does not support a finding of fair price.

### vii.    The Hindsight Defense

Defendants finally argue from hindsight. They claim the Grant was fair because it worked: "Tesla thrived *because of* the 2018 Plan."[904]  With this argument, Defendants ask the court to infer a direct causal relationship between the Grant and Tesla's subsequent performance.  But Defendants failed to prove that Musk's less-than-full time efforts for Tesla were solely or directly responsible for Tesla's recent

---

[901] *Weinberger,* 457 A.2d at 712.

[902] *SolarCity III*, 298 A.3d at 728–29.

[903] *See also ACP*, 2017 WL 3421142, at \*23 (holding that, where information was not expected nor asked for by a committee, that information was not required to be disclosed because there was not an unfair disparity between the market and the decision-makers).

[904] Defs.' Post-Trial Opening Br. at 52 (emphasis added).

191

growth, or that the Grant was solely or directly responsible for Musk's efforts. This last argument is empty rhetoric, not evidence of fair price.

### D. Rescission Is A Reasonable And Appropriate Remedy.

As a remedy, Plaintiff only seeks recission.[905] Plaintiff's lead argument is that the court must rescind the Grant due to the disclosure defects because the Board conditioned the Grant on stockholder approval.[906] Plaintiff also argues that the court has discretion to order rescission as a remedy for fiduciary breaches.[907] Plaintiff further argues that, "at minimum," the court should rescind the options for the first three tranches given lack of disclosure regarding the probability of achievement.[908]

Plaintiff's first argument does not work. It would create an overly rigid rule that runs contrary to the Delaware Supreme Court's holding in *Weinberger*. But Plaintiff's second argument prevails, so the court need not reach Plaintiff's third argument. The court orders rescission of the Grant as a remedy for Defendants' fiduciary breaches.

---

[905] Plaintiff sought alternative remedies but has abandoned those requests. Pl.'s Post-Trial Opening Br. at 104–06.

[906] The court referred to this as Plaintiff's "kill shot" theory, which was a reference to the racquet term meaning an unreturnable volley that ends a match, not the Eminem song.

[907] Pl.'s Post-Trial Opening Br. at 105.

[908] *Id.* at 105–06.

192

### 1. The Automatic-Invalidation Argument Fails.

In their lead argument, Plaintiff argues that because Tesla conditioned the Grant on stockholder approval,[909] "a single material disclosure failure invalidates" the Grant.[910] Plaintiff says that because stockholder approval was secured by a materially misleading Proxy, the Grant is void, and rescission must follow automatically.

There is appeal in the simplicity of Plaintiff's approach, but it is not quite right. The consequence of an uninformed stockholder vote depends in part on whether that vote was required or voluntary.[911] The DGCL requires stockholder approval of certain transactions—a merger, sale of assets, or charter amendment, for example.[912] For transactions that require stockholder approval, there are strong arguments that a material disclosure deficiency "warrant[s] an injunction against, or rescission of, the transaction."[913]

But even when a Delaware statute requires a vote, this court does not necessarily void the transaction when that vote was uninformed.[914] In *Weinberger*,

---

[909] JX-791 at 4 (Board resolution approving the Grant) (stating that the Grant was effective "subject to the Requisite Stockholder Approval" and that if the Grant "fail[ed] to receive the affirmative vote" of a majority of non-Musk shares, it would be "forfeited and cancelled").

[910] Pl.'s Post-Trial Opening Br. at 1–11.

[911] *See generally In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013).

[912] 8 *Del. C.* §§ 241, 242, 271, 251(c).

[913] *Wayport*, 76 A.3d at 314–15; *Gantler*, 965 A.2d at 713.

[914] *See SolarCity III*, 298 A.3d at 729; *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 537 (Del. 1996) (holding that "the argument that the disclosure violation renders

the Delaware Supreme Court made that plain by correcting a misunderstanding that it believed had arisen regarding the importance of its ruling in *Vickers*. That earlier decision held that rescission was the preferred remedy for a transaction tainted by disclosure violations and that rescissory damages—the monetary equivalent of rescission—could substitute where rescission was not feasible.[915] The *Weinberger* decision stressed that rescissory damages were not the exclusive remedy for a disclosure violation.[916] By the same logic, rescission need not follow automatically either.

That is especially true for transactions where the DGCL does not require a stockholder vote. A corporation may seek stockholder approval for those transactions, and the vote is "voluntary" in this sense.[917] When voluntarily seeking stockholder approval, the failure to disclose material information "will eliminate any effect that a favorable stockholder vote otherwise might have for the validity of the transaction or for the applicable standard of review."[918] For example, the failure to disclose material information will render *Corwin* cleansing and burden shifting

---

the statutory merger void must fail"); *see also* 13 Am. Jur. 2d *Cancellation of Instruments* § 4 ("Cancellation or rescission as an equitable remedy is not available as a matter of right. Rather, relief by way of cancellation is a matter within the court's discretion and is granted or withheld according to what is reasonable and proper under the circumstances of each case.").

[915] *See Vickers*, 429 A.2d at 501.

[916] *Weinberger*, 457 A.2d at 704 (overruling *Vickers* "to the extent that it purports to limit a stockholder's monetary relief to a specific damage formula").

[917] *Wayport*, 76 A.3d at 314 (citing *Gantler*, 965 A.2d at 713).

[918] *Id.*

unavailable.[919]   The failure to disclose material information might also support an independent claim and remedies for breach of the duty of disclosure,[920] but the court has discretion when fashioning a remedy in that context as well.   The failure to disclose material information for voluntary stockholder votes, however, does not automatically invalidate the transaction.

The stockholder vote on the Grant was not required by the DGCL.[921]   The Proxy deficiencies defeated Defendants' effort to shift the burden under the entire

---

[919] *See, e.g.*, *van der Fluit*, 2017 WL 5953514, at *8 n.115 ("[O]ne violation is sufficient to prevent application of *Corwin*.").

[920] *See, e.g., Weinberger,* 457 A.2d at 703; *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 7704774, at *10–11 (Del. Ch. Nov. 15, 2023) (awarding *Weinberger* damages); *In re Columbia Pipeline Gp., Merger Litig.*, 299 A.3d 393, 494–500 (Del. Ch. 2023) (same).

[921] In this case, the stockholder vote was required by NASDAQ Rules. NASDAQ R. 5635(c) ("Shareholder approval is required prior to the issuance of securities when a stock option or purchase plan is to be established or materially amended or other equity compensation arrangement made or materially amended").  Plaintiff argues that the NASDAQ requirement renders the vote "legally required" and thus mandates recission for transactions approved by a materially deficient vote.  Pl.'s Post-Trial Suppl. Answering Br. at 8.  Effectively, Plaintiff urges this court to serve as NASDAQ enforcement agent, which would run contrary to multiple strains of Delaware law.  *See Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 70 (Del. Ch. 2015) (holding that stockholder plaintiff had no standing to prosecute a violation of the NYSE Rules); *In re Aquila Inc. S'holders Litig.* 805 A.2d 184, 192 n.11 (Del. Ch. 2002) (noting that plaintiffs conceded they had "no standing directly to bring an action to enforce the NYSE rules or to seek sanctions for any alleged violation thereof"); *see also Mill Bridge V, Inc. v. Benton,* 2009 WL 4639641, *12 (E.D. Pa. Dec. 3, 2009) ("courts in [the Third Circuit] have 'unanimously refused to recognize any private right of action for violation of a stock exchange rule" (quoting *In re Farmers Gp. Stock Options Litig.*, 1989 WL 73245, at *3 (E.D. Pa. July 5, 1989))).  Given the complexities of this issue in an otherwise complex case, the court does not reach it.  And the court need not do so because, ultimately, Plaintiff is getting what he asks for—recission.

fairness standard to Plaintiff, but the uninformed vote does not automatically invalidate the Grant.

Plaintiff responds that although a stockholder vote was not required by the DGCL, the Board elevated the vote to a requirement by conditioning the Grant on a favorable vote. That does not change the outcome, because the court has the discretion to determine a remedy for corporate transactions where a vote is required. The same is true for a transaction that is conditioned on a vote.

### 2. Rescission Is Warranted.

Although rescission does not automatically flow from the disclosure deficiencies, it is nevertheless an available and appropriate remedy.

The remedy of rescission "restore[s] the parties substantially to the position which they occupied before making the contract."[922] "Rescission 'is not given for every serious mistake and it is neither given nor withheld automatically, but is awarded as a matter of judgment.'"[923] The court has broad discretion to award recission where the facts and circumstances warrant.[924] This court has awarded rescission as a

---

[922] *Craft v. Bariglio*, 1984 WL 8207, at *12 (Del. Ch. Mar. 1, 1984) (citing Henry Campbell Black, *On Rescission and Cancellation* § 616 (2nd ed.)); *accord Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) ("rescission results in abrogation or unmaking of an agreement, and attempts to return the parties to the status quo" (quoting *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982)); *id.* at 61 ("'[E]quitable rescission offers a platform to provide additional equitable relief, such as cancellation of a valid instrument—the formal annulment or setting aside of an instrument or obligation.'" (quoting *Ravenswood*, 2018 WL 1410860, at *21)).

[923] *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 174 (Del. 2002) (quoting *Gaffin v. Teledyne, Inc.*, 1990 WL 195914, at *16 (Del. Ch. Dec. 4, 1990)).

[924] *Id.* at 164 (stating that whether to order rescission is within the discretion of the Court of Chancery); 13 Am. Jur. 2d Cancellation of Instruments § 4 ("Cancellation or

remedy for breach of fiduciary duty,[925] particularly in the context of self-dealing transactions.[926] Indeed, as discussed above, the Delaware Supreme Court referred to recission as "the preferrable remedy" in *Vickers* for breach of fiduciary duty where one party has misled another.[927]

---

rescission as an equitable remedy is not available as a matter of right. Rather, relief by way of cancellation is a matter within the court's discretion and is granted or withheld according to what is reasonable and proper under the circumstances of each case. A court may shape the rescission of contract remedy in order to serve substantial justice."); *see also Weinberger*, 457 A.2d at 714 ("[T]he Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate."); *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("In determining damages, the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages" (internal citations omitted)).

[925] *See, e.g.*, *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 46 (Del. Ch. 2010) (ordering rescission of a rights plan as a remedy for breach of fiduciary duty); *Coleman v. Newborn*, 948 A.2d 422, 433 (Del. Ch. 2007) (ordering rescission of a deed as remedy for breach of fiduciary duty); *Valeant*, 921 A.2d at 752 (ordering rescission of a compensation plan where the defendants "failed to show that the transaction was entirely fair" and it was "clear that he has no right to retain any of the $3 million bonus he received"); *see also Zutrau v. Jansing*, 2014 WL 3772859, at *26 (Del. Ch. July 31, 2014) (ordering partial rescission); *Loral*, 2008 WL 4293781, at *32 (same).

[926] *Zutrau*, 2014 WL 3772859, at *26 (stating "recission frequently is granted where self-dealing transactions are found not to be entirely fair"); *see also Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) ("An interested transaction is not void but is voidable, and a court will uphold such a transaction against a beneficiary challenge only if the trustee can show that the transaction was fair and that the beneficiaries consented to the transaction after receiving full disclosure of its terms."); *Firefighters' Pension Sys. of Kans. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 251 (Del. Ch. 2021) ("A finding that a transaction is not entirely fair thus could lead to transaction-based relief, such as an injunction, rescission, or an equitable modification of the transaction's terms.").

[927] *Vickers*, 429 A.2d at 501; *but see ENI Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013) (denying on a motion to dismiss a request for rescission, but noting that "[r]escission is . . . a remedy available only where facts indicate equity so requires," and that the plaintiff's "burden to establish an entitlement to rescission, in light of the likely change in circumstances due to the passage of time, is heavy").

To be entitled to equitable rescission, a plaintiff must demonstrate that rescission is both "reasonable and appropriate" under the circumstances.[928] This includes showing that it is possible for "all parties to the transaction [to] be restored to the *status quo ante, i.e.*, to the position they occupied before the challenged transaction."[929]

Plaintiff has demonstrated that rescission is reasonable, appropriate, and practicable. This Grant is not "too complex to unscramble[.]"[930] Rescission is uniquely available: no third-party interests are implicated, the entire Grant sits unexercised and undisturbed, and exercised shares would be subject to the Five-Year Hold Period.[931]

Defendants argue that rescission is a harsh consequence that would leave Musk uncompensated. But Musk's preexisting equity stake provided him tens of billions of dollars for his efforts. And Defendants have not offered a viable alternative short of leaving the Grant intact.

On this point, *Valeant* is instructive.[932] There, the plaintiff claimed that the directors of Valeant Pharmaceuticals International breached their fiduciary duties by awarding themselves and other executives and employees large cash bonuses in

---

[928] *Lenois v. Lawal*, 2017 WL 5289611, at *20 (Del. Ch. Nov. 7, 2017).

[929] *Strassburger v. Earley*, 752 A.2d 557, 578 (Del. Ch. 2000) (emphasis in original).

[930] *In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *14 (Del. Ch. Jan. 5, 2010); *see, e.g., Weinberger*, 457 A.3d at 714 (finding transaction "too involved to undo[]").

[931] JX-878 at 56 (2/8/18 Schedule 14A Proxy Statement).

[932] *Valeant*, 921 A.2d 732.

198

connection with a "later-aborted corporate restructuring."[933] All but one defendant settled before trial, and the court found that the remaining defendant failed to prove that the transaction was fair.[934] Although that defendant went all-in on the defense that the entirety of his bonus was fair and presented no evidence for why a portion of the bonus was more defensible than the remaining amount,[935] he asked that the court limit disgorgement "to the extent that the bonus was unfair."[936] The court rejected that argument given the defendant's failure of proof and ordered disgorgement of the entire amount.[937]

As in *Valeant*, Defendants heralded the Grant as fair but failed to meet their burden. They also failed to identify any logically defensible delta between the unfair Grant and a fair one. As a result, there is nothing in the record to allow the court to fashion a remedy that would order recission only to the extent the Grant was unfair. "Once a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."[938] Here, the wrongdoers are Defendants, and so the court resolves uncertainty against them.

---

[933] 921 A.2d at 735.

[934] *See id.* at 736.

[935] *Id.* at 744 (noting that the defendant "embrace[d]" the burden).

[936] *Id.* at 752.

[937] *Id.* at 752–53.

[938] *Dole*, 2015 WL 5052214, at *44 (quoting *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993)).

## III.    CONCLUSION

For the foregoing reasons, judgment is entered in Plaintiff's favor.  The parties are to confer on a form of final order implementing this decision and submit a joint letter identifying all issues, including fees,[939] that need to be addressed to bring this matter to a conclusion at the trial level.

---

[939] *See Pope Invs. LLC v. Marilyn Abrams Living Tr.*, 166 A.3d 912, 2017 WL 2774361, at *1 (Del. June 26, 2017) (TABLE) (holding that "a judgment on the merits is not final until an outstanding related application for an award of attorneys fees has been decided" (citing *Lipson v. Lipson*, 799 A.2d 345, 348 (Del. 2001))).